**In Re:**

*JAUSTON HUERTA, et al. vs*
*GREG EWING, et al.*

---

*GREGORY T. EWING, Sheriff*
*April 27, 2018*

---

*SWIFT REPORTING SERVICE*
*50 Fairhurst Court, Terre Haute, IN 47802*
*Phone: (812) 298-9224*
*Cell Phone: (812) 243-6418*
*donnalswift@gmail.com*

Original File ascii.gregtewing.txt
**Min-U-Script® with Word Index**

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION
NO. 2:16-cv-397-JMS-DKL


JAUSTON HUERTA, et al.,
    Plaintiffs,
    -vs-
GREG EWING, et al.,
    Defendant.


    The Deposition of GREGORY T. EWING, Sheriff of
Vigo County, Indiana, conducted in the above
entitled cause, pursuant to Notice to Take
Deposition and the applicable Federal Rules of
Civil Procedure, for and on behalf of Jauston
Huerta, et al., Plaintiffs, on the 27th day of
April, 2018, at the law offices of Wilkinson,
Goeller, Modesitt, Wilkinson & Drummy, LLP, 333
Ohio Street, Terre Haute, Vigo County, Indiana.


SWIFT REPORTING SERVICE
Donna L. Swift, Reporter
50 Fairhurst Court
Terre Haute, IN 47802
(812) 298-9224
Cell: (812) 243-6418
donnalswift@gmail.com

GREGORY T. EWING, Sheriff

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION
NO. 2:16-cv-397-JMS-DKL


JAUSTON HUERTA, et al.,
    Plaintiffs,
    -vs-
GREG EWING, et al.,
    Defendant.

     DEPOSITION OF GREGORY T. EWING, SHERIFF

          A P P E A R A N C E S

FOR AND ON BEHALF of JAUSTON HUERTA, et al.,
Plaintiffs:
               Kenneth J. Falk, Attorney
               ACLU of Indiana
               1031 E. Washington St.
               Indianapolis, IN 46202
               (317) 635-4059, Ext. 104
               kfalk@aclu-in.org

               Michael K. Sutherlin, Attorney
               SUTHERLIN & ASSOCIATES
               403 East Wabash Avenue
               Crawfordsville, IN 47933
               msutherlin@gmail.com


FOR AND ON BEHALF of GREG EWING, et al.,
Defendants:
               David P. Friedrich, Attorney
               WILKINSON, GOELLER, MODESITT,
               WILKINSON & DRUMMY, LLP
               333 Ohio Street
               Terre Haute, IN 47807
               Phone: (812) 232-4311
               DPFriedrich@wilkinsonlaw.com
               ***********************

               Donna L. Swift, Court Reporter
               SWIFT REPORTING SERVICE
               50 Fairhurst Court
               Terre Haute, IN 47802
               Phone: (812) 298-9224
               Cell: (812) 243-6418
               donnalswift@gmail.com

GREGORY T. EWING, Sheriff

3

1   GREGORY T. EWING, SHERIFF   ,

2                        being first duly sworn upon his oath

3                        to tell the truth, the whole truth,

4                        and nothing but the truth, deposes and

5                        states, as follows:

6   DIRECT EXAMINATION,

7   QUESTIONS BY KENNETH J. FALK, Legal Director, ACLU

8   Indiana, Attorney for Plaintiffs' Class:

9   Q    State your name, please.

10  A    Gregory Thomas Ewing.

11  Q    And you are the Sheriff of Vigo County. Is

12       that correct?

13  A    Yes, sir.

14  Q    And you have been deposed before?

15  A    Yes, sir.

16                  MR. FALK: I will not go through the

17                  drill then. You understand that this

18                  is a deposition, and everything is

19                  under oath?

20                  WITNESS: Yes, sir.

21                  MR. FALK: And if you don't understand

22                  my question, please let me know;

23                  otherwise, I'll assume you understand

24                  it.

25                  WITNESS: Yes.

GREGORY T. EWING, Sheriff

4

1   Q    And how long have you been Sheriff?

2   A    I took office January 1st of 2011.

3   Q    And prior to that time, were you involved in

4        law enforcement?

5   A    Yes. I started with the Sheriff's office in

6        1991, as a jail officer--a jailer, and in

7        October of 1992 I was appointed as a merit

8        deputy sheriff. I think it was 2003, Sheriff

9        Marvel's first year in office, he appointed me

10       as the chief of operations. I did that for

11       eight years until I was elected sheriff, if my

12       math is right.

13  Q    That is correct. ... I'm showing you what has

14       been marked as Exhibit #3. Do you recognize

15       that document?

16  A    Yes, I do.

17  Q    And it is a Deposition Notice, asking the

18       office of the Sheriff to designate a person to

19       testify as its designee in this deposition.

20       And you are that person?

21  A    Yes, sir.

22  Q    I want to talk a little bit about the physical

23       structure and capacities of the jail. There's

24       a part of the jail that was built in 1980. Is

25       that correct?

GREGORY T. EWING, Sheriff

5

1    A    That is correct.

2    Q    And then litigation was brought in 2000,

3         called Acosta vs. Harris. Is that correct?

4    A    Yes.

5    Q    And that led to an expansion of the existing

6         jail. Is that correct?

7    A    Yes, sir.

8    Q    And so frequently you will see in the

9         documents, new side/old side?

10   A    Yes, sir.

11   Q    Old side, 1980; new side, 2000. Is that

12        correct?

13   A    That is correct.

14   Q    The 2000 construction was not of a new

15        building. It was actually converting an office

16        building that was right next to the jail. Is

17        that correct?

18   A    Yes. It held the county offices originally,

19        and they were vacated, and that space was

20        turned into what we now refer to as "the new

21        side."

22   Q    And the old side is what is described as a

23        linear jail. Is that correct?

24   A    That is correct.

25   Q    And what does that mean?

GREGORY T. EWING, Sheriff

6

```
 1    A    That means you have basically the cells all in
 2         a row, and they open up into a day area. It's
 3         long. It's just a linear hall. It's probably
 4         wider than a hall.
 5    Q    And how many floors are in the old side?
 6    A    Of the whole building, or just the--
 7    Q    For the jail part where people are housed.
 8    A    For the jail, it's two floors.
 9    Q    And how about the new side?
10    A    It's two floors, with a third floor being
11         class rooms and recreation.
12    Q    If the old side is linear, how would you
13         describe the new side?
14    A    I would describe the new side as a wanna-be
15         pod jeweler type design.
16    Q    And what does that mean?
17    A    It means that you have a central control room
18         in the middle, and it's almost like a pie, if
19         you will, where that person who sits there can
20         actually look into each of the blocks or pods
21         and can see those all the way around.
22    Q    In the Acosta vs. Harris case, which I was
23         involved in, it was agreed that the rate of
24         capacity of the jail is 268. Is that correct?
25    A    Yes, sir.
```

GREGORY T. EWING, Sheriff

7

1    Q    And who is Kenneth Whipker?

2    A    He is the State General Inspector for our

3         area.

4    Q    And is that someone you consult with, as well,

5         about jail issues?

6    A    Yes, he is also our inspector.

7    Q    And do you rely on his expertise?

8    A    Yes, sir.

9    Q    And he does an annual report, which I'm sure

10        you've seen?

11   A    Yes, sir.

12   Q    And his annual report says the jail has 267

13        operational beds?

14   A    Yes.

15   Q    Did I make a mistake in Acosta by saying 268?

16   A    Well, I noticed that difference, too. I think

17        that--

18   Q    You can say, yes, by the way, that I made a

19        mistake.

20   A    I think it's where the padded cell is, because

21        we didn't use it. It had storage stuff, and

22        now it's being used again. I think it was,

23        wasn't, was.

24   Q    So right now in terms of beds in the jail, is

25        it 267 or 268?

GREGORY T. EWING, Sheriff

8

1   A    I would say 267.

2   Q    And operational beds, which is the term Mr.

3        Whipker used, and ready capacity, you view

4        those as the same. Is that correct?

5   A    Yes.

6   Q    I'm showing you what has been marked as

7        Exhibit #4. This is something that I think you

8        gave me some time ago in other litigation to

9        set out the various blocks and beds in the

10       jail.

11  A    Yes, sir.

12  Q    Is this still accurate?

13  A    Yes, sir.

14  Q    Good. Could you tell me which blocks are on

15       the new side, and which blocks are on the old

16       side?

17  A    Sure. A, B, C, D, E, F, G and H, are all the

18       old side. Then when you get to I, J, K, L, M,

19       N, O, and P, that is what we call the new

20       side. Hospital 1 and 2 is on the old side, as

21       is Solitary 1 and 2. Isolation 1, 2 and 3 are

22       in the booking area in the old side.

23  Q    So they are all on the old side then?

24  A    Yes, sir.

25  Q    It's been a while since I toured, but the jail

GREGORY T. EWING, Sheriff

9

1       is all cells. Is that correct? Are there any

2       dormitories?

3  A    No, there are no dormitories.

4  Q    And are the cells of different sizes, or are

5       some two, four?

6  A    Yeah. On the old side there is pretty much a

7       consistency of four bunks in each cell. Some

8       of the blocks, like A-Block, I think, is the

9       shortest of that because of the design. But

10      then you get over to the new side, and if I

11      didn't have this sheet in front of me, I would

12      have to go in there and physically tell you

13      how many beds are in this cell because of the

14      way it's--

15 Q    But looking at this, this tell us how many are

16      in each?

17 A    Absolutely.

18 Q    And is there a uniform size on the old side to

19      the cells that have four bunks? Do you know

20      what the sizes are?

21              MR. FALK: Do you know, did you measure

22              them when you were there?

23              MR. SUTHERLIN: I did not measure, but

24              they're small.

25 A    Yeah, the four, and then I think there are a

GREGORY T. EWING, Sheriff

10

1          couple in the corners that have like six bunks

2          in them. ... Well, obviously, one has eight.

3     Q    Right. And you said on the old side there is

4          like a day room?

5     A    Unhuh (affirmative response).

6     Q    That is an area immediately outside the cell

7          where there are tables?

8     A    Yeah, two tables along the bars, and then

9          there's a round table in the middle, which is

10         next to the shower which is by the television.

11    Q    So you have a shower and television and three

12         tables?

13    A    Yes.

14    Q    So it's a small space with those tables in

15         there. Is that correct?

16    A    Yes.

17    Q    And are the cells any larger on the new side?

18    A    I haven't measured them, but by looks I would

19         say they are larger, and the day area is

20         larger with more tables.

21              MR. FALK: Can we go off the record for

22              a second?

23              (OFF THE RECORD BRIEFLY)

24    DIRECT EXAMINATION, MR. FALK CONTINUES:

25    Q    Now, just talking about the number of

GREGORY T. EWING, Sheriff

11

1        permanent beds, if you add up all the numbers

2        there where it says "beds," with the exception

3        of hospital, solitary, isolation, it adds up

4        to 260.

5    A   Okay.

6    Q   So then the Hosp 1 and Hosp 2 are two beds

7        for, I assume, sick people?

8    A   Unhuh (affirmative response).

9    Q   And is there a separate hospital unit then?

10   A   It was a vending room, turned into a--

11   Q   They get put in there because they need to be

12       isolated?

13   A   Well, no, that's just where they evaluate.

14   Q   So that's for someone who is there short-term?

15   A   Yeah.

16   Q   I assume if they're seriously ill, they go to

17       the hospital?

18   A   Yeah. Oh, yes.

19   Q   And Solitary 1 and Solitary 2, are those

20       disciplinary cells?

21   A   Yeah, those are segregation cells.

22   Q   And then the Isolation 1, 2, and 3, are those

23       sort of suicide watch?

24   A   Yeah, they're right in the booking area, right

25       there where everybody comes in.

GREGORY T. EWING, Sheriff

12

1    Q    And so those seven beds are permanent beds,
2         but they're not beds that anyone is assigned
3         to on a long-term basis. Is that correct?
4    A    That is correct.
5    Q    So ideally, in a perfect world, which I
6         realize you do not operate in, those beds
7         wouldn't be counted?
8    A    I would agree.
9    Q    Because you need to have them, and need to put
10        people back where they were?
11   A    Yes, sir. Yes, in a perfect world.
12   Q    Now, and those are three different cells, Iso
13        1, Iso 2, Iso 3. Is that correct?
14   A    Yes.
15   Q    You said they're out in the booking area?
16   A    Yes.
17   Q    So "observance" is a visual observance?
18   A    Yeah, it's in that same hallway right across
19        from the booking counters.
20   Q    Is there audio or video observation?
21   A    Yes.
22   Q    Is there audio or video observation in the
23        Solitary 1, Solitary 2?
24   A    Yes, as is the hospital.
25                  MR. FRIEDRICH: Just to be clear, Greg,

GREGORY T. EWING, Sheriff

13

1                    I think it's all just video, isn't it?

2                    There's no audio, is there?

3    A    Yeah, the booking counter has the audio, but

4         not in each cell. There's no audio in the

5         cells.

6    Q    So what is the audio at the booking counter?

7         Where's the other end of it?

8    A    I don't understand.

9                    MR. FALK: Let's go off the record for

10                   a second.

11                   (OFF THE RECORD BRIEFLY)

12   DIRECT EXAMINATION, MR. FALK CONTINUES:

13   Q    Just to clarify. The Hospital 1, Hospital 2,

14        Sol 1, Sol 2, ISO is Isolation 1, Isolation 2,

15        Isolation 3, they have a video system there

16        connecting them with someone in the booking

17        area but not in audio. Is that correct?

18   A    Correct.

19   Q    Would you agree that correctional experts

20        agree, and do yourself agree that a jail is

21        overcrowded long before it gets to 100% of

22        capacity?

23   A    Absolutely agree.

24   Q    And is the figure 80%? Is that the figure?

25   A    That's a number I've heard, yes.

GREGORY T. EWING, Sheriff

14

1   Q    I think that's the one Mr. Whipker used?

2   A    That is.

3   Q    And do you agree that any jail, and your jail,

4        particularly, is overcrowded at 80%?

5   A    Yes.

6   Q    And why is that?

7   A    Well, the largest reason is you don't have

8        room to put people or classify them

9        appropriately where they belong, because when

10       you have every single bed filled how could you

11       possibly classify somebody?

12  Q    And when you talk about classification, what

13       are the areas that you would want to have

14       classification in? What is the breakdown,

15       ideally?

16  A    Well, obviously, by gender.

17  Q    Good call!

18  A    Obviously by gender, their level of crime

19       class, protective custody, which would be like

20       your child molesters, and so forth.

21  Q    People who might be injured by other people in

22       the jail?

23  A    By other inmates, correct. Then you have to

24       have, obviously, the cells open for

25       administrative segregation, and so forth.

GREGORY T. EWING, Sheriff

15

1  Q    And the type of prisoner who is put into

2       segregation is both administrative and

3       disciplinary. Is that correct?

4  A    That's right, yes.

5  Q    Disciplinary is when you do something wrong?

6  A    Correct.

7  Q    What is administrative segregation for?

8  A    Administrative segregation could be where

9       there hasn't been a finding of what events had

10      taken place, so they're just segregated until

11      there actually can be a hearing.

12 Q    And ideally would you also want to be able to

13      classify people who are mentally ill?

14 A    Yes.

15 Q    Somewhere they can be watched more closely?

16 A    Yes.

17 Q    The same with someone with disabilities?

18 A    Medical, too, yes.

19 Q    And you want to have the ability to move

20      people back and forth, obviously, right?

21 A    Yes.

22 Q    If they do something wrong, you want to be

23      able to get them into a different level or get

24      them into disciplinary?

25 A    Correct.

GREGORY T. EWING, Sheriff

16

1   Q    There is also the question of separtees. Is

2         that correct?

3   A    Yes.

4   Q    I know years ago I got some discovery from

5         your jail where there was a log of people in

6         the jail, and then next to them were their

7         separtees, people they could not be held with.

8         Some of them had ten people on the list,

9         right?

10   A    Very common, yes.

11   Q    So you have to make sure, ideally, that that

12         person is not with the other person, because

13         bad things would happen?

14   A    Yes.

15   Q    And sometimes they are separtee status,

16         because, for instance, the prosecutor says,

17         'We have five co-defendants here, and I don't

18         want them together?'

19   A    Correct. That is correct.

20   Q    I assume that happens a lot?

21   A    That happens quite a bit.

22   Q    And other separtees are people who have a

23         history of violence towards each other and it

24         would be dangerous for them to be together?

25   A    A history of violence, and another common one

GREGORY T. EWING, Sheriff

17

1          that we see is maybe somebody worked with the

2          drug task force, and assisted in a person

3          being in jail, and so you can't have them

4          together. Typically, those people are real

5          quick to tell you, 'I can't be with--.'

6    Q    And, also, I know from my history of dealing

7          with this that sometimes separtee are because

8          you have a relative of a victim of a crime in

9          jail, as well, with the alleged perpetrator?

10   A    Yes.

11   Q    And that happens frequently, I assume?

12   A    Yes.

13   Q    And what is the risk of not classifying

14         prisoners properly?

15   A    Well, at the most extreme, somebody could

16         really be injured and/or killed--at the most

17         extreme, just because of the reasons we

18         discussed to have that proper classification.

19         Then also you try not to want to blend a lower

20         level offender with your highest level

21         offenders, so that hopefully they don't learn-

22         -you know. As a parent, you wouldn't want your

23         child with a murderer, I suppose.

24   Q    Sure, sure. And I believe your testimony is

25         that when you get above that 80% mark, you

GREGORY T. EWING, Sheriff

18

1         can't do that type of classification?

2    A    No, sir.

3    Q    I asked you a double negative.

4    A    Oh, you did? Did I answer in a double

5         negative?

6    Q    I don't know. I'd have to figure it out, but

7         we'll correct it without having to figure it

8         out. When you get above that 80% figure, can

9         you do the classification you need to keep

10        everyone safe?

11   A    No, you cannot.

12   Q    And when I say "everyone safe," I'm asking not

13        just about the prisoners, but also your staff

14        who has to deal with the prisoners.

15   A    That is correct. You cannot. It becomes very

16        difficult.

17   Q    And is it fair to say that despite best

18        efforts, the jail population is sometimes over

19        that 267 amount, and it's always over the 80%

20        of that figure?

21   A    Yes, that is correct.

22   Q    Because 80% is like 2014?

23   A    Yes.

24   Q    And this is despite the fact that every day

25        the jail has to have arrangements to house

GREGORY T. EWING, Sheriff

19

1          some prisoners outside the county. Is that
2          correct?
3    A     That is correct.
4    Q     And I'm showing you what has been marked as
5          Exhibit #5. I will represent to you that among
6          many wonderful things I get every day in my
7          emails is the population report from your
8          jail. This is the population report from
9          November 1st through April 24th. I will show
10         what has been marked as Exhibit #6, which I
11         will represent to you is just a listing of the
12         various documents that make up the prior
13         exhibit.
14   A     Yes.
15   Q     I'm looking at Exhibit #6, and we have a
16         listing of current human beings actually in
17         the jail on that date. Is that correct?
18   A     That is correct.
19   Q     And the population reports around 8 o'clock in
20         the morning. Is that correct?
21   A     Yes.
22   Q     And then temporary are the number of prisoners
23         who are out of the jail, but in some other
24         jail. Is that correct?
25   A     That is correct.

GREGORY T. EWING, Sheriff

20

| | | |
|---|---|---|
| 1 | Q | And female is female, and male is male. ... |
| 2 | | What jails are you currently placing prisoners |
| 3 | | into from Vigo County? |
| 4 | A | We have Knox. That's where we have quite a |
| 5 | | few. Sullivan has a few. Parke and--Where did |
| 6 | | Charlie tell me? |
| 7 | Q | Charlie is the Jail Commander? |
| 8 | A | The Jail Commander, yeah. |
| 9 | Q | One other jail? |
| 10 | A | Another jail. There is another jail, and I |
| 11 | | can't remember what county he said though now. |
| 12 | Q | And how much are you paying? |
| 13 | A | Thirty-five dollars a day per inmate. |
| 14 | Q | And that doesn't include transportation and |
| 15 | | all that, the back and forth? |
| 16 | A | No, no. That does not. |
| 17 | Q | And do these jails have beds reserved for you, |
| 18 | | or do you, the Sheriff's Department, have to |
| 19 | | sort of get on the phone every day and say, |
| 20 | | 'How many do you have down there?' |
| 21 | A | That is absolutely correct. |
| 22 | Q | And so sometimes you have to go from county to |
| 23 | | county? |
| 24 | A | Yes. |
| 25 | Q | And are other counties trying to outbid you? |

GREGORY T. EWING, Sheriff

21

1           Do you have a situation where counties are
2           willing to pay more than $35?
3     A     I know Marion County would pay $45, if we
4           could hold anybody.
5     Q     So it's someone's job in the jail to sort of
6           be a booking agent to try and find places for
7           your people. Is that correct?
8     A     That is correct.
9     Q     And is that pretty much a full-time job?
10    A     It is a very, yes, time consuming, daunting
11          job, because there are ninety-one jails in the
12          State of Indiana.
13    Q     I know way back it was male prisoners who were
14          being sent out, but are you getting enough
15          population pressure from female prisoners that
16          they're leasing out now, too?
17    A     Yes.
18    Q     Is it fair to say that the pressure on the
19          jail, the number of human beings who have been
20          sent to you to incarcerate in the Vigo County
21          Jail, that that has been increasing over time?
22    A     Yes, it has.
23    Q     And why is that?
24    A     I suppose you could speculate on several
25          different things. What I'm seeing since I've

GREGORY T. EWING, Sheriff

22

1          been there, since I started back in '91, if
2          you don't mind me just kind of elaborating a
3          little bit--
4     Q    Please do.
5     A    What I see is the level of crime seems to be a
6          lot more aggressive than back in those early
7          days. Female population is going through the
8          roof, and I think you can attribute a lot of
9          that originally to meth. Now we're kind of
10         looking at the opioid crisis. I think, really,
11         if you looked at it hard, you would probably
12         see a lot of it as a result of drug abuse.
13    Q    And have you been burdened population-wise by
14         the change in Indiana law regarding the
15         housing of Level 6 prisoners?
16    A    We have.
17    Q    And what was that change?
18    A    I think it was House Bill 1006, if I'm not
19         mistaken, where they kind of rewrote
20         everything. We went from classes to levels.
21         What was once a D-Felony is now a Level 6
22         Felony, I believe, and will never see the
23         inside of a prison wall. They stay locally.
24    Q    They have to stay in the county?
25    A    In the county.

1 Q    And I know that you meet with other state
2      workers from the county: the judges, the
3      prosecutor, probation, et cetera, to try to
4      discuss ways of addressing the population?
5 A    Yes.
6 Q    And the pressure on the jail is increasing
7      despite all those efforts. Is that correct?
8 A    That is correct.
9 Q    Now, looking at Exhibit 4, the layout of the
10     blocks, are any of these blocks reserved for
11     particular prisoners, or is it all very
12     malleable because of your inability to
13     classify?
14 A   Yeah. For example, this would probably be the
15     easiest one, the females, let's say. I don't
16     know what our female count is today, but in
17     looking at these 42, 45, last year, an example
18     is, F Block has four beds, and in 1991 we were
19     lucky if we had four females. That was the
20     female block. Coincidentally it was F-Block.
21     That made it easy. Now we have to use the
22     longer blocks, because we have so many
23     females. We have the ability to move them into
24     larger and shrink them. The problem is, let's
25     say, B-Block has 22 beds. If I've got twenty-

GREGORY T. EWING, Sheriff

24

```
 1          six females, okay, now what? Do I shut down a
 2          block for the--
 3     Q    And so, sometimes you do. Sometimes you
 4          actually move men out of a block to bring
 5          females in?
 6     A    Yeah, that's what I was-- And vice versa. The
 7          same thing with protective custody. You know,
 8          depending on that number, where can we plug
 9          them in?
10     Q    And you're not going to be using Hospital 1,
11          Hospital 2, Solitary 1, Solitary 2, Isolation
12          1, 2 and 3. You're not going to be using those
13          for routine housing?
14     A    No.
15     Q    So you're moving however many prisoners you
16          have around 260 beds?
17     A    Yes.
18     Q    And, nevertheless, you try and have some
19          rudimentary classification. You try not to
20          classify people you know to be extremely
21          violent with people who are not?
22     A    Yes.
23     Q    And you try and house people who you know are
24          disabled, either mentally or physically,
25          together, so you can watch them?
```

GREGORY T. EWING, Sheriff

25

1   A   Yes. I don't know which pod it is today,

2       because, that, too, changes, but we try and

3       keep those people who have some type of

4       chronic medical issues together. It also makes

5       it easier for our nursing staff.

6   Q   But because of trying to do some rudimentary

7       classification, and because of the population

8       pressures, there are times when prisoners are

9       assigned to a block and they do not have a

10      permanent bed?

11   A   That is correct.

12   Q   And that happens every day. Is that correct?

13   A   That is correct.

14   Q   And so instead of a bed, they're given a

15      mattress and whatever one calls a "boat." Is

16      that correct?

17   A   That is correct.

18   Q   And the boat is just a plastic liner, where

19      the mattress fits in?

20   A   Yes.

21   Q   So the mattress is not on the floor, but the

22      boat is?

23   A   Yes.

24   Q   But it's a very thin plastic between the

25      mattress and the floor?

GREGORY T. EWING, Sheriff

26

1   A     That is correct.

2   Q     So every day there are multiple people in

3         boats in the jail?

4   A     Yes.

5   Q     Sometimes ten or twenty, or more?

6   A     Probably.

7   Q     Do you ever run out of boats that you know of?

8   A     Not that I've been told.

9   Q     The way the structure is of the jail, you have

10        the cells, and the cells lock. Is that

11        correct?

12  A     Yes.

13  Q     And they open into another locked area?

14  A     Yes.

15  Q     Which we've described as a day room, but at

16        least on the old side it's basically a very

17        small space with three tables, a TV, and a

18        shower?

19  A     Correct.

20  Q     And the larger side, I assume, is TV, shower,

21        but a little more room. Is that correct?

22  A     That is correct, yes.

23  Q     And during the day, are the cell doors

24        generally open?

25  A     Yes.

GREGORY T. EWING, Sheriff

27

1   Q    And so they're shut at what time, do you
2        think?
3   A    I think it's midnight.
4   Q    And they're open--
5   A    --at 7 a.m.
6   Q    Is there a bathroom? Are there toilets on the
7        outside in the day room? There's a shower, you
8        said, but is there a toilet?
9   A    No.
10  Q    So on the old side, where do I sleep if I'm in
11       a boat? Do I sleep on the floor in the cell,
12       or do I try and sleep in the day area?
13  A    Day area. The boats won't fit.
14  Q    In the cell?
15  A    In the cells.
16  Q    And the cell is locked?
17  A    No, the cell is not.
18  Q    So the cell is kept open so I have access to
19       the bathroom?
20  A    To a toilet, yes.
21  Q    And is there enough room in the old area? Is
22       there enough room for all the boats, or is it
23       sometimes basically boat, to boat, to boat?
24  A    I don't know that I've ever seen it boat-to
25       boat-to boat.

GREGORY T. EWING, Sheriff

28

| | | |
|---|---|---|
| 1 | Q | But I assume it's crowded, because they're |
| 2 | | underneath tables, right? Or next to tables? |
| 3 | A | Next to tables, yeah. There is some space. |
| 4 | Q | And then on the new side, they sleep in the |
| 5 | | cell? |
| 6 | A | Depending, yeah. A lot of those cells are |
| 7 | | bigger, so the boat will accommodate, yeah. |
| 8 | Q | Prisoners during the day frequently who have a |
| 9 | | bed go back to their cells to lay down, or |
| 10 | | read, or whatever. Is that correct? |
| 11 | A | That is correct. |
| 12 | Q | If you have a boat, you can't lay down, I |
| 13 | | assume. It causes a bit of a controversy if |
| 14 | | you try and put the boat down in the middle of |
| 15 | | the day room? |
| 16 | A | Yes. |
| 17 | Q | And I assume there have been disputes over |
| 18 | | that? |
| 19 | A | I would assume so. |
| 20 | Q | At the current time, how many staff people do |
| 21 | | you have responsible for the jail? How many |
| 22 | | deputies or jailers do you have? |
| 23 | A | I believe it's forty-five. |
| 24 | Q | Over three shifts. Is that correct? |
| 25 | A | That is correct. |

GREGORY T. EWING, Sheriff

29

1   Q    And does this include officers who transport

2        people back and forth?

3   A    Yes, it does.

4   Q    And how many officers are involved in that? By

5        "back and forth," I meant back and forth to

6        other jails.

7   A    To other jails? Well, at a minimum, two.

8   Q    And does this include officers who are

9        assigned to the Courthouse?

10  A    You mean as far as taking the prisoners over

11       to Court?

12  Q    Right.

13  A    Yeah, those are jail staff, too.

14  Q    And how many do that?

15  A    It depends on the size of the chain. Normally,

16       two.

17  Q    Now, I'm showing you what has been marked as

18       Exhibit #7. Have you seen that before?

19  A    Yes, I have.

20  Q    And that was a staff analysis done by Bill

21       Wilson. Is that correct?

22  A    That is correct.

23  Q    And I don't know what Bill's position was at

24       the time, but he was formerly the head jailer

25       down in Monroe County. Is that correct?

GREGORY T. EWING, Sheriff

30

1    A    That is correct.

2    Q    And he currently works for the Indiana State

3         Sheriffs Association?

4    A    Yes.

5    Q    But he was doing a jail staff analysis with

6         materials supplied by the National Institute

7         of Corrections. Is that correct?

8    A    Yes.

9    Q    And before we talk about that, I'm showing you

10        what has been marked as Exhibit #8. This was

11        given to me by your attorney yesterday.

12   A    Yes.

13   Q    I will tell you, it looks like it's staffing

14        at the jail from 2015 through the current

15        time. It does look like you have gotten more

16        staff. Is that correct? I can't read it very

17        well.

18   A    This is the what the county calls the Form

19        144, where the employees are listed when

20        they're preparing the budget. The only thing

21        that I would say has changed in this from 2015

22        to today is somewhere in those years we did

23        add. I have requested funding for more staff,

24        but the one thing the Council did approve was

25        a line for part-time jail staff. So that might

GREGORY T. EWING, Sheriff

31

1        be where you see a change, but full-time has

2        been flat.

3   Q    For how long?

4   A    Long. A long time.

5                 MR. FALK: Could we go off the record

6                 for a second?

7                 (OFF THE RECORD BRIEFLY)

8   DIRECT EXAMINATION, MR. FALK CONTINUES:

9   Q    Before we go through some other more specific

10        stuff, you had indicated that you--I can't

11        remember how you said it--but you basically

12        said you've asked repeatedly for more staff?

13  A    Yes.

14  Q    And that's every year to the Council?

15  A    Yes.

16  Q    And did you do that in a form of a proposal of

17        how many more people you need?

18  A    Yes.

19  Q    And how many have you asked for?

20  A    I have actually submitted this very Exhibit #7

21        to them in my budgetary paperwork for the

22        last-- Well, since we did this.

23  Q    And you indicated that you currently have

24        forty-five people as jail staff?

25  A    Yes.

GREGORY T. EWING, Sheriff

32

1    Q    And that includes, not just the line jail
2         officers, but also the shift supervisor, the
3         sergeants, et cetera?
4    A    Yes, it does.
5    Q    Looking at the report, Exhibit #7, first of
6         all, you've read the report?
7    A    Yes.
8    Q    And do you agree with its analysis?
9    A    Yes.
10   Q    And there is a breakdown on Page 17 of Exhibit
11        #7 of staffing that is necessary, and staffing
12        that is in existence. The total listed at Page
13        17 of Exhibit #7 is 40 staff in the jail. Do
14        you see that?
15   A    Yes.
16   Q    And what Mr. Wilson estimated was 66.5?
17   A    Yes.
18   Q    And so in looking at those two figures, and
19        understanding that he broke those down, your
20        current positions are 45. Is that correct?
21   A    Yes.
22   Q    And does that include any part-time?
23   A    No, that does not.
24   Q    How many part-time positions do you have?
25   A    ... It's just like a lump bucket of money per

GREGORY T. EWING, Sheriff

33

1       hour.

2   Q   So what does it add up to in terms of money?

3   A   I think it's like six.

4   Q   And they would probably be included in your

5       figure of the total number of people in the

6       jail. Is that correct? That six? So we're

7       talking 51 people?

8   A   Yeah. They're not probably listed. Well, they

9       wouldn't be in this, because that was before

10      that.

11  Q   Right. But I mean in terms of trying to

12      reconcile the total number Mr. Wilson had,

13      which is 66.5, you tell me there are 45, but

14      you have an additional probably 6 or so part-

15      time?

16  A   Yeah.

17  Q   Adding up to six positions?

18  A   But probably not six full-time positions is

19      the problem.

20  Q   So somewhere between 45 and 51 is where you

21      are now?

22  A   Yeah.

23  Q   So you're still far short of what he said. I

24      should say, just to be scrupulously honest, I

25      think it's a typo. I don't think it's 66.5. I

GREGORY T. EWING, Sheriff

34

1          think it's 65.5, but he has 66.5, so that's

2          fine.

3    Q     And so you've asked the Council for more money

4          to get to the 66.5?

5    A     Yes, based on this.

6    Q     And you've done that every year since the

7          report?

8    A     Yes.

9    Q     And you probably were asking for more staff

10         before the report, because you look like a

11         complaining sort of guy!

12   A     Yeah.

13   Q     So you've been asking every year for more

14         staff?

15   A     Yeah.

16   Q     And I suspect Sheriff Marvel, when he was

17         Sheriff, was asking for more staff, too?

18   A     I would assume.

19   Q     And this is a request that you make directly

20         to the Council. It doesn't go through the

21         Commissioners?

22   A     Right, to the Council.

23   Q     So just going through what Exhibit #7, the

24         report, notes is a problem that occurs in the

25         jail because of lack of staff. At Pages 10

GREGORY T. EWING, Sheriff

35

1      through 11, Mr. Wilson talks about the

2      difficulty in classification and the risks

3      that causes because of staffing deficiencies,

4      as well as population?

5    A   Yes.

6    Q   Is that still the case?

7    A   Yes.

8    Q   And at Page 2, Mr. Wilson says in summary form

9      that an analysis of the current staffing

10     levels revealed that the Vigo County Jail does

11     not presently have sufficient staff resource

12     hours to patrol the jail, conduct important

13     security operations, such as routine cell

14     searches, and staff important areas of the

15     jail, such as infirmary and control rooms. Is

16     that still the case?

17   A   Yes.

18   Q   Even with your staff that you have today?

19   A   Yeah. It has helped, but it's, again, part-

20     time.

21   Q   And it's still a deficiency that you note?

22   A   Yes.

23   Q   If you look at Page 7, and if you'll just read

24     to yourself the three paragraphs, one going

25     onto Page 8, beginning with, "The majority."

GREGORY T. EWING, Sheriff

36

1          If you could just read those.

2    A    (Witness complies with request).

3    Q    Is that all still true?

4    A    That is all still true.

5    Q    Is there anything in this report that is still

6         not true?

7    A    No, it's still all about the same.

8    Q    On Page 10 of the report, the paragraph at the

9         top of the page, "Health and welfare checks?"

10   A    Unhuh (affirmative response).

11   Q    Is that still a problem being able to

12        adequately do health and welfare checks?

13   A    We have added a system. I don't know what it's

14        called. It's where they have to go through and

15        punch a thing, but it's only as good as the

16        staff to hold the dang thing to do the welfare

17        checks.

18   Q    Right, and if the staff has the time to do the

19        welfare checks.

20   A    Right. We've tried to improve that area, but

21        it falls back on short staff.

22   Q    So it's still a problem because of staffing

23        deficiencies?

24   A    It's still a problem, yes.

25   Q    On Page 23 of the Report there's a Deficiency

GREGORY T. EWING, Sheriff

37

1         Table listed. Would you agree these are still
2         areas of deficiencies, where a lack of
3         staffing contributes to the deficiency?
4    A    Yes, absolutely.
5    Q    And as a final, almost final, on Page 26, the
6         short paragraph in the middle that begins
7         with, "Observations." Given the overcrowding
8         and the physical structure of the jail, and
9         the staffing patterns, this is still the case.
10        Is that correct?
11   A    That is still the case.
12   Q    And then, finally, on Page 27, the "In
13        addition" paragraph. Are those all still
14        problems in the jail at the current time?
15   A    Yes, it is.
16   Q    Now, we'll talk a little bit more, obviously,
17        about the jail and the problems there, but can
18        the problems in the jail, as you see them, be
19        rectified by hiring more staff? I understand
20        that things might get better, but can the
21        problems be solved?
22   A    No.
23   Q    Why is that?
24   A    Because we're at 100 plus percent capacity.
25   Q    And the physical structure of the jail, as Mr.

GREGORY T. EWING, Sheriff

38

```
 1        Wilson has noted, and I think as you've noted,
 2        is very staff intensive. Is that correct?
 3    A   It is very staff intensive.
 4    Q   Particularly in the linear part of the jail,
 5        the only way to see what's going on is for you
 6        to go see what's going on. Is that correct?
 7    A   Yes.
 8    Q   I think you have some cameras in the linear
 9        parts, but they don't give you a 100% view of
10        the--
11    A   No, by design. There are cameras in there, but
12        you have to physically go in.
13    Q   And there are no microphones?
14    A   No microphones.
15    Q   No audio?
16    A   No intercom.
17    Q   Now, in the newer side, you actually can look
18        down and see what's going on?
19    A   Yes.
20    Q   Can you look into the cells?
21    A   No. There are no cameras in those cells.
22        They're designed so you can at least look at
23        the frontage of the doors.
24    Q   But there is still a need to check in
25        frequently?
```

GREGORY T. EWING, Sheriff

39

1   A    Sure, absolutely.

2   Q    And that's a problem with staff?

3   A    That absolutely is.

4   Q    There is an indoor and outdoor recreation area

5        in the jail. Is that correct?

6   A    Yes, sir.

7   Q    And are they both being used?

8   A    Yes, sir.

9   Q    And do you agree that in the small areas

10       outside the cell, especially on the old part,

11       the day room, there is little or no

12       opportunity to engage in physical vigorous

13       exercise. Is that correct?

14  A    I would agree.

15  Q    Especially with lots of people there?

16  A    Yes.

17  Q    And there is a benefit to recreation for

18       prisoners?

19  A    Yes.

20  Q    And in the private settlement agreement in

21       Acosta, we agreed that prisoners were to have

22       an opportunity for recreation outside their

23       cell area for at least three hours a week,

24       including outdoors, weather permitting. Is

25       that correct?

GREGORY T. EWING, Sheriff

40

| | | |
|---|---|---|
| 1 | A | Yes, that is correct. |
| 2 | Q | And Acosta also put the cap of 268 on the |
| 3 | | jail. Is that correct? |
| 4 | A | Yes. |
| 5 | Q | And in a prior deposition, this, I think is |
| 6 | | our third or fourth, in the last deposition we |
| 7 | | did in July of last year, you agreed that the |
| 8 | | jail was not able to get prisoners rec three |
| 9 | | hours a week regularly because of staffing and |
| 10 | | overcrowding. |
| 11 | A | That is correct. |
| 12 | Q | Is that still a problem? |
| 13 | A | It is still a problem. We've tried to increase |
| 14 | | that, but we just fall short in staffing. |
| 15 | Q | And your attorney has recreation logs for us |
| 16 | | to look at, but I assume we'll see, if they're |
| 17 | | like the ones from last year, that some people |
| 18 | | don't get out and some people get out there |
| 19 | | rarely. Is that correct? |
| 20 | A | Yes. |
| 21 | Q | And, again, that's a product of overcrowding |
| 22 | | and staffing? |
| 23 | A | Yes. |
| 24 | Q | And I assume prisoner movement is even |
| 25 | | difficult when you're dealing with lots of |

GREGORY T. EWING, Sheriff

41

```
 1              prisoners and not enough staff. Is that
 2              correct?
 3    A    Everything is difficult, yes.
 4    Q    When recreation is offered, is it offered to
 5         the whole block, or sometimes are there too
 6         many people on the block for recreation to
 7         accommodate the whole block?
 8    A    No, the whole block is offered it.
 9    Q    And is there times when it's so crowded that
10         there's not a lot of recreating to do when
11         they get to the area?
12    A    No. The area is rather large, yeah.
13    Q    But it's just a question of getting them to
14         the area?
15    A    Yes.
16    Q    And so it's fair to say that because of
17         overcrowding and staff and physical structure,
18         there are many prisoners who are not afforded
19         regular recreation. Is that correct?
20    A    I would agree.
21    Q    And what problems has this caused?
22    A    With not letting them go to rec, they can't
23         burn off steam or whatever may be. It's just
24         kind of a mental wellness type of thing, too.
25         You know, locked inside a room where you only
```

GREGORY T. EWING, Sheriff

42

1   have limited movement, it does let them get

2   out. So that does reduce the agitation level,

3   fights, and all that stuff. You can attribute

4   recreation to a calmer facility.

5 Q You see a direct correlation between

6   recreation and prisoners not getting into

7   fights?

8 A Absolutely.

9 Q And, conversely, you see fights when prisoners

10   are not getting recreation?

11 A Absolutely.

12 Q So part of your jail is almost forty years

13   old?

14 A Yes.

15 Q Is there a problem from just a maintenance

16   standpoint of keeping the jail going?

17 A Yes.

18 Q We talked before you. We talked with County

19   Council, and they talked about money going to

20   HVAC and other systems. Is this just a

21   constant? Are things constantly breaking down?

22 A Yes, sir. They are constantly.

23 Q And are there similar problems in the newer

24   part of the jail, since it's newer only

25   relative to the older part?

GREGORY T. EWING, Sheriff

43

| | | |
|---|---|---|
| 1 | A | Yes. It's starting to develop the same. |
| 2 | Q | Does the fact that the newer part wasn't built |
| 3 | | as a jail, that it was actually an office |
| 4 | | building, contribute to wearing down or |
| 5 | | physical structure problems? |
| 6 | A | Yes, I would agree with that. We have had |
| 7 | | issues with the conversion over time. |
| 8 | Q | Are those issues like plumbing and HVAC stuff? |
| 9 | A | Not so much that. Just the design. |
| 10 | Q | It's not really designed as a jail? |
| 11 | A | No. |
| 12 | Q | So even though it's better than the old part, |
| 13 | | it's not ideal. Is that correct? |
| 14 | A | That is correct. |
| 15 | Q | I'm showing you what has been marked as |
| 16 | | Exhibit #2. It's a statement by a subversive |
| 17 | | Vigo County resident. No, actually, this is a |
| 18 | | statement by your predecessor, right? |
| 19 | A | Yes, that is correct. |
| 20 | Q | Commissioner Marvel was your immediate |
| 21 | | predecessor? |
| 22 | A | Yes. |
| 23 | Q | And you've seen this before. Is that correct? |
| 24 | A | Yes. |
| 25 | Q | I think this was handed out. I just got it, I |

GREGORY T. EWING, Sheriff

44

1          think, at one of the public meetings either

2          last year or the year before. I don't

3          remember.

4     A    I don't remember either.

5     Q    Do you agree with what he says in terms of the

6          facts?

7     A    I would only dispute the first one, that the

8          jail in its original construction in 1982 was

9          only designed for like 83 beds. Then they

10         double bunked it before they ever occupied it

11         to its 133.

12    Q    So the jail was overcrowded from the get-go?

13    A    From the very first block.

14    Q    So the actual cells, which we'll get the

15         measurements of, were actually designed for

16         one person?

17    A    One or two.

18    Q    But it was doubled up right away?

19    A    Yes.

20    Q    And he notes that the demand exceeded

21         available capacity by an average inmate count

22         of 78 inmates per day. I'm not quite sure what

23         he was referring to. You're not transporting

24         78 people, but, when you take into account the

25         80% figure, you are certainly 78 or more over

GREGORY T. EWING, Sheriff

45

1           capacity every day. Is that correct?

2   A    Yes, that is correct.

3   Q    And he talks in the third paragraph from the

4        bottom that a recent evaluation-- Do you see

5        that one?

6   A    Unhuh (affirmative response).

7   Q    Would you agree that the facility is in a

8        steady state of deterioration--advanced state

9        of deterioration?

10  A    I would agree.

11  Q    With major deficiencies in HVAC, structural

12       and electrical systems?

13  A    Yes.

14  Q    So the county is spending enormous amounts of

15       money to try and keep this place running, but

16       it's tough. Is that correct?

17  A    Yes.

18  Q    So what kind of problems do you have?

19  A    Well, one of the largest problems we have is

20       the plumbing in the facility, and mostly on

21       the old side. The plumber is there almost

22       every single day, patching leaks.

23  Q    The prisoners have noted that sometimes floors

24       are wet, and what-have-you, and obviously

25       sometimes prisoners do things to make floors

GREGORY T. EWING, Sheriff

46

1         wet, but you're saying that it's just because

2         of the antiquated plumbing that you see that?

3    A    Yeah, and a lot of that is stuff that is

4         behind the scenes or behind the walls, or

5         whatever like that. The toilets, I've been

6         told by the plumber, in the old side cells, we

7         have to buy some kind of retro part, because

8         they don't even make pieces for the toilets we

9         have now.

10   Q    Are the toilets in the cells the individual

11        unit?

12   A    Combi.

13   Q    Are the toilets in the cells the units, a sink

14        unit with a toilet?

15   A    Yeah, the combi unit.

16   Q    And do you have problems with a leaking roof?

17   A    Well, now, we did, and I complained enough to

18        the Council, and they spent the money to put a

19        new roof on.

20   Q    And there is a concern, which I know the State

21        Jail Inspector, Mr. Whipker, has articulated

22        in reports that there's a certain number of

23        toilets and showers you're supposed to have

24        per prisoner, and you obviously are way over

25        that because of the number of prisoners you

GREGORY T. EWING, Sheriff

47

1       have?

2    A    Yes.

3    Q    So do you see the shower getting overused and-

4         -

5    A    Everything is taxed beyond its design.

6    Q    And things like a lack of toilet, or a running

7         toilet, or lack of shower or running shower,

8         is that a source of tension among prisoners?

9    A    Well, I would imagine it would have to be.

10   Q    And so there are times when the prisoners were

11        sleeping on the boats or sleeping on floors

12        that are wet?

13   A    Could potentially be.

14   Q    From toilets?

15   A    Could potentially be.

16   Q    There are lighting issues, that your lighting

17        isn't very strong in certain areas in the old

18        part. Is that correct?

19   A    That is correct.

20   Q    And is that a problem from a security

21        standpoint, or is it comfort for the prisoner?

22        Or both?

23   A    Probably both.

24   Q    And I know Mr. Whipker, who I spoke to,

25        mentioned to me concerns about air exchange,

GREGORY T. EWING, Sheriff

48

1          especially in the old side, that you're not

2          getting enough good air in?

3     A    Yes.

4     Q    Is that something that's noticeable?

5     A    You know, they measure that cubic feet per

6          whatever the measurement is. I don't recall

7          off the top of my head what it is, but it

8          could be better. You can see and feel air

9          movement, but it's probably not where it

10         should be.

11    Q    Are there other problems with the physical

12         structure at the jail?

13    A    Where do you want me to begin?

14    Q    Sure, wherever you want.

15    A    The plumbing is definitely the number one

16         issue we have. But just the kitchen.

17    Q    Tell me about the kitchen. Your food is

18         prepared by a private company Canteen. Is that

19         correct?

20    A    Canteen Correctional Services out of Michigan.

21    Q    But the kitchen, I assume, was built for a

22         certain number of prisoners?

23    A    The kitchen was built in 1982. Remember, for

24         83, right, then double-bunked everything to

25         133. Then they moved the Annex out, turned

GREGORY T. EWING, Sheriff

49

1       that into jail cells, and doubled our capacity

2       to 267-268.

3   Q   Right. So what problems did that cause the

4       kitchen?

5   A   They didn't do anything to the kitchen.

6   Q   So what does that mean?

7   A   That means they're doubling the meals that

8       they have to produce three times a day in a

9       cramped tight place. We had to completely redo

10      the kitchen, because the tiles were coming up.

11      Most of that I paid for out of the commissary

12      account.

13  Q   Is there a problem delivering food to

14      prisoners just because of how long it takes?

15      Are prisoners getting food delayed?

16  A   No. We're up on that. They get it out and get

17      it. It's just everything is very tight. We

18      could actually use probably more utensils, I

19      would imagine. I'm not a chef, by no means.

20      We've tried to add different pieces to help

21      food service. Like, for example, a mixer. We

22      have one mixer, okay? Probably we should have

23      two mixers, stuff like that, if that one

24      breaks.

25  Q   And so are there times that food services, if

GREGORY T. EWING, Sheriff

50

1       not disrupted, is at least different than it's
2       supposed to be because of things breaking
3       down?
4   A   Yes.
5   Q   And sometimes it's disrupted for a period of
6       time?
7   A   Yes. Or if the one dishwasher breaks.
8   Q   That could be a problem.
9   A   Yeah.
10  Q   Your medical and mental healthcare is provided
11      by whom?
12  A   Quality Correctional Care out of Muncie, I
13      think.
14  Q   And I assume there's a kite system, where
15      prisoners will ask to be seen?
16  A   Yes.
17  Q   And is that reviewed by staff? What happens
18      there?
19  A   It's on a kiosk inside, and they can do a
20      medical request, which goes then somehow to
21      the actual nurses station or the nurses
22      office. Then she can review the issue.
23  Q   And do you have twenty-four hour medical care
24      in the jail?
25  A   I have a twenty-four hour nurse.

GREGORY T. EWING, Sheriff

51

1    Q    And what about mental health care? Is there a
2         mental health person?

3    A    There is. We actually have two. QCC, Quality
4         Correctional Care, has a guy, and I don't know
5         his name, who comes in on a regular basis. We
6         also have Hamilton Center that is there.
7         Virgil Mackey, who is there almost--I see him
8         all the time at the jail.

9    Q    So he's frequently there during the day?

10   A    Yes.

11   Q    But no one at night?

12   A    No.

13   Q    And from your perspective, does the increased
14        population sometimes result in delays in
15        getting medical care or triaging people?

16   A    Ask that question again so I'm following you?

17   Q    Sure. Does the number of prisoners in the jail
18        affect how quickly they are seen for medical
19        care?

20   A    I don't know that I would say the
21        "quickliness" or timeliness of it, but because
22        of the design and people spread throughout the
23        place would probably attribute to medicine
24        dispensing and so forth. It's just a catacomb
25        of three jails.

GREGORY T. EWING, Sheriff

52

1   Q    Could there be a delay in getting services

2        just because of having to negotiate all that?

3   A    Certainly not emergency services, by no means.

4        I don't know that I would say that the delay

5        would be any different than if you would wait

6        in a doctor's office. Now, if he punches in at

7        1 a.m., unless it's emergent, but non emergent

8        it's going to go to probably the daytime.

9   Q    And the kiosk is reviewed right away, the

10       medical request?

11  A    As far as I understand it, yes.

12  Q    Looking back at Exhibit #2, which is the

13       statement by Mr. Marvel, the second to last

14       paragraph, beginning with, "The limited

15       capacity--," would you agree with this

16       paragraph?

17  A    Yes.

18  Q    And would you agree that despite the best

19       efforts of you and your staff that both staff

20       and inmate safety and security are imperiled

21       by the current conditions at the jail?

22  A    I would absolutely agree.

23  Q    And due to the nature of prisoners in

24       confinement, it's inevitable that there are

25       going to be fights between prisoners?

GREGORY T. EWING, Sheriff

53

1    A    True.

2    Q    And modern jails have, among other things,

3         audio and video systems to monitor prisoners

4         at all times?

5    A    True.

6    Q    You don't have that. Is that correct?

7    A    No.

8    Q    And therefore, without this monitoring,

9         violence and injury and other problems can and

10        do occur. Is that correct?

11   A    Yes.

12   Q    And the risk of prisoner injury increases with

13        the population?

14   A    Yes.

15   Q    Both because of just raw numbers, and also

16        tensions rise as people are cramped into a

17        limited space?

18   A    On both sides, staff and inmates.

19   Q    So we currently have a situation where

20        prisoners in the jail are getting into fights

21        and suffer injuries at times?

22   A    Yes.

23   Q    And sometimes that's caused because of your

24        inability to classify people who shouldn't be

25        together. Is that correct?

GREGORY T. EWING, Sheriff

54

1    A    I would agree.

2    Q    Sometimes it's caused by inability to

3         supervise?

4    A    I would agree.

5    Q    And sometimes it's caused just by too many

6         people in too small a space?

7    A    I would agree.

8    Q    And this, obviously, I should say, rolls back

9         on your staff?

10   A    Yes.

11   Q    Sometimes prisoners act aggressively toward

12        staff?

13   A    Yes.

14   Q    And in a crowded jail they're going to act

15        more aggressively just because of the problems

16        we've talked about?

17   A    That is correct.

18   Q    And therefore the likelihood of prisoner and

19        staff negative or violent interactions

20        increases because of the jail's population and

21        physical structure. Is that correct?

22   A    That is correct.

23   Q    Do you have a turnover problem with staff?

24   A    Yes, we do.

25   Q    And my experience is that crowded jails have

GREGORY T. EWING, Sheriff

55

```
 1          turnover problems, because they are not the

 2          best place to work?

 3    A     That is correct.

 4    Q     And therefore you get new people in who aren't

 5          as good at dealing with the prisoners, and you

 6          enter this sort of vicious cycle of difficult

 7          interactions or inappropriate interactions

 8          between staff and prisoners?

 9    A     That is correct.

10    Q     Do you keep incident reports?

11    A     The jail? Yes, we do.

12    Q     And you will document any physical

13          interactions, or any sort of interaction,

14          between staff and prisoners. Is that correct?

15    A     Yes, that is correct.

16    Q     And any sort of interaction between prisoner

17          and prisoner that is deemed to be

18          inappropriate?

19    A     Yes.

20    Q     However, there are undoubtedly problems that

21          occur that you don't know about because of

22          your structure of your jail and the inability

23          to supervise. Is that correct?

24    A     That would be correct.

25    Q     And I'm sure you have the experience
```

GREGORY T. EWING, Sheriff

56

1       frequently, as I've heard about, prisoners

2       claiming after they have gotten beaten up that

3       they fell. They obviously don't want to make

4       waves in reporting it. Is that correct?

5  A   That is correct.

6  Q   And you have no way of knowing what happened?

7  A   That is correct, unless it happened to be in

8       the area where we had a video.

9  Q   And we're talking about physical violence, but

10       there is also the problem with prisoners

11       needing prompt attention because of medical or

12       other emergencies, and that is a difficult

13       situation, as well. Is that correct?

14  A   It is very difficult.

15  Q   Because in that sort of situation, you have to

16       depend somehow on the prisoner, if he or she

17       isn't able to get out of their cell, somehow

18       alerting other prisoners who are then willing

19       to alert your staff, and then you have to have

20       staff able to respond?

21  A   Yes. The old side, in particular, because it

22       has no intercom system to alert.

23  Q   And that all impacts negatively on prisoner

24       safety?

25  A   Yes.

GREGORY T. EWING, Sheriff

57

1    Q    And the physical structure of the jail also

2         can and has contributed to prisoners being

3         injured, and prisoners on the floor have been

4         hurt because people step on them?

5    A    Yes.

6    Q    Inadvertently or "advertently," if that's a

7         word. Correct?

8    A    Correct.

9    Q    And, to some extent, prisoners are injured

10        because of lack of exercise and can cause

11        emotional problems. Is that correct?

12   A    Sure.

13   Q    And physical problems if it goes on long

14        enough. Is that correct?

15   A    Sure.

16   Q    There are wet floors in the jail, on which

17        prisoners slip and fall. Is that correct?

18   A    Yes.

19   Q    If there was a fire, or another emergency, a

20        tornado bearing down on the jail, what would

21        you do to evacuate prisoners?

22   A    Well, the plan with the staff that we have, we

23        would start, depending on where the disaster

24        is, to move them down and through and into the

25        sallyport areas. We have steel doors then that

GREGORY T. EWING, Sheriff

58

1       they can trigger and shut that down to keep

2       the smoke from coming that direction now.

3   Q   Is that your worst nightmare?

4   A   That would be, yes.

5   Q   Why?

6   A   Because how am I going to put 268 people in a

7       small sallyport? There's no plan.

8           MR. SUTHERLIN: You have no plan, you

9           say?

10  A   No, no, no. I'm saying there was no plan when

11      they did this renovation. You've doubled the

12      people. What am I supposed to do? I suppose we

13      could just open the floodgates and--

14  Q   And that would be interesting, too. ... So we

15      have overcrowding. We have jail design. We

16      have lack of staff. Is there anything else

17      that impacts negatively on the jail's ability

18      to care for its prisoners?

19  A   Those are probably the three paramount things

20      that have to be in place, in my opinion, to

21      run an efficient safe and secure facility.

22  Q   In the Acosta case, are you aware that it was

23      agreed upon in a private settlement agreement

24      that the jail would house no more than 268

25      people, and people would get out of their

GREGORY T. EWING, Sheriff

59

1        cells for recreation outside their immediate

2        cell areas at least three hours a week. Is

3        that correct?

4    A   That is correct.

5    Q   And we've discussed that three hours a week

6        isn't happening. Your population report

7        indicates even at 268, which I think we agree,

8        is 20% over capacity?

9    A   Yes.

10   Q   Sometimes that's not met as well. Is that

11       correct?

12   A   That is correct.

13   Q   Last summer when we spoke in a deposition, you

14       indicated that you saw no remedy other than

15       building a new jail.

16   A   That is correct.

17   Q   This is not a situation where the existing

18       structure can be rehabbed?

19   A   No, there is no way.

20   Q   And I assume you still agree that there needs

21       to be a new jail?

22   A   I do agree.

23   Q   The County has been talking for years about

24       building a new facility. Is that correct?

25   A   That is correct.

GREGORY T. EWING, Sheriff

60

1  Q    We discussed with a representative of the
2       Council the fact that there was a formal
3       ordinance proposed by the Commissioners last
4       year that would have built the jail that had
5       been recommended by the DLZ Corporation, which
6       would have had 500 plus beds. Is that correct?
7  A    Yeah, I believe.
8  Q    That foundered. At the current time, the
9       Commissioners propose, and the Council funded,
10      a study by Dr. Ray and RJS Justice Services?
11 A    Yes.
12 Q    Have you met with them?
13 A    Yes, I have.
14 Q    And my understanding is they are doing an
15      assessment of the criminal justice system in
16      Vigo County, obviously with an eye on
17      relieving pressures on the jail, but seeing if
18      a new jail needs to be built?
19 A    Yes.
20 Q    And have you discussed with them their
21      preliminary conclusions? They don't have a
22      final report yet.
23 A    Yes, I have.
24 Q    And who have you talked with?
25 A    I've talked with Dr. Ray extensively.

GREGORY T. EWING, Sheriff

61

1   Q   And what did Dr. Ray indicate?

2   A   He indicated to me that in the preliminary

3       numbers, the DLZ's report is not way out of

4       line.

5   Q   The DLZ went out, I think, twenty-five years

6       or twenty years?

7   A   I think it's twenty.

8   Q   Twenty years?

9   A   Yeah, I'm pretty sure twenty.

10  Q   But did Dr. Ray have a comment on the current

11      facility?

12  A   I believe that he said a D-9 bulldozer.

13  Q   He saw that you needed a new jail?

14  A   Yeah. He said it's a crisis situation.

15  Q   And the only question then is how big to make

16      it, considering how far off you want to

17      project?

18  A   Right.

19  Q   And I think the representative counsel

20      indicated that he had heard--I don't mean to

21      represent what he said, but that basically he

22      indicated he thought ten years because Dr. Ray

23      had indicated that after that it becomes kind

24      of fuzzy?

25  A   And I have not heard that from him, but heard

GREGORY T. EWING, Sheriff

62

1           it indirectly, too.

2    Q     But even at ten years, you need a jail that's

3           massively larger than the jail you have now?

4    A     Absolutely.

5    Q     And it's quite possible that if the jail is

6           built along modern standards, with a true

7           modular setup, your staffing needs might not

8           be as acute as they are now because you would

9           need less staff to supervise. Is that correct?

10   A     It would be more efficient.

11                   MR. SUTHERLIN: Can we go off the

12                   record?

13                   (OFF THE RECORD).

14   DIRECT EXAMINATION, QUESTIONS BY MICHAEL K.

15   SUTHERLIN, Attorney for Plaintiffs:

16   Q     Would you look at Exhibit #7, which is the

17          Jail Analysis, please? Page 17. At the time

18          this was prepared, you had a different medical

19          provider, did you not? In 2013?

20   A     Yes, probably did.

21   Q     And so that medical provider went out of

22          business, and even though they kept Nurse

23          Streeter on, it's now a new corporation?

24   A     Yes, that is correct.

25   Q     Now, it says one nurse and no mental health.

GREGORY T. EWING, Sheriff

63

1       This was in 2013. Do you see "Present Staffing

2       Position?"

3   A   Yes.

4   Q   Now, you're saying it has changed since then

5       with the mental health?

6   A   Yeah, that's part of this new Quality

7       Correctional Care with the psychologists.

8   Q   So they've brought in some mental health

9       people?

10  A   Yes.

11  Q   And it's supplemented by Hamilton Center?

12  A   Yes.

13  Q   But you still have just one nurse?

14  A   One nurse there twenty-four hours. It's over

15      the entire twenty-four hour period.

16  Q   So there's a nurse on station twenty-four, so

17      you have to have more than one nurse. You have

18      to have probably three.

19  A   Yeah. Well, and there's probably more than

20      that, actually, but there is a nurse at the

21      facility twenty-four hours a day.

22  Q   And it says somewhere in there you have a jail

23      doctor that visits the jail every day. Is that

24      really true?

25  A   Not every day. Now, probably back then, and I

GREGORY T. EWING, Sheriff

64

1       don't know that he even came every day.

2 Q    He was available, but he doesn't necessarily

3       come every day, right?

4 A    Right.

5 Q    Would it be fair to say that he checks with

6       the nurse to see whether there is somebody

7       that really needs to see him, even though

8       there are some medical requests in there?

9 A    Yes. I think it would be fair to say she can

10      consult with him at any time, but I do know

11      that he does come to the jail at least on a

12      weekly basis.

13 Q   Now, the assigned area for the jail nurse is

14      in the old jail?

15 A    Yes, sir.

16 Q   And that hasn't changed since 1982, has it? I

17      mean, the space dedicated?

18 A    Originally it was a vending machine room. I

19      don't know where the nurse was before that.

20 Q   But when you came on? Let's do it that way.

21      When you came on, is it the same dedicated

22      area?

23 A    It was, yes.

24 Q   Which is not very big?

25 A    No, sir.

GREGORY T. EWING, Sheriff

65

| | | |
|---|---|---|
| 1 | Q | And when there's a person who has mental |
| 2 | | health issues, is it fair to say that |
| 3 | | sometimes you put him in a restraining chair |
| 4 | | and put him out in the hallway for |
| 5 | | observation? |
| 6 | A | Just because he has mental health issues? I |
| 7 | | would disagree with that. I would say there |
| 8 | | had to be something that would precipitate him |
| 9 | | injuring himself, or something to that fact. |
| 10 | Q | The restraining chair that I've seen is out in |
| 11 | | the hallway, and I've seen it occupied. Would |
| 12 | | Deputy Sheriff Funk be a better person to ask |
| 13 | | those questions of? |
| 14 | A | Yeah, probably so. |
| 15 | Q | Now, the other thing is, would you agree there |
| 16 | | are a lot of your inmates who have medical |
| 17 | | problems and mental health problems which |
| 18 | | require a number of pills to be dispensed on a |
| 19 | | regular basis? Medications to be dispensed on |
| 20 | | a regular basis? |
| 21 | A | I don't know what the number is, but I'd say |
| 22 | | surely there would be medication to be |
| 23 | | dispensed. |
| 24 | Q | Maybe you're not the person to answer this. |
| 25 | | The people who are coming into the jail have |

GREGORY T. EWING, Sheriff

66

1       mental health problems and preexisting
2       conditions, do they not?
3   A   True.
4   Q   And those conditions have been treated by
5       other physicians, and medications have been
6       prescribed for each of those individual
7       inmates with those preexisting conditions.
8       Would you agree with that?
9   A   I would agree with that.
10  Q   And the jail is supposed to honor those
11      medication prescriptions to the extent that
12      they can. If it's a narcotic they might have
13      to use a substitute, but they're supposed to
14      honor those preexisting medication
15      prescriptions, are they not?
16  A   Michael, I don't know that answer.
17  Q   What I'm getting at though is, if you have a
18      lot of people coming in with preexisting
19      medical problems, wouldn't that put a strain
20      on the medical staff to keep up with the
21      medical prescriptions that are to be dispensed
22      on a regular daily basis or whenever the cycle
23      is? Or do you know?
24  A   I don't know.
25  Q   Were you aware of one of the inmates, Lloyd

GREGORY T. EWING, Sheriff

67

1           Thomas, that was given the wrong medication?

2           Was that ever brought to your attention?

3    A    I do remember. I don't remember the name, but

4           I remember that I was alerted. I don't

5           remember the specific inmate's name.

6    Q    And has that happened more than once where

7           people get the wrong medication?

8    A    Not to my knowledge.

9    Q    Would it necessarily be brought to your

10          attention?

11   A    More than likely, yes. I don't know of any

12          other, off the top of my head.

13   Q    You've read the Complaint, I assume, the first

14          Complaint and the Amended Complaint in this

15          case?

16   A    I didn't hear you.

17   Q    Have you read the Complaint and the Amended

18          Complaint in this case?

19   A    Yes.

20   Q    Then you're aware that Jauston Huerta was on

21          the floor, not in a boat, when somebody jumped

22          out or fell out of his top bunk and hit him in

23          the head?

24   A    Yes.

25   Q    So he was sleeping in the cell area?

GREGORY T. EWING, Sheriff

68

1    A    Yes.

2    Q    And not on a boat?

3    A    Correct.

4    Q    So would you agree that the inmates sometimes

5         just don't get a boat or choose not to sleep

6         in a boat?

7    A    I would agree with that statement.

8    Q    And sometimes the boat doesn't slide under the

9         bottom bunk, so they prefer to sleep on the

10        mattress without a bunk?

11   A    Yes, sir.

12   Q    And Mr. Falk has already covered the fact

13        that, even if they're sleeping on the floor,

14        with or without a boat, they're in close

15        proximity to the urinal, and they're in the

16        way of somebody who would want to use the

17        bathroom or get a drink of water at the end of

18        the cell?

19   A    Yes, sir.

20   Q    Exhibit #6. I think Mr. Falk said that you

21        take this count in the morning?

22   A    Yeah. Usually it's done, I believe, anywhere

23        from 7:30 and 8 a.m.

24   Q    So the number outside the jail varies from 20

25        to 50, or so. Is that correct?

GREGORY T. EWING, Sheriff

69

1   A      Yeah, that would be fair.

2   Q      In addition to male and female, are you

3          required to house juveniles if they're waived

4          back to adult court?

5   A      Yes.

6   Q      And are they kept in a separate cell area?

7   A      Yes. We try and keep them in the smaller

8          units.

9   Q      So that takes up another category, if you

10         will?

11  A      Yes.

12  Q      So if you have one person, he may take up a

13         four-man cell, or a two-and-a-half cell,

14         whatever you have available.

15  A      Yes.

16  Q      Is that correct?

17  A      That is correct.

18  Q      I want to clear up something. I know the

19         camera system is just video, but do you have

20         audio communication with some of the cells?

21  A      Like an intercom?

22  Q      Yes.

23  A      Yes, on the new side.

24  Q      On the new side you can actually talk to them,

25         give them instructions, and if they need help

GREGORY T. EWING, Sheriff

70

1        they can get ahold of you?

2    A    Yeah, in the general day area, and then each

3        cell has an intercom.

4    Q    Now, I'm told by some of the inmates that the

5        jail has the ability to turn it off so they're

6        not bothered. Do the jail officers have the

7        right to turn that off so they're not

8        bothered?

9    A    I've never seen it operated that way. I do not

10       know that it can be turned off.

11   Q    When we toured the jail, apparently the design

12       people were not onboard with the requirements

13       of separation by sight and sound between

14       female and male. So you have some cell areas

15       where the windows actually have what looks

16       like plywood over them?

17   A    Yes.

18   Q    Are there any structural problems, or

19       classification problems, in that new section?

20   A    Well, aside of that we had to put an alarm

21       system up in the ceiling, because under

22       Sheriff Marvel they were getting up in the

23       ceiling trying to break their way out.

24   Q    Because of its acoustical tiles?

25   A    No. They were actually able to sit on the top

GREGORY T. EWING, Sheriff

71

1    bunk, and work the security screws loose of
2    the sheet metal. It's probably not sheet
3    metal, but the metal. In fact, the County
4    wound up going back to the original architect
5    on that, and I think they paid to have a
6    heavier mill of steel put in all that new
7    side. You know, just over time, they were
8    backing those screws out, not to mention the
9    fact that there are access panels inside the
10   cells that they were able to put their towels
11   behind, bend them out, and get up into the
12   chase.
13 Q  Now you're getting technical here.
14 A  Sorry.
15 Q  That's okay. What it leads up to is that
16   ingenious inmates will find a way to get out
17   if it's not properly constructed?
18 A  Oh, yes.
19 Q  Based upon my experience, it would appear as
20   if the old jail section, especially, and the
21   new jail, does not have dedicated space for
22   private interviews if you have more than one
23   person coming over. Is that correct?
24 A  That is correct.
25 Q  So I've seen the investigators for the Public

GREGORY T. EWING, Sheriff

72

```
 1         Defenders actually interview people out in the
 2         hallway. Is that more common than not?
 3    A    It does occur, yes.
 4    Q    And so if an inmate wants to talk to his
 5         attorney, they have to look around for a place
 6         for that to happen. It's not a dedicated
 7         space?
 8    A    That is correct.
 9    Q    Have you ever had any problems with contagious
10         diseases, and you didn't have a way to isolate
11         that person with the contagious disease?
12    A    Normally if they find something of a
13         contagious disease, they put them in those
14         hospital cells. I would speculate that those
15         two hospital cells probably don't function the
16         way they were supposed to with negative
17         pressure or whatever that is.
18    Q    And what about tuberculosis? Have you had any
19         problems with tuberculosis?
20    A    Not that I know of.
21    Q    Now, I've gotten just one letter. It said
22         during the winter months the heating was
23         inadequate. I don't know whether that was the
24         old area or the new area. Do you know anything
25         about that?
```

GREGORY T. EWING, Sheriff

73

1   A    No, I don't.

2   Q    Going back to Exhibit #7, it would appear on

3        Page 17 that when it comes to jail officers,

4        he is recommending that the jail officers be

5        doubled, almost, from 22 to 42. Would you

6        agree that that's necessary?

7   A    I would agree because of the design of the

8        facility and the overcrowded condition.

9   Q    Were you involved in any of the negotiations

10       we had back in 2016 with regard to trying to

11       arrange for an agreement, a resolution--

12               MR. FRIEDRICH: Let's go off the record

13               right now.

14               (OFF THE RECORD BRIEFLY)

15   DIRECT EXAMINATION, MR. SUTHERLIN CONTINUES:

16   Q    Sheriff, as I started to say, these are going

17       to be certified questions. He has objected so

18       you don't have to answer. Were you aware that

19       the parties had reached a stipulation with

20       regard to admitting the jail was operated in

21       an unconstitutional fashion?

22               MR. SUTHERLIN: Are you instructing

23               your--

24               MR. FRIEDRICH: I'm objecting to that

25               question, and instruct you not to

GREGORY T. EWING, Sheriff

74

1              answer.

2              MR. SUTHERLIN: Certify that question.

3    Q    Do you believe that the current jail, as it

4         functions right now, is operated in an

5         unconstitutional fashion because of

6         understaffing, overcrowding, and other various

7         mechanical problems?

8              MR. FRIEDRICH: Same objection.

9              MR. SUTHERLIN: Certify the question.

10             ... That's all I have.

11             MR. FRIEDRICH: Ken, are you finished?

12             MR. FALK: Yes.

13             MR. FRIEDRICH: We'll take signature

14             for this one.

15

16

17

18    FURTHER DEPONENT SAITH NOT:

19

20    _____

21         Gregory T. Ewing, Sheriff

22

GREGORY T. EWING, Sheriff

75

STATE OF INDIANA          )

                          ) SS.

COUNTY OF VIGO            )


     I, Donna L. Swift, a Notary Public in and for
the State of Indiana, do hereby certify that
GREGORY T. EWING, Sheriff, was by me first sworn
to tell the truth, the whole truth, and nothing
but the truth in the following civil cause of
action presently pending before the United States
District Court, Southern District of Indiana,
Terre Haute Division, bearing Case No. 2:16-cv-
397-JMS-MJD: Jauston Huerta, et al., versus, Greg
Ewing, et al.

     That the foregoing deposition was conducted
pursuant to Notice of Deposition and the Federal
Rules of Civil Procedure on behalf of Plaintiffs
and the Class on the 27th day of April, 2018, at
the law offices of Wilkinson, Goeller, Modesitt,
Wilkinson & Drummy, LLP, 333 Ohio Street, Terre
Haute, Vigo County, Indiana.

     That said deposition was taken down by means
of recording and afterwards reduced to typewriting
by me; that the Deponent reviewed and signed this
deposition transcript, and that the deposition

GREGORY T. EWING, Sheriff

76

transcript was duly certified to by me. That the

Plaintiffs were represented by Kenneth J. Falk,

Legal Director ACLU Indiana, and Michael K.

Sutherlin, Attorney; and that the Defendants were

represented David P. Friedrich, Attorney.

    I do further certify that I am a disinterested

person in this cause of action, that I am not a

relative or Attorney of any party, or otherwise

interested in the event of this action, and am not

in the employ of the attorneys for the respective

parties.

    IN WITNESS WHEREOF, I have hereunto set my

hand and affixed my notarial seal this _____day

of _____, 2018.


_____

        Donna L. Swift, Notary Public

            Vigo County, Indiana

My Commission Expires:

May 28, 2024

## #

**#2 (2)**
43:16;52:12
**#3 (1)**
4:14
**#4 (1)**
8:7
**#5 (1)**
19:5
**#6 (3)**
19:10,15;68:20
**#7 (8)**
29:18;31:20;32:5,
11,13;34:23;62:16;
73:2
**#8 (1)**
30:10

## $

**$35 (1)**
21:2
**$45 (1)**
21:3

## A

**a- (1)**
11:10
**ability (4)**
15:19;23:23;58:17;
70:5
**able (8)**
15:12,23;36:11;
40:8;56:17,20;70:25;
71:10
**A-Block (1)**
9:8
**above (2)**
17:25;18:8
**Absolutely (10)**
9:17;13:23;20:21;
37:4;39:1,3;42:8,11;
52:22;62:4
**abuse (1)**
22:12
**access (2)**
27:18;71:9
**accommodate (2)**
28:7;41:7
**account (2)**
44:24;49:12
**accurate (1)**
8:12
**ACLU (1)**
3:7
**Acosta (6)**
5:3;6:22;7:15;
39:21;40:2;58:22
**acoustical (1)**
70:24

**across (1)**
12:18
**act (2)**
54:11,14
**actual (2)**
44:14;50:21
**actually (17)**
5:15;6:20;15:11;
19:16;24:4;31:20;
38:17;43:3,17;44:15;
49:18;51:3;63:20;
69:24;70:15,25;72:1
**acute (1)**
62:8
**add (4)**
11:1;30:23;33:2;
49:20
**added (1)**
36:13
**Adding (1)**
33:17
**addition (2)**
37:13;69:2
**additional (1)**
33:14
**addressing (1)**
23:4
**adds (1)**
11:3
**adequately (1)**
36:12
**administrative (4)**
14:25;15:2,7,8
**admitting (1)**
73:20
**adult (1)**
69:4
**advertently (1)**
57:6
**affect (1)**
51:18
**affirmative (4)**
10:5;11:8;36:10;
45:6
**afforded (1)**
41:18
**again (4)**
7:22;35:19;40:21;
51:16
**agent (1)**
21:6
**aggressive (1)**
22:6
**aggressively (2)**
54:11,15
**agitation (1)**
42:2
**ago (2)**
8:8;16:4
**agree (31)**
12:8;13:19,20,20,
23;14:3;32:8;37:1;
39:9,14;41:20;43:6;

**44:5;45:7,10;52:15,
18,22;54:1,4,7;59:7,
20,22;65:15;66:8,9;
68:4;7;73:6,7**
**agreed (4)**
6:23;39:21;40:7;
58:23
**agreement (3)**
39:20;58:23;73:11
**ahold (1)**
70:1
**air (3)**
47:25;48:2,8
**alarm (1)**
70:20
**alert (2)**
56:19,22
**alerted (1)**
67:4
**alerting (1)**
56:18
**alleged (1)**
17:9
**almost (5)**
6:18;37:5;42:12;
45:21;73:5
**almost-I (1)**
51:7
**along (3)**
10:8;62:6
**always (1)**
18:19
**Amended (2)**
67:14,17
**among (3)**
19:5;47:8;53:2
**amount (1)**
18:19
**amounts (1)**
45:14
**analysis (5)**
29:20;30:5;32:8;
35:9;62:17
**and- (2)**
47:3;58:13
**and/or (1)**
17:16
**and-Where (1)**
20:5
**Annex (1)**
48:25
**annual (2)**
7:9,12
**antiquated (1)**
46:2
**apparently (1)**
70:11
**appear (2)**
71:19;73:2
**appointed (2)**
4:7,9
**appropriately (1)**
14:9

**approve (1)**
30:24
**April (1)**
19:9
**architect (1)**
71:4
**area (26)**
6:2;7:3;8:22;10:6,
19;11:24;12:15;
13:17;26:13;27:12,
13,21;36:20;39:4,23;
41:11,12,14;56:8;
64:13,22;67:25;69:6;
70:2;72:24,24
**areas (8)**
14:13;35:14;37:2;
39:9;47:17;57:25;
59:2;70:14
**around (4)**
6:21;19:19;24:16;
72:5
**arrange (1)**
73:11
**arrangements (1)**
18:25
**articulated (1)**
46:21
**aside (1)**
70:20
**assessment (1)**
60:15
**assigned (4)**
12:2;25:9;29:9;
64:13
**assisted (1)**
17:2
**Association (1)**
30:3
**assume (17)**
3:23;11:7,16;16:20;
17:11;26:20;28:1,13,
17,19;34:18;40:16,
24;48:21;50:14;
59:20;67:13
**attention (3)**
56:11;67:2,10
**Attorney (5)**
3:8;30:11;40:15;
62:15;72:5
**attribute (3)**
22:8;42:3;51:23
**audio (10)**
12:20,22;13:2,3,4,6,
17;38:15;53:3;69:20
**available (3)**
44:21;64:2;69:14
**average (1)**
44:21
**aware (4)**
58:22;66:25;67:20;
73:18
**away (2)**
44:18;52:9

## B

**back (18)**
12:10;15:20;20:15;
21:13;22:1,6;28:9;
29:2,5,5;36:21;52:12;
54:8;63:25;69:4;71:4;
73:2,10
**backing (1)**
71:8
**bad (1)**
16:13
**bars (1)**
10:8
**based (2)**
34:5;71:19
**basically (5)**
6:1;26:16;27:23;
31:11;61:21
**basis (6)**
12:3;51:5;64:12;
65:19,20;66:22
**bathroom (3)**
27:6,19;68:17
**B-Block (1)**
23:25
**bearing (1)**
57:20
**beaten (1)**
56:2
**becomes (2)**
18:15;61:23
**bed (4)**
14:10;25:10,14;
28:9
**beds (18)**
7:13,24;8:2,9;9:13;
11:1,2,6;12:1,1,2,6;
20:17;23:18,25;
24:16;44:9;60:6
**begin (1)**
48:13
**beginning (2)**
35:25;52:14
**begins (1)**
37:6
**behind (3)**
46:4,4;71:11
**beings (2)**
19:16;21:19
**belong (1)**
14:9
**bend (1)**
71:11
**benefit (1)**
39:17
**best (3)**
18:17;52:18;55:2
**better (4)**
37:20;43:12;48:8;
65:12
**beyond (1)**

47:5
**big (2)**
61:15;64:24
**bigger (1)**
28:7
**Bill (2)**
22:18;29:20
**Bill's (1)**
29:23
**bit (4)**
4:22;16:21;28:13;
37:16
**bit- (1)**
22:3
**blend (1)**
17:19
**Block (10)**
23:18,20;24:2,4;
25:9;41:5,6,7,8;44:13
**blocks (8)**
6:20;8:9,14,15;9:8;
23:10,10,22
**boat (17)**
25:15,18,22;27:11,
23,23,23,25;28:7,12,
14;67:21;68:2,5,6,8,
14
**boats (5)**
26:3,7;27:13,22;
47:11
**boat-to (2)**
27:24,25
**booking (8)**
8:22;11:24;12:15,
19;13:3,6,16;21:6
**both (7)**
15:2;39:7;47:22,23;
52:19;53:15,18
**bothered (2)**
70:6,8
**bottom (2)**
45:4;68:9
**break (1)**
70:23
**breakdown (2)**
14:14;32:10
**breaking (2)**
42:21;50:2
**breaks (2)**
49:24;50:7
**BRIEFLY (4)**
10:23;13:11;31:7;
73:14
**bring (1)**
24:4
**broke (1)**
32:19
**brought (4)**
5:2;63:8;67:2,9
**bucket (1)**
32:25
**budget (1)**
30:20

**budgetary (1)**
31:21
**building (6)**
5:15,16;6:6;43:4;
59:15,24
**built (7)**
4:24;43:2;48:21,23;
60:4,18;62:6
**bulldozer (1)**
61:12
**bunk (4)**
67:22;68:9,10;71:1
**bunked (1)**
44:10
**bunks (3)**
9:7,19;10:1
**burdened (1)**
22:13
**burn (1)**
41:23
**business (1)**
62:22
**buy (1)**
46:7

**C**

**call (1)**
8:19
**call! (1)**
14:17
**called (2)**
5:3;36:14
**calls (2)**
25:15;30:18
**calmer (1)**
42:4
**came (3)**
64:1,20,21
**camera (1)**
69:19
**cameras (3)**
38:8,11,21
**can (30)**
6:19,21;7:18;10:21;
15:11,15;18:8;22:8;
24:8,25;37:17,20;
38:17,20,22;42:3;
48:8;50:19,22;53:9;
57:2,10;58:1;59:18;
62:11;64:9;66:12;
69:24;70:1,10
**Canteen (2)**
48:18,20
**cap (1)**
40:2
**capacities (1)**
4:23
**capacity (8)**
6:24;8:3;13:22;
37:24;44:21;45:1;
49:1;59:8
**capacity- (1)**

52:15
**Care (8)**
50:12,23;51:1,4,15,
19;58:18;63:7
**case (8)**
6:22;35:6,16;37:9,
11;58:22;67:15,18
**catacomb (1)**
51:24
**category (1)**
69:9
**cause (2)**
49:3;57:10
**caused (4)**
41:21;53:23;54:2,5
**causes (2)**
28:13;35:3
**ceiling (2)**
70:21,23
**cell (24)**
7:20;9:7,13;10:6;
13:4;26:23;27:11,14,
16,17,18;28:5;35:13;
39:10,23;56:17;59:2;
67:25;68:18;69:6,13,
13;70:3,14
**cells (27)**
6:1;9:1,4,19;10:17;
11:20,21;12:12;13:5;
14:24;26:10,10;
27:15;28:6,9;38:20,
21;44:14;46:6,10,13;
49:1;59:1;69:20;
71:10;72:14,15
**Center (2)**
51:6;63:11
**central (1)**
6:17
**certain (3)**
46:22;47:17;48:22
**certainly (1)**
44:25;52:3
**certified (1)**
73:17
**Certify (2)**
74:2,9
**cetera (2)**
23:3;32:3
**chain (1)**
29:15
**chair (2)**
65:3,10
**change (3)**
22:14,17;31:1
**changed (3)**
30:21;63:4;64:16
**changes (1)**
25:2
**Charlie (2)**
20:6,7
**chase (1)**
71:12
**check (1)**

38:24
**checks (5)**
36:9,12,17,19;64:5
**chef (1)**
49:19
**chief (1)**
4:10
**child (2)**
14:20;17:23
**choose (1)**
68:5
**chronic (1)**
25:4
**claiming (1)**
56:2
**clarify (1)**
13:13
**Class (3)**
3:8;6:11;14:19
**classes (1)**
22:20
**classification (9)**
14:12,14;17:18;
18:1,9;24:19;25:7;
35:2;70:19
**classify (6)**
14:8,11;15:13;
23:13;24:20;53:24
**classifying (1)**
17:13
**clear (2)**
12:25;69:18
**close (1)**
68:14
**closely (1)**
15:15
**co-defendants (1)**
16:17
**Coincidentally (1)**
23:20
**Combi (2)**
46:12,15
**comfort (1)**
47:21
**coming (5)**
49:10;58:2;65:25;
66:18;71:23
**Commander (2)**
20:7,8
**comment (1)**
61:10
**commissary (1)**
49:11
**Commissioner (1)**
43:20
**Commissioners (3)**
34:21;60:3,9
**common (3)**
16:10,25;72:2
**communication (1)**
69:20
**company (1)**
48:18

**complained (1)**
46:17
**complaining (1)**
34:11
**Complaint (5)**
67:13,14,14,17,18
**completely (1)**
49:9
**complies (1)**
36:2
**concern (1)**
46:20
**concerns (1)**
47:25
**conclusions (1)**
60:21
**condition (1)**
73:8
**conditions (4)**
52:21;66:2,4,7
**conduct (1)**
35:12
**confinement (1)**
52:24
**connecting (1)**
13:16
**considering (1)**
61:16
**consistency (1)**
9:7
**constant (1)**
42:21
**constantly (2)**
42:21,22
**constructed (1)**
71:17
**construction (2)**
5:14;44:8
**consult (2)**
7:4;64:10
**consuming (1)**
21:10
**contagious (3)**
72:9,11,13
**CONTINUES (4)**
10:24;13:12;31:8;
73:15
**contribute (1)**
43:4
**contributed (1)**
57:2
**contributes (1)**
37:3
**control (2)**
6:17;35:15
**controversy (1)**
28:13
**conversely (1)**
42:9
**conversion (1)**
43:7
**converting (1)**
5:15

JAUSTON HUERTA, et al. vs
GREG EWING, et al.

GREGORY T. EWING, Sheriff
April 27, 2018

corners (1)
  10:1
Corporation (2)
  60:5;62:23
correctional (5)
  13:19;48:20;50:12;
  51:4;63:7
Corrections (1)
  30:7
correlation (1)
  42:5
Council (9)
  30:24;31:14;34:3,
  20,22;42:19;46:18;
  60:2,9
counsel (1)
  61:19
count (3)
  23:16;44:21;68:21
counted (1)
  12:7
counter (2)
  13:3,6
counters (1)
  12:19
counties (2)
  20:25;21:1
County (21)
  3:11;5:18;19:1;
  20:3,11,22,23;21:3,
  20;22:24,25;23:2;
  29:25;30:18;35:10;
  42:18;43:17;45:14;
  59:23;60:16;71:3
couple (1)
  10:1
Court (2)
  29:11;69:4
Courthouse (1)
  29:9
covered (1)
  68:12
cramped (2)
  49:9;53:16
crime (3)
  14:18;17:8;22:5
criminal (1)
  60:15
crisis (2)
  22:10;61:14
crowded (4)
  28:1;41:9;54:14,25
cubic (1)
  48:5
current (10)
  19:16;28:20;30:14;
  32:20;35:9;37:14;
  52:21;60:8;61:10;
  74:3
currently (4)
  20:2;30:2;31:23;
  53:19
custody (2)

14:19;24:7
cycle (2)
  55:6;66:22

**D**

D-9 (1)
  61:12
daily (1)
  66:22
dang (1)
  36:16
dangerous (1)
  16:24
date (1)
  19:17
daunting (1)
  21:10
day (28)
  6:2;10:4,19;18:24;
  19:6;20:13,19;25:12;
  26:2,15,23;27:7,12,
  13;28:8,15;39:11;
  44:22;45:1,22;49:8;
  51:9;63:21,23,25;
  64:1,3;70:2
days (1)
  22:7
daytime (1)
  52:8
deal (1)
  18:14
dealing (3)
  17:6;40:25;55:5
dedicated (4)
  64:17,21;71:21;
  72:6
deemed (1)
  55:17
Defenders (1)
  72:1
deficiencies (4)
  35:3;36:23;37:2;
  45:11
deficiency (3)
  35:21;36:25;37:3
definitely (1)
  48:15
delay (2)
  52:1,4
delayed (1)
  49:15
delays (1)
  51:14
delivering (1)
  49:13
demand (1)
  44:20
Department (1)
  20:18
depend (1)
  56:16
depending (3)

24:8;28:6;57:23
depends (1)
  29:15
DEPONENT (1)
  74:18
deposed (1)
  3:14
deposes (1)
  3:4
deposition (6)
  3:18;4:17,19;40:5,
  6;59:13
deputies (1)
  28:22
deputy (2)
  4:8;65:12
describe (2)
  6:13,14
described (2)
  5:22;26:15
design (9)
  6:15;9:9;38:11;
  43:9;47:5;51:22;
  58:15;70:11;73:7
designate (1)
  4:18
designed (4)
  38:22;43:10;44:9,
  15
designee (1)
  4:19
despite (4)
  18:17,24;23:7;
  52:18
deterioration (1)
  45:9
deterioration-advanced (1)
  45:8
develop (1)
  43:1
D-Felony (1)
  22:21
difference (1)
  7:16
different (8)
  9:4;12:12;15:23;
  21:25;49:20;50:1;
  52:5;62:18
difficult (6)
  18:16;40:25;41:3;
  55:6;56:12,14
difficulty (1)
  35:2
DIRECT (7)
  3:6;10:24;13:12;
  31:8;42:5;62:14;
  73:15
direction (1)
  58:2
directly (1)
  34:19
Director (1)
  3:7

disabilities (1)
  15:17
disabled (1)
  24:24
disagree (1)
  65:7
disaster (1)
  57:23
disciplinary (4)
  11:20;15:3,5,24
discovery (1)
  16:4
discuss (1)
  23:4
discussed (4)
  17:18;59:5;60:1,20
disease (2)
  72:11,13
diseases (1)
  72:10
dishwasher (1)
  50:7
dispensed (2)
  65:18,19,23;66:21
dispensing (1)
  51:24
dispute (1)
  44:7
disputes (1)
  28:17
disrupted (2)
  50:1,5
DLZ (2)
  60:5;61:5
DLZ's (1)
  61:3
doctor (1)
  63:23
doctor's (1)
  52:6
document (2)
  4:15;55:12
documents (2)
  5:9;19:12
dollars (1)
  20:13
done (3)
  29:20;34:6;68:22
doors (3)
  26:23;38:23;57:25
dormitories (2)
  9:2,3
double (3)
  18:3,4;44:10
double-bunked (1)
  48:24
doubled (4)
  44:18;49:1;58:11;
  73:5
doubling (1)
  49:7
down (14)
  20:20;24:1;28:9,12,

14;29:25;32:19;
38:18;42:21;43:4;
50:3;57:20,24;58:1
Dr (5)
  60:10,25;61:1,10,
  22
drill (1)
  3:17
drink (1)
  68:17
drug (2)
  17:2;22:12
due (1)
  52:23
duly (1)
  3:2
during (4)
  26:23;28:8;51:9;
  72:22

**E**

early (1)
  22:6
easier (1)
  25:5
easiest (1)
  23:15
easy (1)
  23:21
efficient (2)
  58:21;62:10
efforts (3)
  18:18;23:7;52:19
eight (2)
  4:11;10:2
either (3)
  24:24;44:1,4
elaborating (1)
  22:2
elected (1)
  4:11
electrical (1)
  45:12
else (1)
  58:16
emails (1)
  19:7
emergencies (1)
  56:12
emergency (2)
  52:3;57:19
emergent (2)
  52:7,7
emotional (1)
  57:11
employees (1)
  30:19
end (2)
  13:7;68:17
enforcement (1)
  4:4
engage (1)

39:12
**enormous (1)**
45:14
**enough (7)**
21:14;27:21,22;
41:1;46:17;48:2;
57:14
**enter (1)**
55:6
**entire (1)**
63:15
**especially (4)**
39:10,15;48:1;
71:20
**estimated (1)**
32:16
**et (2)**
23:3;32:3
**evacuate (1)**
57:21
**evaluate (1)**
11:13
**evaluation- (1)**
45:4
**Even (10)**
35:18;40:24;43:12;
46:8;59:7;62:2,22;
64:1,7;68:13
**events (1)**
15:9
**everybody (1)**
11:25
**everyone (2)**
18:10,12
**EWING (3)**
3:1,10;74:21
**EXAMINATION (6)**
3:6;10:24;13:12;
31:8;62:14;73:15
**example (3)**
23:14,17;49:21
**exceeded (1)**
44:20
**exception (1)**
11:2
**exchange (1)**
47:25
**exercise (2)**
39:13;57:10
**Exhibit (19)**
4:14;8:7;19:5,10,
13,15;23:9;29:18;
30:10;31:20;32:5,10,
13;34:23;43:16;
52:12;62:16;68:20;
73:2
**existence (1)**
32:12
**existing (2)**
5:5;59:17
**expansion (1)**
5:5
**experience (3)**

54:25;55:25;71:19
**expertise (1)**
7:7
**experts (1)**
13:19
**extensively (1)**
60:25
**extent (2)**
57:9;66:11
**extreme (2)**
17:15,17
**extremely (1)**
24:20
**eye (1)**
60:16

## F

**facility (8)**
42:4;45:7,20;58:21;
59:24;61:11;63:21;
73:8
**fact (7)**
18:24;43:2;60:2;
65:9;68:12;71:3,9
**facts (1)**
44:6
**fair (3)**
18:17;21:18;41:16;
64:5,9;65:2;69:1
**FALK (13)**
3:7,16,21;9:21;
10:21,24;13:9,12;
31:5,8;68:12,20;
74:12
**fall (2)**
40:14;57:17
**falls (1)**
36:21
**far (4)**
29:10;33:23;52:11;
61:16
**fashion (2)**
73:21;74:5
**F-Block (1)**
23:20
**feel (1)**
48:8
**feet (1)**
48:5
**fell (2)**
56:3;67:22
**Felony (1)**
22:22
**female (8)**
20:1,1;21:15;22:7;
23:16,20;69:2;70:14
**females (5)**
23:15,19,23;24:1,5
**few (2)**
20:5,5
**fights (5)**
42:3,7,9;52:25;

53:20
**figure (8)**
13:24,24;18:6,7,8,
20;33:5;44:25
**figures (1)**
32:18
**filled (1)**
14:10
**final (3)**
37:5,5;60:22
**finally (1)**
37:12
**find (3)**
21:6;71:16;72:12
**finding (1)**
15:9
**fine (1)**
34:2
**finished (1)**
74:11
**fire (1)**
57:19
**first (6)**
3:2;4:9;32:5;44:7,
13;67:13
**fit (1)**
27:13
**fits (1)**
25:19
**five (1)**
16:17
**flat (1)**
31:2
**floodgates (1)**
58:13
**floor (7)**
6:10;25:21,25;
27:11;57:3;67:21;
68:13
**floors (7)**
6:5,8,10;45:23,25;
47:11;57:16
**following (1)**
51:16
**follows (1)**
3:5
**food (5)**
48:17;49:13,15,21,
25
**force (1)**
17:2
**Form (3)**
30:18;31:16;35:8
**formal (1)**
60:2
**formerly (1)**
29:24
**forth (8)**
14:20,25;15:20;
20:15;29:2,5,5;51:24
**forty (1)**
42:12
**forty-five (2)**

28:23;31:24
**foundered (1)**
60:8
**four (6)**
9:5,7,19,25;23:18,
19
**four-man (1)**
69:13
**fourth (1)**
40:6
**frequently (6)**
5:8;17:11;28:8;
38:25;51:9;56:1
**FRIEDRICH (6)**
12:25;73:12,24;
74:8,11,13
**front (1)**
9:11
**frontage (1)**
38:23
**full-time (3)**
21:9;31:1;33:18
**function (1)**
72:15
**functions (1)**
74:4
**funded (1)**
60:9
**funding (1)**
30:23
**Funk (1)**
65:12
**FURTHER (1)**
74:18
**fuzzy (1)**
61:24

## G

**gave (1)**
8:8
**gender (2)**
14:16,18
**General (2)**
7:2;70:2
**generally (1)**
26:24
**get-go (1)**
44:12
**gets (1)**
13:21
**given (4)**
25:14;30:11;37:7;
67:1
**goes (2)**
50:20;57:13
**Good (5)**
8:14;14:17;36:15;
48:2;55:5
**Greg (1)**
12:25
**GREGORY (3)**
3:1,10;74:21

**guy (1)**
51:4
**guy! (1)**
34:11

## H

**hall (2)**
6:3,4
**hallway (4)**
12:18;65:4,11;72:2
**Hamilton (1)**
51:6;63:11
**handed (1)**
43:25
**happen (2)**
16:13;72:6
**happened (3)**
56:6,7;67:6
**happening (1)**
59:6
**happens (5)**
16:20,21;17:11;
25:12;50:17
**hard (1)**
22:11
**Harris (2)**
5:3;6:22
**head (4)**
29:24;48:7;67:12,
23
**Health (11)**
36:9,12;51:1,2;
62:25;63:5,8;65:2,6,
17;66:1
**healthcare (1)**
50:10
**hear (1)**
67:16
**heard (4)**
13:25;56:1;61:25,
25
**heard-I (1)**
61:20
**hearing (1)**
15:11
**heating (1)**
72:22
**heavier (1)**
71:6
**held (2)**
5:18;16:7
**help (2)**
49:20;69:25
**helped (1)**
35:19
**highest (1)**
17:20
**himself (1)**
65:9
**hiring (1)**
37:19
**history (3)**

16:23,25;17:6
**hit (1)**
    67:22
**hold (2)**
    21:4;36:16
**honest (1)**
    33:24
**honor (2)**
    66:10,14
**hopefully (1)**
    17:21
**Hosp (2)**
    11:6,6
**Hospital (11)**
    8:20;11:3,9,17;
    12:24;13:13,13;
    24:10,11;72:14,15
**hour (4)**
    33:1;50:23,25;
    63:15
**hours (7)**
    35:12;39:23;40:9;
    59:2,5;63:14,21
**house (5)**
    18:25;22:18;24:23;
    58:24;69:3
**housed (1)**
    6:7
**housing (2)**
    22:15;24:13
**Huerta (1)**
    67:20
**human (2)**
    19:16;21:19
**hurt (1)**
    57:4
**HVAC (3)**
    42:20;43:8;45:11

## I

**ideal (1)**
    43:13
**ideally (4)**
    12:5;14:15;15:12;
    16:11
**ill (2)**
    11:16;15:13
**imagine (2)**
    47:9;49:19
**immediate (2)**
    43:20;59:1
**immediately (1)**
    10:6
**impacts (2)**
    56:23;58:17
**imperiled (1)**
    52:20
**important (2)**
    35:12,14
**improve (1)**
    36:20
**inability (4)**

23:12;53:24;54:2;
    55:22
**inadequate (1)**
    72:23
**Inadvertently (1)**
    57:6
**inappropriate (2)**
    55:7,18
**incarcerate (1)**
    21:20
**incident (1)**
    55:10
**include (4)**
    20:14;29:1,8;32:22
**included (1)**
    33:4
**includes (1)**
    32:1
**including (1)**
    39:24
**increase (1)**
    40:13
**increased (1)**
    51:13
**increases (2)**
    53:12;54:20
**increasing (1)**
    21:21;23:6
**Indiana (4)**
    3:8;21:12;22:14;
    30:2
**indicate (1)**
    61:1
**indicated (7)**
    31:10,23;59:14;
    61:2,20,22,23
**indicates (1)**
    59:7
**indirectly (1)**
    62:1
**individual (2)**
    46:10;66:6
**indoor (1)**
    39:4
**inevitable (1)**
    52:24
**infirmary (1)**
    35:15
**ingenious (1)**
    71:16
**injured (4)**
    14:21;17:16;57:3,9
**injuries (1)**
    53:21
**injuring (1)**
    65:9
**injury (2)**
    53:9,12
**inmate (4)**
    20:13;44:21;52:20;
    72:4
**inmates (9)**
    14:23;44:22;53:18;

65:16;66:7,25;68:4;
    70:4;71:16
**inmate's (1)**
    67:5
**inside (4)**
    22:23;41:25;50:19;
    71:9
**Inspector (3)**
    7:2,6;46:21
**instance (1)**
    16:16
**instead (1)**
    25:14
**Institute (1)**
    30:6
**instruct (1)**
    73:25
**instructing (1)**
    73:22
**instructions (1)**
    69:25
**intensive (2)**
    38:2,3
**interaction (2)**
    55:13,16
**interactions (4)**
    54:19;55:7,7,13
**intercom (4)**
    38:16;56:22;69:21;
    70:3
**interesting (1)**
    58:14
**interview (1)**
    72:1
**interviews (1)**
    71:22
**into (19)**
    5:20;6:2,20;11:10;
    15:1,23,24;20:3;
    23:23;26:13;38:20;
    42:6;44:24;49:1;
    53:16,20;57:24;
    65:25;71:11
**investigators (1)**
    71:25
**involved (4)**
    4:3;6:23;29:4;73:9
**Iso (4)**
    12:12,13,13;13:14
**isolate (1)**
    72:10
**isolated (1)**
    11:12
**Isolation (7)**
    8:21;11:3,22;13:14,
    14,15;24:11
**issue (2)**
    48:16;50:22
**issues (7)**
    7:5;25:4;43:7,8;
    47:16;65:2,6
**it-but (1)**
    31:11

**it's- (1)**
    9:14

## J

**jail (111)**
    4:6,23,24;5:6,16,
    23;6:7,8,24;7:5,12,24;
    8:10,25;13:20;14:3,3,
    22;16:5,6;17:3,9;
    18:18,25;19:8,17,23,
    24;20:7,8,9,10,10;
    21:5,19,21;23:6;26:3,
    9;28:21;29:13;30:5,
    14,25;31:24;32:1,13;
    33:6;34:25;35:10,12,
    15;37:8,14,17,18,25;
    38:4;39:5;40:3,8;
    42:12,16,24;43:3,10;
    44:8,12;46:21;48:12;
    49:1;50:24;51:8,17;
    52:21;53:20;54:14;
    55:11,22;57:1,16,20;
    58:15,24;59:15,21;
    60:4,17,18;61:13;
    62:2,3,5,17;63:22,23;
    64:11,13,14;65:25;
    66:10;68:24;70:5,6,
    11;71:20,21;73:3,4,
    20;74:3
**jailer (2)**
    4:6;29:24
**jailers (1)**
    28:22
**jails (8)**
    20:2,17;21:11;29:6,
    7;51:25;53:2;54:25
**jail's (2)**
    54:20;58:17
**January (1)**
    4:2
**Jauston (1)**
    67:20
**jeweler (1)**
    6:15
**job (3)**
    21:5,9,11
**judges (1)**
    23:2
**July (1)**
    40:7
**jumped (1)**
    67:21
**Justice (2)**
    60:10,15
**juveniles (1)**
    69:3

## K

**keep (7)**
    18:9;25:3;45:15;
    55:10;58:1;66:20;

69:7
**keeping (1)**
    42:16
**Ken (1)**
    74:11
**KENNETH (2)**
    3:7;7:1
**kept (3)**
    27:18;62:22;69:6
**killed-at (1)**
    17:16
**kind (7)**
    22:2,9,19;41:24;
    45:18;46:7;61:23
**kiosk (2)**
    50:19;52:9
**kitchen (7)**
    48:16,17,21,23;
    49:4,5,10
**kite (1)**
    50:14
**knowing (1)**
    56:6
**knowledge (1)**
    67:8
**Knox (1)**
    20:4

## L

**lack (6)**
    34:25;37:2;47:6,7;
    57:10;58:16
**large (1)**
    41:12
**larger (6)**
    10:17,19,20;23:24;
    26:20;62:3
**largest (2)**
    14:7;45:19
**last (8)**
    23:17;40:6,7,17;
    44:2;52:13;59:13;
    60:3
**last- (1)**
    31:22
**law (2)**
    4:4;22:14
**lay (2)**
    28:9,12
**layout (1)**
    23:9
**leads (1)**
    71:15
**leaking (1)**
    46:16
**leaks (1)**
    45:22
**learn- (1)**
    17:21
**leasing (1)**
    21:16
**least (6)**

JAUSTON HUERTA, et al. vs
GREG EWING, et al.

GREGORY T. EWING, Sheriff
April 27, 2018

26:16;38:22;39:23;
50:1;59:2;64:11
**led (1)**
5:5
**Legal (1)**
3:7
**less (1)**
62:9
**letter (1)**
72:21
**letting (1)**
41:22
**level (8)**
14:18;15:23;17:20,
20;22:5,15,21;42:2
**levels (2)**
22:20;35:10
**lighting (2)**
47:16,16
**likelihood (1)**
54:18
**likely (1)**
67:11
**limited (3)**
42:1;52:14;53:17
**line (3)**
30:25;32:1;61:4
**linear (5)**
5:23;6:3,12;38:4,8
**liner (1)**
25:18
**list (1)**
16:8
**listed (4)**
30:19;32:12;33:8;
37:1
**listing (2)**
19:11,16
**litigation (2)**
5:2;8:8
**little (5)**
4:22;22:3;26:21;
37:16;39:11
**Lloyd (1)**
66:25
**locally (1)**
22:23
**lock (1)**
26:10
**locked (3)**
26:13;27:16;41:25
**log (1)**
16:5
**logs (1)**
40:15
**long (8)**
4:1;6:3;13:21;31:3,
4,4;49:14;57:13
**longer (1)**
23:22
**long-term (1)**
12:3
**look (10)**

6:20;30:15;34:10;
35:23;38:17,20,22;
40:16;62:16;72:5
**looked (1)**
22:11
**looking (8)**
9:15;19:15;22:10;
23:9,17;32:5,18;
52:12
**looks (3)**
10:18;30:13;70:15
**loose (1)**
71:1
**lot (9)**
16:20;22:6,8,12;
28:6;41:10;46:3;
65:16;66:18
**lots (2)**
39:15;40:25
**lower (1)**
17:19
**lucky (1)**
23:19
**lump (1)**
32:25

## M

**machine (1)**
64:18
**Mackey (1)**
51:7
**maintenance (1)**
42:15
**major (1)**
45:11
**majority (1)**
35:25
**makes (1)**
25:4
**male (5)**
20:1,1;21:13;69:2;
70:14
**malleable (1)**
23:12
**many (17)**
6:5;9:13,15;19:6;
20:20;23:22;24:15;
28:20,21;29:4,14;
31:17,19;32:24;41:6,
18;54:5
**Marion (1)**
21:3
**mark (1)**
17:25
**marked (7)**
4:14;8:6;19:4,10;
29:17;30:10;43:15
**Marvel (4)**
34:16;43:20;52:13;
70:22
**Marvel's (1)**
4:9

**massively (1)**
62:3
**materials (1)**
30:6
**math (1)**
4:12
**mattress (5)**
25:15,19,21,25;
68:10
**may (2)**
41:23;69:12
**maybe (2)**
17:1;65:24
**meals (1)**
49:7
**mean (7)**
5:25;6:16;29:10;
33:11;49:6;61:20;
64:17
**means (5)**
6:1,17;49:7,19;52:3
**meant (1)**
29:5
**measure (3)**
9:21,23;48:5
**measured (1)**
10:18
**measurement (1)**
48:6
**measurements (1)**
44:15
**mechanical (1)**
74:7
**Medical (16)**
15:18;25:4;50:10,
20,23;51:15,18;
52:10;56:11;62:18,
21;64:8;65:16;66:19,
20,21
**medication (5)**
65:22;66:11,14;
67:1,7
**Medications (2)**
65:19;66:5
**medicine (1)**
51:23
**meet (1)**
23:1
**meetings (1)**
44:1
**men (1)**
24:4
**mental (11)**
41:24;50:10;51:1,2;
62:25;63:5,8;65:1,6,
17;66:1
**mentally (2)**
15:13;24:24
**mention (1)**
71:8
**mentioned (1)**
47:25
**merit (1)**

4:7
**met (2)**
59:10;60:12
**metal (3)**
71:2,3,3
**meth (1)**
22:9
**MICHAEL (2)**
62:14;66:16
**Michigan (1)**
48:20
**microphones (2)**
38:13,14
**middle (4)**
6:18;10:9;28:14;
37:6
**midnight (1)**
27:3
**might (5)**
14:21;30:25;37:20;
62:7;66:12
**mill (1)**
71:6
**mind (1)**
22:2
**minimum (1)**
29:7
**mistake (2)**
7:15,19
**mistaken (1)**
22:19
**mixer (2)**
49:21,22
**mixers (1)**
49:23
**modern (2)**
53:2;62:6
**modular (1)**
62:7
**molesters (1)**
14:20
**money (6)**
32:25;33:2;34:3;
42:19;45:15;46:18
**monitor (1)**
53:3
**monitoring (1)**
53:8
**Monroe (1)**
29:25
**months (1)**
72:22
**more (28)**
10:20;15:15;21:2;
22:6;26:5,21;30:15,
23;31:9,12,17;34:3,9,
13,17;37:16,19;
44:25;49:18;54:15;
58:24;62:10;63:17,
19;67:6,11;71:22;
72:2
**morning (2)**
19:20;68:21

**most (3)**
17:15,16;49:11
**mostly (1)**
45:20
**move (4)**
15:19;23:23;24:4;
57:24
**moved (1)**
48:25
**movement (3)**
40:24;42:1;48:9
**moving (1)**
24:15
**much (4)**
9:6;20:12;21:9;
43:9
**multiple (1)**
26:2
**Muncie (1)**
50:12
**murderer (1)**
17:23

## N

**name (4)**
3:9;51:5;67:3,5
**narcotic (1)**
66:12
**National (1)**
30:6
**nature (1)**
52:23
**necessarily (2)**
64:2;67:9
**necessary (2)**
32:11;73:6
**need (9)**
11:11;12:9,9;18:9;
31:17;38:24;62:2,9;
69:25
**needed (1)**
61:13
**needing (1)**
56:11
**needs (3)**
59:20;60:18;62:7;
64:7
**negative (4)**
18:3,5;54:19;72:16
**negatively (2)**
56:23;58:17
**negotiate (1)**
52:2
**negotiations (1)**
73:9
**nevertheless (1)**
24:18
**new (27)**
5:9,11,14,20;6:9,13,
14;8:15,19;9:10;
10:17;28:4;46:19;
55:4;59:15,21,24;

JAUSTON HUERTA, et al. vs
GREG EWING, et al.

GREGORY T. EWING, Sheriff
April 27, 2018

60:18;61:13;62:23;
63:6;69:23,24;70:19;
71:6,21;72:24
**newer (4)**
38:17;42:23,24;
43:2
**next (5)**
5:16;10:10;16:6;
28:2,3
**night (1)**
51:11
**nightmare (1)**
58:3
**ninety-one (1)**
21:11
**non (1)**
52:7
**Normally (2)**
29:15;72:12
**note (1)**
35:21
**noted (3)**
38:1,1;45:23
**notes (2)**
34:24;44:20
**Notice (1)**
4:17
**noticeable (1)**
48:4
**noticed (1)**
7:16
**November (1)**
19:9
**number (15)**
10:25;13:25;19:22;
21:19;24:8;33:5,12;
46:22,25;48:15,22;
51:17;65:18,21;68:24
**numbers (3)**
11:1;53:15;61:3
**nurse (11)**
50:25;62:22,25;
63:13,14,16,17,20;
64:6,13,19
**nurses (2)**
50:21,21
**nursing (1)**
25:5

**O**

**oath (2)**
3:2,19
**objected (1)**
73:17
**objecting (1)**
73:24
**objection (1)**
74:8
**observance (2)**
12:17,17
**observation (3)**
12:20,22;65:5

**Observations (1)**
37:7
**obviously (11)**
10:2;14:16,18,24;
15:20;37:16;45:24;
46:24;54:8;56:3;
60:16
**occupied (2)**
44:10;65:11
**occur (3)**
53:10;55:21;72:3
**occurs (1)**
34:24
**o'clock (1)**
19:19
**October (1)**
4:7
**off (17)**
10:21,23;13:9,11;
31:5,7;41:23;48:7;
61:16;62:11,13;
67:12;70:5,7,10;
73:12,14
**offender (1)**
17:20
**offenders (1)**
17:21
**offered (3)**
41:4,4,8
**office (8)**
4:2,5,9,18;5:15;
43:3;50:22;52:6
**officer-a (1)**
4:6
**officers (7)**
29:1,4,8;32:2;70:6;
73:3,4
**offices (1)**
5:18
**Old (26)**
5:11,22;6:5,12;
8:15,18,20,22,23;9:6,
18;10:3;26:16;27:10,
21;39:10;42:13;
43:12;45:21;46:6;
47:17;48:1;56:21;
64:14;71:20;72:24
**older (1)**
42:25
**onboard (1)**
70:12
**once (2)**
22:21;67:6
**one (28)**
10:2;14:1;16:25;
20:9;23:15;25:15;
30:24;35:24;44:1,7,
16,17;45:5,19;48:15;
49:22,23;50:7;51:11;
62:25;63:13,14,17;
66:25;69:12;71:22;
72:21;74:14
**ones (1)**

40:17
**only (8)**
30:20;36:15;38:5;
41:25;42:24;44:7,9;
61:15
**onto (1)**
35:25
**open (6)**
6:2;14:24;26:13,24;
27:18;58:13
**open- (1)**
27:4
**operate (1)**
12:6
**operated (3)**
70:9;73:20;74:4
**operational (2)**
7:13;8:2
**operations (2)**
4:10;35:13
**opinion (1)**
58:20
**opioid (1)**
22:10
**opportunity (2)**
39:12,22
**ordinance (1)**
60:3
**original (2)**
44:8;71:4
**originally (3)**
5:18;22:9;64:18
**otherwise (1)**
3:23
**out (32)**
8:9;12:15;18:6,8;
19:23;21:14,16;24:4;
26:7;40:18,18;42:2;
43:25;48:20,25;
49:11,16;50:12;
56:17;58:25;61:3,5;
62:21;65:4,10;67:22,
22;70:23;71:8,11,16;
72:1
**outbid (1)**
20:25
**outdoor (1)**
39:4
**outdoors (1)**
39:24
**outside (7)**
10:6;19:1;27:7;
39:10,22;59:1;68:24
**over (15)**
9:10;18:18,19;
21:21;28:17,24;
29:10;43:7;44:25;
46:24;59:8;63:14;
70:16;71:7,23
**overcrowded (4)**
13:21;14:4;44:12;
73:8
**overcrowding (6)**

37:7;40:10,21;
41:17;58:15;74:6
**overused (1)**
47:3

**P**

**padded (1)**
7:20
**Page (12)**
32:10,12;35:8,23,
25;36:8,9,25;37:5,12;
62:17;73:3
**Pages (1)**
34:25
**paid (2)**
49:11;71:5
**panels (1)**
71:9
**paperwork (1)**
31:21
**paragraph (6)**
36:8;37:6,13;45:3;
52:14,16
**paragraphs (1)**
35:24
**paramount (1)**
58:19
**parent (1)**
17:22
**Parke (1)**
20:5
**part (12)**
4:24;6:7;38:4;
39:10;42:12,24,25;
43:2,12;46:7;47:18;
63:6
**part- (2)**
33:14;35:19
**particular (2)**
23:11;56:21
**particularly (1)**
14:4;38:4
**parties (1)**
73:19
**parts (1)**
38:9
**part-time (3)**
30:25;32:22,24
**patching (1)**
45:22
**patrol (1)**
35:12
**patterns (1)**
37:9
**pay (2)**
21:2,3
**paying (1)**
20:12
**people (47)**
6:7;11:7;12:10;
14:8,21,21;15:13,20;
16:5,7,8,22;17:4;

37:7;40:10,21;
41:17;58:15;74:6
**overused (1)**
47:3

21:7;24:20,21,23;
25:3;26:2;28:20;29:2;
31:17,24;33:5,7;
39:15;40:17,18;41:6;
44:24;51:15,22;
53:16,24;54:6;55:4;
57:4;58:6,12,25,25;
63:9;65:25;66:18;
67:7;70:12;72:1
**per (5)**
20:13;32:25;44:22;
46:24;48:5
**percent (1)**
37:24
**perfect (2)**
12:5,11
**period (2)**
50:5;63:15
**permanent (3)**
11:1;12:1;25:10
**permitting (1)**
39:24
**perpetrator (1)**
17:9
**person (14)**
4:18,20;6:19;16:12,
12;17:2;44:16;51:2;
65:1,12,24;69:12;
71:23;72:11
**perspective (1)**
51:13
**phone (1)**
20:19
**physical (12)**
4:22;37:8,25;39:12;
4:2;37:4,5;48:11;
54:21;55:12;56:9;
57:1,13
**physically (3)**
9:12;24:24;38:12
**physicians (1)**
66:5
**pie (1)**
6:18
**pieces (2)**
46:8;49:20
**pills (1)**
65:18
**place (7)**
15:10;45:15;49:9;
51:23;55:2;58:20;
72:5
**places (1)**
21:6
**placing (1)**
20:2
**Plaintiffs (1)**
62:15
**Plaintiffs' (1)**
3:8
**plan (6)**
57:22;58:7,8,10
**plastic (2)**

JAUSTON HUERTA, et al. vs
GREG EWING, et al.

GREGORY T. EWING, Sheriff
April 27, 2018

25:18,24
**please (4)**
  3:9,22;22:4;62:17
**plug (1)**
  24:8
**plumber (2)**
  45:21;46:6
**plumbing (4)**
  43:8;45:20;46:2;
  48:15
**plus (2)**
  37:24;60:6
**plywood (1)**
  70:16
**pod (2)**
  6:15;25:1
**pods (1)**
  6:20
**population (13)**
  18:18;19:7,8,19;
  21:15;22:7;23:4;25:7;
  35:4;51:14;53:13;
  54:20;59:6
**population-wise (1)**
  22:13
**position (2)**
  29:23;63:2
**positions (4)**
  32:20,24;33:17,18
**possible (1)**
  62:5
**possibly (1)**
  14:11
**potentially (2)**
  47:13,15
**precipitate (1)**
  65:8
**predecessor (2)**
  43:18,21
**preexisting (4)**
  66:1,7,14,18
**prefer (1)**
  68:9
**preliminary (2)**
  60:21;61:2
**prepared (2)**
  48:18;62:18
**preparing (1)**
  30:20
**prescribed (1)**
  66:6
**prescriptions (3)**
  66:11,15,21
**Present (1)**
  63:1
**presently (1)**
  35:11
**pressure (4)**
  21:15,18;23:6;
  72:17
**pressures (2)**
  25:8;60:17
**pretty (3)**

9:6;21:9;61:9
**prior (3)**
  4:3;19:12;40:5
**prison (1)**
  22:23
**prisoner (10)**
  15:1;40:24;46:24;
  47:21;53:12;54:18;
  55:16,17;56:16,23
**prisoners (48)**
  17:14;18:13,14;
  19:1,22;20:2;21:13,
  15;22:15;23:11;
  24:15;25:8;28:8;
  29:10;39:18,21;40:8;
  41:1,18;42:6,9;45:23,
  25;46:25;47:8,10;
  48:22;49:14,15;
  50:15;51:17;52:23,
  25;53:3,20;54:11;
  55:5,8,14;56:1,10,18;
  57:2,3,9,17,21;58:18
**private (4)**
  39:20;48:18;58:23;
  71:22
**probably (23)**
  6:3;22:11;23:14;
  26:6;33:4,8,14,18;
  34:9;47:23;48:9;
  49:18,22;51:23;52:8;
  58:19;62:20;63:18,
  19,25;65:14;71:2;
  72:15
**probation (1)**
  23:3
**problem (15)**
  23:24;33:19;34:24;
  36:11,22,24;39:2;
  40:12,13;42:15;
  47:20;49:13;50:8;
  54:23;56:10
**problems (27)**
  37:14,17,18,21;
  41:21;42:23;43:5;
  45:18,19;46:16;
  48:11;49:3;53:9;
  54:15;55:1,20;57:11,
  13;65:17,17;66:1,19;
  70:18,19;72:9,19;
  74:7
**produce (1)**
  49:8
**product (1)**
  40:21
**project (1)**
  61:17
**prompt (1)**
  56:11
**proper (1)**
  17:18
**properly (2)**
  17:14;71:17
**proposal (1)**

31:16
**propose (1)**
  60:9
**proposed (1)**
  60:3
**prosecutor (2)**
  16:16;23:3
**protective (2)**
  14:19;24:7
**provided (1)**
  50:10
**provider (2)**
  62:19,21
**proximity (1)**
  68:15
**psychologists (1)**
  63:7
**public (2)**
  44:1;71:25
**punch (1)**
  36:15
**punches (1)**
  52:6
**put (15)**
  11:11;12:9;14:8;
  15:1;28:14;40:2;
  46:18;58:6;65:3,4;
  66:19;70:20;71:6,10;
  72:13

**Q**

**QCC (1)**
  51:3
**Quality (3)**
  50:12;51:3;63:6
**quick (1)**
  17:5
**quickliness (1)**
  51:21
**quickly (1)**
  51:18
**quite (4)**
  16:21;20:4;44:22;
  62:5

**R**

**rarely (1)**
  40:19
**rate (1)**
  6:23
**rather (1)**
  41:12
**raw (1)**
  53:15
**Ray (5)**
  60:10,25;61:1,10,
  22
**reached (1)**
  73:19
**read (7)**
  28:10;30:16;32:6;

35:23;36:1;67:13,17
**ready (1)**
  8:3
**real (1)**
  17:4
**realize (1)**
  12:6
**really (5)**
  17:16;22:10;43:10;
  63:24;64:7
**reason (1)**
  14:7
**reasons (1)**
  17:17
**rec (2)**
  40:8;41:22
**recall (1)**
  48:6
**recent (1)**
  45:4
**recognize (1)**
  4:14
**recommended (1)**
  60:5
**recommending (1)**
  73:4
**reconcile (1)**
  33:12
**record (10)**
  10:21,23;13:9,11;
  31:5,7;62:12,13;
  73:12,14
**recreating (1)**
  41:10
**recreation (12)**
  6:11;39:4,17,22;
  40:15;41:4,6,19;42:4,
  6,10;59:1
**rectified (1)**
  37:19
**redo (1)**
  49:9
**reduce (1)**
  42:2
**refer (1)**
  5:20
**referring (1)**
  44:23
**regard (2)**
  73:10,20
**regarding (1)**
  22:14
**regular (5)**
  41:19;51:5;65:19,
  20;66:22
**regularly (1)**
  40:9
**rehabbed (1)**
  59:18
**relative (2)**
  17:8;42:25
**relieving (1)**
  60:17

**rely (1)**
  7:7
**remedy (1)**
  59:14
**remember (9)**
  20:11;31:11;44:3,4;
  48:23;67:3,3,4,5
**renovation (1)**
  58:11
**repeatedly (1)**
  31:12
**report (15)**
  7:9,12;19:7,8;32:5,
  6;34:7,10,24;36:5,8,
  25;59:6;60:22;61:3
**reporting (1)**
  56:4
**reports (3)**
  19:19;46:22;55:10
**represent (3)**
  19:5,11;61:21
**representative (2)**
  60:1;61:19
**request (4)**
  34:19;36:2;50:20;
  52:10
**requested (1)**
  30:23
**requests (1)**
  64:8
**require (1)**
  65:18
**required (1)**
  69:3
**requirements (1)**
  70:12
**reserved (2)**
  20:17;23:10
**resident (1)**
  43:17
**resolution- (1)**
  73:11
**resource (1)**
  35:11
**respond (1)**
  56:20
**response (4)**
  10:5;11:8;36:10;
  45:6
**responsible (1)**
  28:21
**restraining (2)**
  65:3,10
**result (2)**
  22:12;51:14
**retro (1)**
  46:7
**revealed (1)**
  35:10
**review (1)**
  50:22
**reviewed (2)**
  50:17;52:9

JAUSTON HUERTA, et al. vs
GREG EWING, et al.

GREGORY T. EWING, Sheriff
April 27, 2018

**rewrote (1)**
22:19
**right (27)**
4:12;5:16;7:24;
10:3;11:24,24;12:18;
15:4,20;16:9;28:2;
29:12;33:11;34:22;
36:18,20;43:18;
44:18;48:24;49:3;
52:9;61:18;64:3,4;
70:7;73:13;74:4
**rise (1)**
53:16
**risk (2)**
17:13;53:12
**risks (1)**
35:2
**RJS (1)**
60:10
**rolls (1)**
54:8
**roof (3)**
22:8;46:16,19
**room (13)**
6:17;10:4;11:10;
14:8;26:15,21;27:7,
21,22;28:15;39:11;
41:25;64:18
**rooms (2)**
6:11;35:15
**round (1)**
10:9
**routine (2)**
24:13;35:13
**row (1)**
6:2
**rudimentary (2)**
24:19;25:6
**run (2)**
26:7;58:21
**running (3)**
45:15;47:6,7

**S**

**safe (3)**
18:10,12;58:21
**safety (2)**
52:20;56:24
**SAITH (1)**
74:18
**sallyport (2)**
57:25;58:7
**same (8)**
8:4;12:18;15:17;
24:7;36:7;43:1;64:21;
74:8
**saw (2)**
59:14;61:13
**saying (4)**
7:15;46:1;58:10;
63:4
**scenes (1)**

46:4
**screws (2)**
71:1,8
**scrupulously (1)**
33:24
**searches (1)**
35:14
**second (4)**
10:22;13:10;31:6;
52:13
**section (2)**
70:19;71:20
**secure (1)**
58:21
**security (4)**
35:13;47:20;52:20;
71:1
**seeing (2)**
21:25;60:17
**seems (1)**
22:5
**segregated (1)**
15:10
**segregation (5)**
11:21;14:25;15:2,7,
8
**sent (2)**
21:14,20
**separate (2)**
11:9;69:6
**separation (1)**
70:13
**separtee (2)**
16:15;17:7
**separtees (3)**
16:1,7,22
**sergeants (1)**
32:3
**seriously (1)**
11:16
**service (1)**
49:21
**Services (5)**
48:20;49:25;52:1,3;
60:10
**set (1)**
8:9
**settlement (2)**
39:20;58:23
**setup (1)**
62:7
**seven (1)**
12:1
**several (1)**
21:24
**sheet (3)**
9:11;71:2,2
**SHERIFF (13)**
3:1,11;4:1,8,8,11,
18;34:16,17;65:12;
70:22;73:16;74:21
**Sheriffs (1)**
30:3

**Sheriff's (2)**
4:5;20:18
**shift (1)**
32:2
**shifts (1)**
28:24
**short (4)**
33:23;36:21;37:6;
40:14
**shortest (1)**
9:9
**short-term (1)**
11:14
**show (1)**
19:9
**shower (8)**
10:10,11;26:18,20;
27:7;47:3,7,7
**showers (1)**
46:23
**showing (6)**
4:13;8:6;19:4;
29:17;30:9;43:15
**shrink (1)**
23:24
**shut (3)**
24:1;27:1;58:1
**sick (1)**
11:7
**side (34)**
5:9,11,11,21,22;6:5,
9,12,13,14;8:15,16,
18,20,20,22,23;9:6,
10,18;10:3,17;26:16,
20;27:10;28:4;38:17;
45:21;46:6;48:1;
56:21;69:23,24;71:7
**side/old (1)**
5:9
**sides (1)**
53:18
**sight (1)**
70:13
**signature (1)**
74:13
**similar (1)**
42:23
**single (2)**
14:10;45:22
**sink (1)**
46:13
**sit (1)**
70:25
**sits (1)**
6:19
**situation (6)**
21:1;53:19;56:13,
15;59:17;61:14
**six (6)**
10:1;24:1;33:3,6,
17,18
**size (2)**
9:18;29:15

**sizes (2)**
9:4,20
**sleep (6)**
27:10,11,12;28:4;
68:5,9
**sleeping (4)**
47:11,11;67:25;
68:13
**slide (1)**
68:8
**slip (1)**
57:17
**small (6)**
9:24;10:14;26:17;
39:9;54:6;58:7
**smaller (1)**
69:7
**smoke (1)**
58:2
**Sol (2)**
13:14,14
**Solitary (8)**
8:21;11:3,19,19;
12:23,23;24:11,11
**solved (1)**
37:21
**somebody (6)**
14:11;17:1,15;64:6;
67:21;68:16
**somehow (3)**
50:20;56:16,17
**someone (4)**
7:4;11:14;13:16;
15:17
**someone's (1)**
21:5
**sometimes (21)**
16:15;17:7;18:18;
20:22;24:3,3;26:5;
27:23;41:5;45:23,25;
50:5;51:14;53:23;
54:2,5,11;59:10;65:3;
68:4,8
**Somewhere (4)**
15:15;30:22;33:20;
63:22
**Sorry (1)**
71:14
**sort (8)**
11:23;20:19;21:5;
34:11;55:6,13,16;
56:15
**sound (1)**
70:13
**source (1)**
47:8
**space (9)**
5:19;10:14;26:17;
28:3;53:17;54:6;
64:17;71:21;72:7
**specific (2)**
31:9;67:5
**speculate (2)**

21:24;72:14
**spending (1)**
45:14
**spent (1)**
46:18
**spoke (2)**
47:24;59:13
**spread (1)**
51:22
**staff (44)**
18:13;25:5;28:20;
29:13,20;30:5,16,23,
25;31:12,24;32:13;
34:9,14,17,25;35:11,
14,18;36:16,18,21;
37:19;38:2,3;39:2;
41:1,17;50:17;52:19,
19;53:18;54:9,12,19,
23;55:8,14;56:19,20;
57:22;58:16;62:9;
66:20
**staffing (13)**
30:13;32:11,11;
35:3,9;36:22;37:3,9;
40:9,14,22;62:7;63:1
**standards (1)**
62:6
**standpoint (2)**
42:16;47:21
**start (1)**
57:23
**started (3)**
4:5;22:1;73:16
**starting (1)**
43:1
**State (8)**
3:9;7:2;21:12;23:1;
30:2;45:8,8;46:20
**statement (4)**
43:16,18;52:13;
68:7
**states (1)**
3:5
**station (2)**
50:21;63:16
**status (1)**
16:15
**stay (2)**
22:23,24
**steady (1)**
45:8
**steam (1)**
41:23
**steel (2)**
57:25;71:6
**step (1)**
57:4
**still (21)**
8:12;33:23;35:6,16,
21;36:3,4,5,7,11,22,
24;37:1,9,11,13;
38:24;40:12,13;
59:20;63:13

stipulation (1)
73:19
storage (1)
7:21
strain (1)
66:19
Streeter (1)
62:23
strong (1)
47:17
structural (2)
45:11;70:18
structure (11)
4:23;26:9;37:8,25;
41:17;43:5;48:12;
54:21;55:22;57:1;
59:18
study (1)
60:10
stuff (6)
7:21;31:10;42:3;
43:8;46:3;49:23
submitted (1)
31:20
substitute (1)
66:13
subversive (1)
43:16
suffer (1)
53:21
sufficient (1)
35:11
suicide (1)
11:23
Sullivan (1)
20:5
summary (1)
35:8
summer (1)
59:13
supervise (3)
54:3;55:23;62:9
supervisor (1)
32:2
supplemented (1)
63:11
supplied (1)
30:6
suppose (3)
17:23;21:24;58:12
supposed (6)
46:23;50:2;58:12;
66:10,13;72:16
sure (13)
7:9;8:17;16:11;
17:24,24;39:1;44:22;
48:14;51:17;55:25;
57:12,15;61:9
surely (1)
65:22
suspect (1)
34:16
SUTHERLIN (8)

9:23;58:8;62:11,15;
73:15,22;74:2,9
sworn (1)
3:2
system (7)
13:15;36:13;50:14;
56:22;60:15;69:19;
70:21
systems (3)
42:20;45:12;53:3

T

table (2)
10:9;37:1
tables (9)
10:7,8,12,14,20;
26:17;28:2,2,3
talk (6)
4:22;14:12;30:9;
37:16;69:24;72:4
talked (6)
42:18,18,19;54:16;
60:24,25
talking (4)
10:25;33:7;56:9;
59:23
talks (2)
35:1;45:3
task (1)
17:2
taxed (1)
47:5
technical (1)
71:13
television (2)
10:10,11
temporary (1)
19:22
ten (4)
16:8;26:5;61:22;
62:2
tension (1)
47:8
tensions (1)
53:16
term (1)
8:2
terms (4)
7:24;33:2,11;44:5
testify (1)
4:19
testimony (1)
17:24
that- (1)
7:17
the- (3)
6:6;24:2;38:10
there' (1)
20:20
therefore (3)
53:8;54:18;55:4
thin (1)

25:24
third (3)
6:10;40:6;45:3
Thirty-five (1)
20:13
Thomas (2)
3:10;67:1
though (5)
20:11;43:12;62:22;
64:7;66:17
thought (3)
61:22
three (13)
10:11;12:12;26:17;
28:24;35:24;39:23;
40:8;49:8;51:25;
58:19;59:2,5;63:18
throughout (1)
51:22
tight (2)
49:9,17
tiles (2)
49:10;70:24
timeliness (1)
51:21
times (7)
25:8;41:9;47:10;
49:8,25;53:4,21
today (4)
23:16;25:1;30:22;
35:18
together (5)
16:24;17:4;24:25;
25:4;53:25
together' (1)
16:18
toilet (5)
27:8,20;46:14;47:6,
7
toilets (7)
27:6;46:5,8,10,13,
23;47:14
told (3)
26:8;46:6;70:4
took (1)
4:2
top (5)
36:9;48:7;67:12,22;
70:25
tornado (1)
57:20
total (3)
32:12;33:5,12
tough (1)
45:16
toured (2)
8:25;70:11
toward (1)
54:11
towards (1)
16:23
towels (1)
71:10

transport (1)
29:1
transportation (1)
20:14
transporting (1)
44:23
treated (1)
66:4
triaging (1)
51:15
tried (3)
36:20;40:13;49:20
trigger (1)
58:1
true (8)
36:3,4,6;53:1,5;
62:6;63:24;66:3
truth (3)
3:3,3,4
try (11)
17:19;21:6;23:3;
24:18,19,23;25:2;
27:12;28:14;45:15;
69:7
trying (5)
20:25;25:6;33:11;
70:23;73:10
tuberculosis (2)
72:18,19
turn (2)
70:5,7
turned (4)
5:20;11:10;48:25;
70:10
turnover (2)
54:23;55:1
TV (2)
26:17,20
twenty (5)
26:5;61:6,7,8,9
twenty- (1)
23:25
twenty-five (1)
61:5
twenty-four (6)
50:23,25;63:14,15,
16,21
two (12)
6:8,10;9:5;10:8;
11:6;29:7,16;32:18;
44:17;49:23;51:3;
72:15
two-and-a-half (1)
69:13
type (5)
6:15;15:1;18:1;
25:3;41:24
Typically (1)
17:4
typo (1)
33:25

U

unconstitutional (2)
73:21;74:5
under (3)
3:19;68:8;70:21
underneath (1)
28:2
understaffing (1)
74:6
undoubtedly (1)
55:20
Unhuh (4)
10:5;11:8;36:10;
45:6
uniform (1)
9:18
unit (4)
11:9;46:11,14,15
units (2)
46:13;69:8
unless (2)
52:7;56:7
up (19)
6:2;11:1,3;19:12;
33:2,17;44:18;49:10,
16;56:2;66:20;69:9,
12,18;70:21,22;71:4,
11,15
upon (3)
3:2;58:23;71:19
urinal (1)
68:15
use (5)
7:21;23:21;49:18;
66:13;68:16
used (4)
7:22;8:3;14:1;39:7
using (2)
24:10,12
Usually (1)
68:22
utensils (1)
49:18

V

vacated (1)
5:19
varies (1)
68:24
various (3)
8:9;19:12;74:6
vending (2)
11:10;64:18
versa (1)
24:6
vice (1)
24:6
vicious (1)
55:6
victim (1)

17:8
**video (7)**
12:20,22;13:1,15;
53:3;56:8;69:19
**view (2)**
8:3;38:9
**Vigo (6)**
3:11;20:3;21:20;
35:10;43:17;60:16
**vigorous (1)**
39:12
**violence (4)**
16:23,25;53:9;56:9
**violent (2)**
24:21;54:19
**Virgil (1)**
51:7
**visits (1)**
63:23
**visual (1)**
12:17
**vs (2)**
5:3;6:22

**W**

**wait (1)**
52:5
**waived (1)**
69:3
**wall (1)**
22:23
**walls (1)**
46:4
**wanna-be (1)**
6:14
**wants (1)**
72:4
**was- (1)**
24:6
**watch (2)**
11:23;24:25
**watched (1)**
15:15
**water (1)**
68:17
**waves (1)**
56:4
**way (17)**
6:21;7:18;9:14;
21:13;26:9;38:5;
46:24;56:6;59:19;
61:3;64:20;68:16;
70:9,23;71:16;72:10,
16
**ways (1)**
23:4
**wearing (1)**
43:4
**weather (1)**
39:24
**week (4)**
39:23;40:9;59:2,5

**weekly (1)**
64:12
**welfare (4)**
36:9,12,16,19
**wellness (1)**
41:24
**wet (4)**
45:24;46:1;47:12;
57:16
**what-have-you (1)**
45:24
**what's (3)**
38:5,6,18
**whenever (1)**
66:22
**Where's (1)**
13:7
**wherever (1)**
48:14
**Whipker (5)**
7:1;8:3;14:1;46:21;
47:24
**whole (5)**
3:3;6:6;41:5,7,8
**wider (1)**
6:4
**willing (2)**
21:2;56:18
**Wilson (6)**
29:21;32:16;33:12;
35:1,8;38:1
**windows (1)**
70:15
**winter (1)**
72:22
**with-' (1)**
17:5
**without (4)**
18:7;53:8;68:10,14
**WITNESS (3)**
3:20,25;36:2
**wonderful (1)**
19:6
**word (1)**
57:7
**work (2)**
55:2;71:1
**worked (1)**
17:1
**workers (1)**
23:2
**works (1)**
30:2
**world (2)**
12:5,11
**worst (1)**
58:3
**wound (1)**
71:4
**wrong (4)**
15:5,22;67:1,7

**Y**

**year (10)**
4:9;23:17;31:14;
34:6,13;40:7,17;44:2,
2;60:4
**years (10)**
4:11;16:4;30:22;
42:12;59:23;61:5,6,8,
22;62:2
**yesterday (1)**
30:11
**you-I (1)**
31:10
**your- (1)**
73:23

**1**

**1 (15)**
8:20,21,21;11:6,19,
22;12:13,23;13:13,14,
14;24:10,11,12;52:7
**10 (2)**
34:25;36:8
**100 (1)**
37:24
**100% (2)**
13:21;38:9
**1006 (1)**
22:18
**11 (1)**
35:1
**133 (2)**
44:11;48:25
**144 (1)**
30:19
**17 (4)**
32:10,13;62:17;
73:3
**1980 (1)**
4:24;5:11
**1982 (3)**
44:8;48:23;64:16
**1991 (2)**
4:6;23:18
**1992 (1)**
4:7
**1st (2)**
4:2;19:9

**2**

**2 (15)**
8:20,21,21;11:6,19,
22;12:13,23;13:13,14,
14;24:11,11,12;35:8
**20 (1)**
68:24
**20% (1)**
59:8
**2000 (3)**

5:2,11,14
**2003 (1)**
4:8
**2011 (1)**
4:2
**2013 (2)**
62:19;63:1
**2014 (1)**
18:22
**2015 (2)**
30:14,21
**2016 (1)**
73:10
**22 (2)**
23:25;73:5
**23 (1)**
36:25
**24th (1)**
19:9
**26 (1)**
37:5
**260 (2)**
11:4;24:16
**267 (4)**
7:12,25;8:1;18:19
**267-268 (1)**
49:2
**268 (7)**
6:24;7:15,25;40:2;
58:6,24;59:7
**27 (1)**
37:12

**3**

**3 (5)**
8:21;11:22;12:13;
13:15;24:12

**4**

**4 (1)**
23:9
**40 (1)**
32:13
**42 (2)**
23:17;73:5
**45 (4)**
23:17;32:20;33:13,
20

**5**

**50 (1)**
68:25
**500 (1)**
60:6
**51 (2)**
33:7,20

**6**

**6 (3)**

22:15,21;33:14
**65.5 (1)**
34:1
**66.5 (5)**
32:16;33:13,25;
34:1,4

**7**

**7 (2)**
27:5;35:23
**7:30 (1)**
68:23
**78 (3)**
44:22,24,25

**8**

**8 (3)**
19:19;35:25;68:23
**80% (7)**
13:24;14:4;17:25;
18:8,19,22;44:25
**83 (2)**
44:9;48:24

**9**

**91 (1)**
22:1



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

JAUSTON HUERTA, *et al.*,    )
                             )
        Plaintiffs,          )
                             )
            v.               )    No. 2:16-cv-397-JMS-DKL
                             )
GREG EWING, *et al.*,        )
                             )
        Defendants.          )

## Notice of Deposition

To:    The Vigo County Council

        Plaintiffs notify the defendants that the deposition of the Vigo County Council will be taken pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, beginning at 9:30 a.m. on April 27, 2018, at the offices of Wilkinson, Goeller, Modesitt, Wilkinson & Drummy, LLP, 333 Ohio Street, Terre Haute, IN 47807.

        Pursuant to Rule 30(b)(6), the defendant Vigo County Council is to designate one or more employees, agents, officers, or other persons to testify on its behalf at the deposition as to the following matters.

        1.      Whether the Vigo County Council is of the opinion that a new, or expanded, Vigo County Jail needs to be constructed and, if so, why.

        2.      All steps that have been taken, or that will or may be taken, by the Vigo County Council to address any:

                a.      Population pressures on the Vigo County Jail and, what are those pressures, if any.

                b.      Issues concerning staffing at the Vigo County Jail, and, what are those issues, if any.

                c.      Concerns about physical plant deficiencies of the Vigo County Jail, and, what are those concerns, if any.

[1]

3.      The options to fund a new or expanded Vigo County Council and the steps being taken by the Council to explore and/or effectuate an option or options.

4.      Whether the Vigo County Council believes that the Vigo County Jail is adequately staffed and upon what is that belief based.  If the Council does not believe that the Jail is adequately staffed, the amount of money it will take to adequately staff the Jail.

5.      All efforts being made to build a new Vigo County Jail or to expand the existing facility.

6..      The recommendations of any consultants hired to evaluate the need for a new or expanded Vigo County Jail.

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, please produce at the deposition the following documents to the extent that they have not already been produced in this litigation or in *Hos v. Vigo Co. Sheriff*, No. 84D01-1308-PL-07173 (Vigo Sup. Ct.).

1.      Any and all documents, created since January 1, 2016, that concern efforts that have been taken by the defendants, or that are planned or that may take place, to address the population of the Vigo County Jail.

2.      Any and all documents that discuss the need, desire, plans, or hopes for a new or expanded Vigo County Jail facility or problems with the existing Vigo County Jail created by the Vigo County Sheriff, Commissioners, or Council, or created by others but in the possession of the Vigo County Commissioners.

3.      Any and all documents that concern the need for increased staff at the Vigo County Jail.

4.      Any and all reports or other documents produced by consultants hired to evaluate the need for a new or expanded Vigo County Jail.

_s/ Michael K. Sutherlin_
Michael K. Sutherlin
No. 508-49
Michael K. Sutherlin and Associates
403 E. Wabash Ave.
Crawfordsville, IN 47933
317/634-6313
fax: 317/631-8818
msutherlin@gmail.com

[2]

Attorney for Plaintiffs and the Certified Class


s/ Kenneth J. Falk
Kenneth J. Falk
No. 6777-49
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059 ext. 104
fax: 317/635-4105
kfalk@aclu-in.org

Attorney for the Certified Class


## Certificate of Service

I hereby certify that on this 23rd day of April 2018, a copy of the foregoing served on the below named persons both electronically and via first class U.S. postage, pre-paid.

Michael Wright
605 Ohio Street – Suite 312
Terre Haute, IN 47807
wrightlawfirm812@gmail.com

Craig M. McKee
David P. Friedrich
WILKINSON, GOELLER, MODESITT, WILKINSON
   & DRUMMY
333 Ohio St.
PO Box 800
Terre Haute, IN 47808
cmmckee@wilkinsonlaw.com
dpfriedrich@wilkinsonlaw.com


s/ Kenneth J. Falk
Kenneth J. Falk
Attorney at Law

[3]



PLAINTIFF'S DEPOSITION EXHIBIT
2

# FACTS

The Vigo County jail was originally constructed in 1982. A renovation project to increase the original capacity was completed in 2001.

Current inmate capacity is 268 inmates, dictated by a Private Settlement Agreement established in response to a federal lawsuit filed by the ACLU (American Civil Liberties Union).

Current demand exceeds available capacity by an average inmate count of 78 inmates per day. These inmates are transported to jail facilities in other counties at a daily charge of $35 per day/per inmate. (This cost does not include transportation, supervision or medical costs).

The projected number of beds required based on recent violation trends and the implementation of House Bill 1006 is estimated at 528 beds.

Vigo County ranks near the top of all Indiana Counties for the production of methamphetamine and related arrests.

Because of the lack of facilities to accommodate offenders, Vigo County Law Enforcement currently has suspended the execution of arrest warrants for non violent offenders.

A recent evaluation of the existing jail facility has determined the condition of the Vigo County Jail to be in advanced state of deterioration due to the nonstop abuse of the inhabitants for nearly forty years. In particular, major deficiencies exist in the HVAC, structural and electrical systems.

The limited capacity of the existing jail prevents the effective separation of higher risk offenders from the general population. Furthermore, census of female inmates has increased significantly over the past 20 years, creating further separation deficiencies. Currently conditions demand staffing well in excess of modern industry standards. All of these factors impact both staff and inmate safety and security.

---

"Imagine filling your house, wall to wall, with hundreds of people who are not allowed to leave and do not want to be there. Now imagine what sort of damage they would do and the condition of your home after decades of abuse. That is the situation we are dealing with when it comes to our jail."

Jon Marvel,
Vigo County Commissioner &
Former Vigo County Sheriff

PLAINTIFF'S DEPOSITION
EXHIBIT
3
PENGAD 800-631-6989

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| JAUSTON HUERTA, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 2:16-cv-397-JMS-DKL |
| | ) | |
| GREG EWING, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### Notice of Deposition

To:    Greg Ewing, in his official capacity as Vigo County Sheriff

Plaintiffs notify the defendants that the deposition of Greg Ewing, in his official capacity as Vigo County Sheriff, will be taken pursuant Rule 30(b)(6) of the Federal Rules of Civil Procedure, beginning at 10:00 a.m. on April 27, 2018, at the offices of Wilkinson, Goeller, Modesitt, Wilkinson & Drummy, LLP, 333 Ohio Street, Terre Haute, IN 47807.

Pursuant to Rule 30(b)(6), the defendant Greg Ewing in his official capacity as Vigo County Sheriff, is to designate one or more employees, agents, officers, or other persons to testify on its behalf at the deposition as to the following matters.

1.    The history of the physical structure of the Vigo County Jail including the date or dates the structure of the Jail was built and the specific areas within the structure (cell blocks by name, capacity, and purpose; recreation areas; medical unit(s); kitchen; etc.).

2.    How frequently prisoners in the Vigo County Jail in each cell block are not able to sleep on a permanent bed because all permanent beds are occupied and where the prisoners sleep in such situations and how frequently this has occurred in the Vigo County Jail since January 1, 2018.

3.    The importance of classification of prisoners in a jail and whether classification is a problem at the Vigo County Jail and, if so, why this is and what problems are engendered because of this problem.

4.    The benefits of recreation for Vigo County Jail prisoners and whether prisoners in the Vigo County Jail are being afforded physical exercise outside of

[1]

their immediate cell areas and, if so, how frequently and how frequently this is out-of-doors.

5.      Whether there is sufficient correctional staff employed by the Vigo County Jail. On what is this opinion based and why and what problems are caused by the existing staffing levels. What efforts have been made to address the staffing level.

6.      The efforts the Vigo County Jail must make to house Vigo County Jail prisoners in other county jails and the complete cost of these efforts, including, but not limited, the amounts paid to other jails and the staffing and transportation costs incurred by Vigo County.

7.      Any and all problems engendered by the population levels at the Vigo County Jail.

8.      Whether the Vigo County Sheriff believes that a new jail facility is necessary and, if so, all reasons why.

9.      Whether the Vigo County Sheriff has been able to comply with the terms of the Private Settlement Agreement in *Acosta v. Harris* (TH 00-081-C-Y/H) and if not, how and why not.

10.      Existing problems with the physical plant of the Vigo County Jail.

11.      Whether the Vigo County Sheriff is of the opinion that the population of the Jail, its physical layout, staffing patterns and/or any other reason(s), has contributed to incidences of prisoner to prisoner or prisoner to staff violence. and, if so, why.

12.      Whether any current conditions at the Vigo County Jail contribute to any difficulty in prisoners obtaining medical care and, if so, what conditions and what problems are engendered.

13,      All ways that the current population of the Jail, its physical layout, its structure, staffing patterns and/or any other conditions at the Jail negatively affect the Jail's ability to care for its prisoners and, if so, how.

14.      All efforts being made to build a new Vigo County Jail or to expand the existing facility.

15.      The recommendations of any consultants hired to evaluate the need for a new or expanded Vigo County Jail.

[2]

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, please produce at the deposition the following documents to the extent that they have not already been produced in this litigation or in *Hos v. Vigo Co. Sheriff*, No. 84D01-1308-PL-07173 (Vigo Sup. Ct.).

1.      Any and all documents that contain information about there not being room for prisoners to sleep on permanent beds in the Vigo County Jail since January 1, 2017.

2..     Any and all documents specifying recreation offered to prisoners in the Vigo County Jail since January 1, 2017.

3.      Any and all documents, created since January 1, 2016, that concern efforts that have been taken by the defendants, or that are planned or that may take place, to address the population of the Vigo County Jail.

4.      Any and all documents created by the Vigo County Sheriff, Commissioners, or Council, or created by others but in the possession of the Vigo County Sheriff. that discuss the need, desire, plans, or hopes for a new or expanded Vigo County Jail facility or problems with the existing Vigo County Jail.

5.      Any and all documents that concern the need for increased staff at the Vigo County Jail.

6.      Any and all documents that discuss the number of beds needed in the Vigo County Jail at the current time or in the future.

7.      Any and all documents showing the staffing patterns at the Vigo County Jail on June 1, 2015; June 1, 2016; and June 1, 2017, and the current time.

8.      Any and all materials that document prisoner on prisoner or prisoner on staff violence at the Vigo County Jail since June 1, 2017.

9.      Any and all reports or other documents produced by consultants hired to evaluate the need for a new or expanded Vigo County Jail.

s/ *Michael K. Sutherlin*
Michael K. Sutherlin
No. 508-49
Michael K. Sutherlin and Associates
403 E. Wabash Ave.
Crawfordsville, IN 47933

[3]

317/634-6313
fax: 317/631-8818
msutherlin@gmail.com

Attorney for Plaintiffs and the Certified
Class


s/ Kenneth J. Falk
Kenneth J. Falk
No. 6777-49
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059 ext. 104
fax: 317/635-4105
kfalk@aclu-in.org

Attorney for the Certified Class


## Certificate of Service

I hereby certify that on this 23rd day of April 2018, a copy of the foregoing served
on the below named persons both electronically and via first class U.S. postage, pre-paid.

Michael Wright
605 Ohio Street – Suite 312
Terre Haute, IN 47807
wrightlawfirm812@gmail.com

Craig M. McKee
David P. Friedrich
WILKINSON, GOELLER, MODESITT, WILKINSON
    & DRUMMY
333 Ohio St.
PO Box 800
Terre Haute, IN 47808
cmmckee@wilkinsonlaw.com
dpfriedrich@wilkinsonlaw.com

[4]

s/ Kenneth J. Falk
Kenneth J. Falk
Attorney at Law

[5]



PLAINTIFF'S DEPOSITION EXHIBIT 4
PENGAD 800-631-6989

|  | Current | Temporary | Female | Male |
|---|---|---|---|---|
| 11/1/17 | 275 | 27 | 42 | 260 |
| 11/2/17 | 280 | 26 | 45 | 261 |
| 11/3/17 | 272 | 26 | 42 | 256 |
| 11/4/17 | 268 | 26 | 43 | 251 |
| 11/5/17 | 278 | 25 | 44 | 259 |
| 11/6/17 | 282 | 25 | 45 | 262 |
| 11/7/17 | 271 | 25 | 44 | 252 |
| 11/8/17 | 269 | 25 | 43 | 251 |
| 11/9/17 | 270 | 24 | 42 | 252 |
| 11/10/17 | 269 | 22 | 42 | 249 |
| 11/11/17 | 276 | 22 | 44 | 254 |
| 11/12/17 | 276 | 22 | 43 | 255 |
| 11/13/17 | 284 | 22 | 44 | 262 |
| 11/14/17 | 269 | 22 | 43 | 248 |
| 11/15/17 | 267 | 21 | 43 | 245 |
| 11/16/17 | 269 | 20 | 42 | 247 |
| 11/17/17 | 259 | 21 | 44 | 236 |
| 11/18/17 | 251 | 21 | 40 | 233 |
| 11/19/17 | 263 | 20 | 43 | 241 |
| 11/20/17 | 266 | 19 | 42 | 244 |
| 11/21/17 | 257 | 18 | 43 | 233 |
| 11/22/17 | 249 | 17 | 40 | 227 |
| 11/23/17 | 245 | 20 | 42 | 224 |
| 11/24/17 | 247 | 20 | 43 | 225 |
| 11/25/17 | 257 | 20 | 45 | 233 |
| 11/26/17 | 263 | 20 | 47 | 237 |
| 11/27/17 | 268 | 20 | 48 | 241 |
| 11/28/17 | 263 | 22 | 47 | 239 |
| 11/29/17 | 272 | 23 | 48 | 248 |
| 11/30/17 | 281 | 23 | 52 | 253 |
| 12/1/17 | 277 | 23 | 46 | 255 |
| 12/2/17 | 268 | 21 | 43 | 247 |
| 12/3/17 | 269 | 20 | 43 | 247 |
| 12/4/17 | 284 | 20 | 46 | 258 |
| 12/5/17 | 283 | 20 | 48 | 255 |
| 12/6/17 | 295 | 18 | 46 | 267 |
| 12/7/17 | 274 | 19 | 46 | 247 |
| 12/8/17 | 260 | 18 | 43 | 235 |
| 12/9/17 | 260 | 18 | 43 | 235 |
| 12/10/17 | 259 | 18 | 42 | 235 |
| 12/11/17 | 260 | 18 | 44 | 234 |
| 12/12/17 | 260 | 17 | 46 | 231 |
| 12/13/17 | 255 | 21 | 46 | 230 |
| 12/14/17 | 253 | 21 | 45 | 229 |
| 12/15/17 | 260 | 20 | 44 | 236 |
| 12/16/17 | 250 | 23 | 41 | 232 |


PLAINTIFF'S DEPOSITION EXHIBIT
6
PENGAD 800-631-6989

| | | | | |
|---|---|---|---|---|
| 12/17/17 | 262 | 23 | 47 | 238 |
| 12/18/17 | 267 | 23 | 47 | 243 |
| 12/19/17 | 262 | 23 | 47 | 238 |
| 12/20/17 | 264 | 22 | 46 | 240 |
| 12/21/17 | 255 | 20 | 49 | 226 |
| 12/22/17 | 242 | 20 | 44 | 218 |
| 12/23/17 | 241 | 20 | 43 | 218 |
| 12/24/17 | 246 | 20 | 44 | 222 |
| 12/25/17 | 248 | 20 | 45 | 223 |
| 12/26/17 | 248 | 20 | 45 | 223 |
| 12/27/17 | 251 | 20 | 45 | 226 |
| 12/28/17 | 243 | 20 | 43 | 220 |
| 12/29/17 | 241 | 18 | 41 | 218 |
| 12/30/17 | 242 | 19 | 43 | 218 |
| 12/31/17 | 248 | 19 | 45 | 222 |
| 1/1/18 | 248 | 19 | 44 | 223 |
| 1/2/18 | 254 | 18 | 47 | 225 |
| 1/3/18 | 249 | 17 | 48 | 218 |
| 1/4/18 | 232 | 30 | 47 | 215 |
| 1/5/18 | 224 | 32 | 42 | 214 |
| 1/6/18 | 235 | 32 | 42 | 225 |
| 1/7/18 | 230 | 42 | 42 | 230 |
| 1/8/18 | 231 | 42 | 43 | 230 |
| 1/9/18 | 242 | 41 | 47 | 236 |
| 1/10/18 | 247 | 41 | 51 | 237 |
| 1/11/18 | 249 | 41 | 50 | 240 |
| 1/12/18 | 235 | 41 | 44 | 232 |
| 1/13/18 | 231 | 40 | 39 | 232 |
| 1/14/18 | 244 | 40 | 41 | 243 |
| 1/15/18 | 247 | 40 | 41 | 246 |
| 1/16/18 | 250 | 40 | 42 | 248 |
| 1/17/18 | 238 | 40 | 41 | 237 |
| 1/18/18 | 236 | 36 | 40 | 232 |
| 1/19/18 | 235 | 35 | 46 | 224 |
| 1/20/18 | 239 | 45 | 49 | 235 |
| 1/21/18 | 247 | 45 | 51 | 241 |
| 1/22/18 | 249 | 43 | 53 | 239 |
| 1/23/18 | 251 | 42 | 50 | 243 |
| 1/24/18 | 247 | 44 | 48 | 243 |
| 1/25/18 | 251 | 43 | 50 | 244 |
| 1/26/18 | 248 | 43 | 47 | 244 |
| 1/27/18 | 257 | 42 | 47 | 252 |
| 1/28/18 | 257 | 48 | 46 | 259 |
| 1/29/18 | 262 | 47 | 49 | 260 |
| 1/30/18 | 258 | 47 | 46 | 259 |
| 1/31/18 | 258 | 48 | 44 | 262 |
| 2/1/18 | 259 | 48 | 41 | 266 |

| | | | | |
|---|---|---|---|---|
| 2/2/18 | 252 | 48 | 44 | 256 |
| 2/3/18 | 256 | 48 | 44 | 260 |
| 2/4/18 | 268 | 48 | 47 | 269 |
| 2/5/18 | 275 | 46 | 46 | 275 |
| 2/6/18 | 254 | 47 | 43 | 258 |
| 2/7/18 | 260 | 47 | 43 | 264 |
| 2/8/18 | 263 | 46 | 46 | 263 |
| 2/9/18 | 255 | 46 | 46 | 255 |
| 2/10/18 | 257 | 46 | 45 | 258 |
| 2/11/18 | 270 | 46 | 47 | 269 |
| 2/12/18 | 279 | 45 | 50 | 274 |
| 2/13/18 | 262 | 45 | 48 | 259 |
| 2/14/18 | 263 | 45 | 49 | 259 |
| 2/15/18 | 250 | 45 | 49 | 246 |
| 2/16/18 | 239 | 45 | 46 | 238 |
| 2/17/18 | 247 | 45 | 51 | 241 |
| 2/18/18 | 253 | 45 | 53 | 245 |
| 2/19/18 | 256 | 45 | 54 | 247 |
| 2/20/18 | 267 | 45 | 55 | 257 |
| 2/21/18 | 249 | 42 | 53 | 238 |
| 2/22/18 | 238 | 40 | 49 | 229 |
| 2/23/18 | 243 | 35 | 50 | 228 |
| 2/24/18 | 235 | 35 | 50 | 220 |
| 2/25/18 | 239 | 36 | 54 | 221 |
| 2/26/18 | 242 | 36 | 53 | 225 |
| 2/27/18 | 238 | 36 | 51 | 223 |
| 2/28/18 | 233 | 41 | 50 | 224 |
| 3/1/18 | 234 | 41 | 50 | 225 |
| 3/2/18 | 233 | 40 | 50 | 223 |
| 3/3/18 | 234 | 40 | 50 | 224 |
| 3/4/18 | 245 | 41 | 57 | 229 |
| 3/5/18 | 246 | 42 | 57 | 231 |
| 3/6/18 | 243 | 45 | 54 | 234 |
| 3/7/18 | 238 | 50 | 54 | 234 |
| 3/8/18 | 237 | 50 | 54 | 233 |
| 3/9/18 | 235 | 43 | 53 | 225 |
| 3/10/18 | 240 | 41 | 58 | 223 |
| 3/11/18 | 246 | 41 | 57 | 230 |
| 3/12/18 | 253 | 42 | 59 | 236 |
| 3/13/18 | 247 | 41 | 54 | 234 |
| 3/14/18 | 245 | 39 | 53 | 231 |
| 3/15/18 | 243 | 39 | 52 | 230 |
| 3/16/18 | 218 | 40 | 48 | 210 |
| 3/17/18 | 219 | 38 | 46 | 211 |
| 3/18/18 | 233 | 38 | 49 | 222 |
| 3/19/18 | 244 | 38 | 55 | 227 |
| 3/20/18 | 243 | 37 | 49 | 231 |

| | | | | |
|---|---|---|---|---|
| 3/21/18 | 248 | 36 | 47 | 237 |
| 3/22/18 | 249 | 35 | 47 | 237 |
| 3/23/18 | 244 | 35 | 46 | 233 |
| 3/24/18 | 243 | 35 | 45 | 233 |
| 3/25/18 | 248 | 35 | 46 | 237 |
| 3/26/18 | 259 | 35 | 48 | 246 |
| 3/27/18 | 251 | 35 | 48 | 238 |
| 3/28/18 | 246 | 36 | 42 | 240 |
| 3/29/18 | 244 | 36 | 44 | 236 |
| 3/30/18 | 244 | 35 | 46 | 233 |
| 3/31/18 | 258 | 35 | 49 | 244 |
| 4/1/18 | 265 | 34 | 49 | 250 |
| 4/2/18 | 272 | 33 | 50 | 255 |
| 4/3/18 | 254 | 34 | 43 | 245 |
| 4/4/18 | 260 | 34 | 47 | 247 |
| 4/5/18 | 258 | 35 | 50 | 243 |
| 4/6/18 | 249 | 35 | 46 | 238 |
| 4/7/18 | 255 | 34 | 48 | 241 |
| 4/8/18 | 256 | 34 | 47 | 243 |
| 4/9/18 | 265 | 34 | 50 | 249 |
| 4/10/18 | 260 | 34 | 50 | 244 |
| 4/11/18 | 261 | 34 | 48 | 247 |
| 4/12/18 | 249 | 34 | 43 | 240 |
| 4/13/18 | 250 | 34 | 40 | 244 |
| 4/14/18 | 240 | 38 | 42 | 236 |
| 4/15/18 | 247 | 38 | 43 | 242 |
| 4/16/18 | 259 | 39 | 43 | 255 |
| 4/17/18 | 246 | 38 | 39 | 245 |
| 4/18/18 | 248 | 40 | 42 | 246 |
| 4/19/18 | 243 | 39 | 43 | 239 |
| 4/20/18 | 241 | 40 | 44 | 237 |
| 4/21/18 | 244 | 39 | 40 | 243 |
| 4/22/18 | 252 | 39 | 44 | 247 |
| 4/23/18 | 260 | 39 | 46 | 253 |
| 4/24/18 | 253 | 38 | 39 | 252 |

Vigo County Indiana Sheriff's Office Staffing Analysis

# Vigo County, Indiana Sheriff's Department

## *Jail Staffing Analysis*

October 2013

Report Prepared by:

Bill Wilson

Jail Services

Working with

Sheriff Gregory Ewing

Jail Administrator Charles Funk

PLAINTIFF'S DEPOSITION
EXHIBIT

7

PENGAD 800-631-6989

Final Report i

Vigo County Indiana Sheriff's Office Staffing Analysis

Introduction ................................................................................................ 1

Staffing Analysis ......................................................................................... 1

Community Profile ...................................................................................... 3

Inmate Population/Bed Table .................................................................... 4

Current Facility ........................................................................................... 4

Cell Housing Table ..................................................................................... 6

Present Jail Staffing .................................................................................... 6

Shift Relief Factor ...................................................................................... 13

Shift Relief Factor Table ............................................................................ 14

Position Chart and Narrative ..................................................................... 15

Staffing Position Table ............................................................................... 16

Summary Staffing Position Table Proposed ............................................. 17

Present Staffing Table ................................................................................ 17

Post Descriptions ........................................................................................ 18

Duties Table ................................................................................................ 21

Deficiencies Table ...................................................................................... 23

Recommendations ...................................................................................... 24

Conclusions ................................................................................................ 25

Vigo County Indiana Sheriff's Office Staffing Analysis

Vigo County Indiana Sheriff's Office Staffing Analysis

## Vigo County Indiana Sheriff's Office Staffing Analysis

### INTRODUCTION

Jail Administrator Charles Funk of Vigo County, Indiana contracted with Jail-Services to review the staffing of the Vigo County Jail. A staffing analysis has been recommended for the Vigo County Jail, by the Indiana Department of Corrections State Jail Inspector, Kenneth Whipker.   The Indiana Jail Standards require Indiana Jails to be operated with sufficient staffing determined through the use of a data driven instrument. This in depth staffing review consists of an interview with Sheriff Gregory Ewing and Jail Administrator Charles Funk to understand the vision, values and mission of the agency, an on-site visit to the jail to better understand the operational aspects, a data review and analysis of present workload responsibilities versus the available staff resource hours. The goal of the review is to evaluate the current staffing levels, affirm positive practice and provide recommendations for change as needed in accordance with **210 IAC 3-1-1**. See copy of Indiana Jail Standards attached.

### STAFFING ANALYSIS

This report contains sections, that when combined, result in determining the number of staff required for operating the Vigo County Jail, constitutionally and securely, twenty-four (24) hours per day, seven (7) days per week, three hundred sixty five (365) days per year.   A staffing analysis is a process by which manpower needs of an agency are determined through examining the requirements of each position, listing the scheduled of each post and determining the relief factor for necessary positions.

Staffing levels are dependent upon a variety of factors, including what is done to, or for those individuals being held in the Vigo County Jail.  There is a constant flow of activity within the Vigo County Jail whenever meals are served, as inmates are booked and released, escorts to and from courts for hearings, programs and services provided within the jail and when providing required security within the jail. The design and layout of the Vigo County Jail will also directly impact the staffing level.  The physical plant dictates the staff's ability to maintain sight and sound contact with inmates, flow patterns, the staff's ability to classify inmates, and to some degree, the method of supervision.

## Vigo County Indiana Sheriff's Office Staffing Analysis

Precedent court decisions at other institutions and state jail standards obligate County officials to "observe and respond" to the issue of inmate supervision. To reduce the County's liability to lawsuits brought by inmates, concerning issues indicating a lack of supervision, the County is best served by providing sufficient staff to adequately support the jail's mission.

Listing the tasks that are organizationally and constitutionally required in conjunction with the facility design determine jail officer duties. The numbers and types of inmates being detained also directly impacts staffing levels. Each jail is designed and managed in a unique fashion that drives staffing needs. These differences require that each jail must create standard operating policies and post orders that correspond to the uniqueness of its design. In addition, standard operating policies and post orders must meet minimum correctional constitutional guarantees and state jail standards as outlined in **210 IAC 3-1-1**.

Critical areas correctional administrators must be attentive to include building and personnel security, inmate and staff supervision, and inmate programs and services as outlined in existing constitutional case law and **210 IAC 3-1-14**. There must be enough available staff scheduled to ensure inmates are observed, controlled and attended to on a continuous and legal basis. In some instances, management can control the activities. In other cases, the agency has little input, e.g. on whether to receive new inmates or to provide services that are mandated by case law or existing jail standards. Specifically, there should be enough staff to operate the jails controls, to complete health and welfare checks as required, to check the inmate cell and housing area for security and safety problems, to maintain the security of the building, and to securely and legally admit and release inmates.

An analysis of the current staffing levels and workload against Indiana Jail Standards and legal based practice revealed the Vigo County Jail does not presently have sufficient staff resource hours (man power) to patrol the jail, conduct important security operations, such as routine cell searches, and staff important areas of the jail (such as the infirmary and

Final Report 2

## Vigo County Indiana Sheriff's Office Staffing Analysis

control rooms.  Without an adequate complement of jail officers, the Vigo County Jail cannot meet required legal and Indiana Jail Standards.  To achieve the desirable staff balance, recommendations provided in this report include expansion of jail officers.

Unless specific to staffing levels, all recommendations contained in this report do not include an evaluation of the current organizational structure, management practices not impacting staffing levels or the current pay schedule.  These variables were beyond the scope of the initial terms and therefore were not considered in the analysis process. Future changes may become warranted should recommendations contained in this report be accepted and required staffing levels are implemented.

## COMMUNITY PROFILE

Vigo County is a county located along the western border of the state of Indiana. Indiana State University, with a student enrollment of over 11,000 students, is located in Terre Haute, the county seat of Vigo County.  The estimated 2012 population of Vigo County is approximately 108,428[i] people. The Vigo County Sheriff is responsible for overseeing county law enforcement services and correctional operations at the county jail. The Vigo County Sheriff's Department, Dispatch Center and Jail are required to provide emergency services to this population which results in increased workload and additional stress to the employees and facility. The Vigo County Sheriff's Department maintains a two hundred and sixty-seven (267) bed jail that is the central intake and booking facility for all of the County's law enforcement agencies and was operating with two hundred forty-one (241) inmates on the day of the on-site inspection.  The Vigo County Jail averaged three hundred and two 302 inmates per day for 2012.

### Vigo County Indiana Sheriff's Office Staffing Analysis

The following table compares counties of comparable size, the number of inmates, available beds and ratio per 1000 county population as indicated by the most recent Indiana Jail Inspection reports.

Inmate Population/Bed Table

| County | Population[n] | # Beds | # Inmates | Beds/1000 | Inmates/1000 |
|--------|------------|--------|-----------|-----------|--------------|
| Floyd | 75283 | 234 | 266 | 3.11 | 3.53 |
| Laporte | 111246 | 368 | 359 | 3.31 | 3.23 |
| Monroe | 141019 | 287 | 265 | 2.04 | 1.88 |
| Average | 109183 | 330 | 297 | 2.82 | 2.88 |
| Vigo | 108428 | 267 | 241 | 2.46 | 2.22 |

The above table illustrates that the Vigo County Jail lacks has fewer beds per 1000 county residents compared to similar size counties. In addition, the number of inmates incarcerated within the existing facility is less than counties of comparable size.

CURRENT FACILITY

The Vigo County jail, located in Terre Haute, Indiana, has a capacity of two hundred and sixty seven (267) inmates. The physical plant affects the staff's ability to supervise and control the inmate, whether it is in his/her living unit, during a program, and/or movement within the jail. When surveillance is used, the staff's direct observation of the area is both limited and intermittent. This causes staff to lose control over their areas of responsibility and, in many cases, can cause inmates to become dependant upon other inmates for their safety rather than staff. The use of technology such as closed-circuit televisions, remote locking devices and alarms may also aid staff in carrying out their duties, but should be seen as a supplement to the staff and not as a substitute.

The Vigo County Jail is a multi-floor jail which includes, a vehicular sally-port located adjacent to the intake/release area. The intake/release area consists of one (1) detox cell, one (1) bull pen temporary holding area and three (3) isolation holding cells. In addition

<u>Vigo County Indiana Sheriff's Office Staffing Analysis</u>

to the intake area, the Vigo County Jail has a main jail control room, full service kitchen and laundry areas, two (2) pod control centers, inmate recreation areas, inmate video arraignment area, inmate classroom area, inmate medical area, commissary area, interview rooms, office space, storage rooms, office space and a secure passage for inmate court movement.

The secure area of the Vigo County Jail consist of the original linear section which includes cell blocks identified as A-Block; B-Block; C-Block; D-Block; E-Block, F-Block, G-Block, and H-Block.  The Vigo County Jail has one (1) program block (I-Block), and two (2) pod areas containing the following cell blocks: J-Block, K-Block, M-Block, N-Block, O-Block and P-Block.

<u>Vigo County Indiana Sheriff's Office Staffing Analysis</u>

Cell Housing Table

| Cell Area | # Cells | # Beds | Classification |
|---|---|---|---|
| A-Block | 5 | 18 | Males |
| B-Block | 6 | 22 | Males |
| C–Block | 6 | 22 | |
| D-Block | 6 | 22 | |
| E-Block | 6 | 22 | |
| F-Block | 2 | 4 | |
| G-Block | 3 | 8 | |
| H-Block | 2 | 4 | |
| I-Block | 4 | 14 | |
| J-Block | 9 | 20 | |
| K-Block | 8 | 18 | |
| M-Block | 5 | 16 | |
| N-Block | 9 | 20 | |
| O-Block | 8 | 18 | |
| P-Block | 6 | 20 | |
| Hospital Beds | | 2 | |
| Solitary Cells | | 2 | |
| Isolation Cells | | 3 | |

<u>PRESENT JAIL STAFFING</u>

The Vigo County Jail's present staffing schedule consists of thrity-two staff assigned to the jail working three (3) eight (8) hour shifts. Each shift is assigned to monitor the intake room, control room and inmate housing areas. In addition, wo (2) staff are as assigned as courthouse security, one (1) staff is assigned as a courthouse rover/patrol officer, one (1) staff is assigned with the child support court, two (2) staff are assigned for maintaining the Vigo county sex offender registry and one (1) staff is assigned as a juvenile court officer. .

Final Report 6

Vigo County Indiana Sheriff's Office Staffing Analysis

Because of staffing deficiencies, emergency transports occurring within the jail may require merit deputies to be pulled off their patrol duties resulting in an interruption of service to the public. Vacations, personal holidays, sick time and other off-duty times, result in increased pressure on the agency to properly staff the jail. In addition, the jail is often faced with workloads that are unpredictable and require jail officers and/or merit deputies to be called in to complete tasks or routinely borrowed from other jobs which results in leaving assigned posts unmanned. Medical emergencies involving inmates are an additional source of stress on the jail staff. The overall lack of staffing creates a substantial risk of injury to both the current staff and inmate population.

The majority of inmates housed in the Vigo County Jail are placed in cells with common dayrooms with limited opportunities for activities. Lack of jail officers has resulted in the jails inability to properly regulate inmate movement from one location to another. In addition, this lack of jail staff has prevented the Vigo County Jail from providing immediate response in emergency situations. The lack of staffing places the county, jail staff, and inmates housed within at risk. Staffing shortages have also crippled the Jail's ability to conduct routine cell searches. It was noted during the on-site visit several cell and common area windows were noted to be in need of repair. Individual cell doors were installed improperly that prevents staff from entering inmate cell housing areas in an efficient and controlled manner. In order protect both inmates and staff from serious harm, the Jail should routinely search inmates, inmate living areas, and inmate property for contraband and potential dangerous items. Under generally accepted correctional standards, selective searches should routinely occur in each housing unit every shift. Staffing shortages are preventing the jail from effectively managing the security within the jail.

Staffing shortages have also prevented the Jail from having a sufficient complement of staff assigned to important areas of the facility at all times. Vulnerable inmates and inmates with noted behavioral issues should be housed in close proximity to staff and be effectively monitored. There is no direct line of sight and no intercom communication system into the old linear cells and common areas. In addition staffing shortages resulted

Vigo County Indiana Sheriff's Office Staffing Analysis

in the pod control rooms not posted. This results in inmates in need of immediate or emergency services to experience delays in jail staff response.

Lastly, insufficiencies in jail staffing, as were found during the on-site visit, raise the likelihood that something serious could happen that overwhelm the jail's ability to respond. By continuing to ignore staffing inadequacies identified in this staffing analysis, the county is showing deliberate indifference to a real and present danger to inmate safety.

There is currently a contract with Premier Health for both a physician and nursing staff. The physician visits the facility five (5) times a week to manage inmate medical request. Medication disbursement is conducted by a nurse with jail staff providing security service. After hour inmate medical concerns are addressed by jail staff. When the nurse is unavailable, jail staff becomes responsible for responding to and initiating emergency medical care.

In addition, no emergency psychiatric staff is available to manage inmates with serious mental health issues as required by constitutional and Indiana Jail Standards. (See **201 IAC 3-1-11**). Recently, the Indiana Department of Correction was found to be deliberately indifferent to the serious mental health needs of prisoners. The U.S. District Court of Southern Indiana provided the following observation:

> The goal of mental health care in the correctional setting is to prevent harm from occurring to prisoners and to prevent prisoners from causing harm as a consequence of a mental condition that significantly influences their behavior. The consensus of opinion in a professional body of literature on the subject presented in this case is that segregation is detrimental for people with serious mental illness because it makes their symptoms worse or because, at best, they do not get any better. *Ind. Prot. and Advocacy Servs. Comm'n v. Comm'r, Ind. Dept. of Corr.*, No. 1:08-cv-01317-TWP-MJD, (S.D. Ind. 2008).

The use of solitary confinement on those with serious mental illness is typically accompanied by inadequate mental health treatment and the denial of access to a myriad of activities provided to other inmate (e.g., showers, visits, telephone calls, recreation). Housing inmates with serious mental illness in isolation cells serves only to exacerbate

Final Report 8

## Vigo County Indiana Sheriff's Office Staffing Analysis

their conditions.  Eighth Amendment violations have been found against prison and jail officials for warehousing prisoners with serious mental illness instead of providing necessary mental health treatment.

To minimize the liability exposure to Vigo County, inmates with serious mental health issues, including past mental health treatment, history of suicidal behavior or attempts, and/or being on psychotropic medications should be referred to appropriate mental health providers for ongoing treatment and housing needs.

The Vigo County Jail is equipped with a full service kitchen.  Food service is contracted through Canteen services with correctional staff assisting inmate workers with the delivery of meals and the collection of trays to inmates housed in the jail.

The master control room is necessary to the secure functioning of the jail.  Security is ensured by a strict secure perimeter.  The control room allows this secure perimeter to exist in conjunction with the regular operations of the jail and provides a back-up to the two (2) pod control rooms located in the Vigo County Jail.  These operations include monitoring living units, intake areas, and service and program areas while controlling security doors and observation through the use of surveillance equipment.  The control room staff is the security back up for jail officers and inmates and the only connection to the outside in case of emergency.

Indiana Jail Standards **210 IAC 3-1-13 Section 13 (d)** provides that:
Each jail shall maintain a secure communication control center separate from other detention and administrative functions. Jail officers and other personnel assigned to jail duty shall be trained in security measures and the handling of special incidents such as the following:

1) Assaults
2) Disturbances
3) Deaths
4) Fires

<u>Vigo County Indiana Sheriff's Office Staffing Analysis</u>

5) Suicide Attempts

6) Natural Disasters

Health and welfare checks are the main concern of jail officers that have direct contact with inmates. These checks ensure each inmate is physically safe and that each inmate is in their proper location. Health and welfare checks should be well documented as a basic constitutional requirement included in the appropriate supervision of inmates. Electronic/video monitors are not a substitute for direct personal contact with inmates. Indiana Jail Standards (**210 IAC 3-1-14**) require: "There shall be sufficient jail personnel in the jail at all times to provide adequate supervision of inmates and to ensure staff and inmate safety."

An adequate classification system is a fundamental management tool to aid in providing a reasonably safe environment in a jail. The primary goal of a classification system is to determine the degree of supervision required to control each inmate and to maintain the safety and security of the jail and the community. Generally accepted correctional practices for classification systems utilize a variety of objective, behavior-based factors to determine the appropriate level of custody. Factors considered include: severity of current offense, prior convictions, and personal characteristics such as age, residence and employment. Typically inmates are divided into high, medium, and low security classifications, and thereafter receive the appropriate level of freedom and staff supervision for that classification level.

Because of deficiencies in staffing resources, the Vigo County jail relies on an antiquated charge-based classification scheme for general population inmates (aside from the obvious separation factors such as male or female). This classification system does not consider an inmate's prior convictions, prior assaultive behavior, or true potential for violence. As a result, there is very little safeguard against housing predatory inmates with vulnerable inmates. Section 18. 210 IAC 3-1-18 of the Indiana Jail Standards require each sheriff to develop and implement an objective classification system by November 15, 2014. This system shall include written procedures for overriding an

Final Report 10

Vigo County Indiana Sheriff's Office Staffing Analysis

inmate's objective classification result to accommodate local needs, for example, physical plant design and program availability.

Recreation opportunities for inmates housed in the Vigo County Jail are not occurring on a regular basis. During the on-site visit, it was noticed the indoor recreation area is in need of extensive repair. The initial construction of the indoor recreation area consisted of a drop style ceiling with no security barrier in place. The ceiling has suffered damage that can result in metal brackets coming into contact with inmates. To prevent these brackets from becoming weapons, the staff has suspended recreation. The recreation area should immediately be repaired so inmate recreation can once again occur on a regular basis. This report will recommend that recreation staff be hired to supervise the recreation activity to prevent damage to the recreation area.

Vigo County Jail officers are required to perform intake and release functions on a continuous basis. Intake activities include controlling persons that are likely to be violent, intoxicated and prone to have infectious/communicable diseases. Jail officers are also required to perform health screening, property control, financial accounting and bail arrangements. The release of inmates requires the accurate processing of the inmate and his or her personal property. Indiana Jail Standards (**210 IAC 3-1-6**) require that prior to the release of any inmate, jail officers shall perform an Indiana Data and Communications system (IDACS) and National Corrections Information Center (NCIC) search in addition to checking for any outstanding wants or warrants. Both the intake and release area are normally a busy and active area where outside agencies and others direct their inquiries concerning the status and location of inmates.

Inmate services and programs that are organizationally and/or constitutionally required include medical services, proper classification, health screening at intake, food services, laundry, recreation, visitation, religion, access to the courts and mail, library services, to file written grievances, mail and telephone access, drug and alcohol programs and educational opportunities. Vigo County jail officers are needed to conduct and supervise these activities to ensure that both personal and environmental security is maintained.

Vigo County Indiana Sheriff's Office Staffing Analysis

The design of a jail impacts the number of staff required to constitutionally protect inmates. The floor plan of the Vigo County is staff intensive. The original jail, built in 1981 is an old linear design. The design prevents staff from having adequate sight lines into the cell housing areas. In addition, no intercom systems are installed in the secure section of the inmate housing areas. Staff must be in close proximity to respond to inmate emergency issues. An addition was added to the Vigo County Jail in 2001-2002. This addition was a conversion of an existing civilian building. The floor design is awkward with minimal sight lines resulting in the need for additional staff to provide for inmate welfare.

The presence of management and agency supervision is essential to the proper and legal functioning of a jail operation. The major vulnerable areas of legal liability for administrators include negligent hiring, failure to direct, failure to supervise, negligent retention, and failure to train. When there is the appropriate number(s) of jail officers in the jail, administrators are able to protect against these liability areas through continuous and direct supervision of staff. When the jail administrator is required to perform jail officer duties his/her ability to properly manage and supervise operations is severely impaired.

The supervisor observing and documenting inappropriate behavior overcomes negligent hiring and negligent retention issues by employees. Protection against failure to direct is accomplished through current jail practice, reflected in policy and procedure that keeps employees accountable. Failure to supervise and failure to train are results of not having ample supervisors available to line staff.

There is no doubt the Vigo County Jail is in the unusual position of being an "around the clock" public agency with fixed posts that must be maintained. While this does not typify the normal operations of other Vigo County agencies, the funding sources, usually the County Council, are not accustomed to these unique staffing problems. Because other agencies typically work a 40-hour week the funding body needs to understand the

Vigo County Indiana Sheriff's Office Staffing Analysis

liability associated with housing any inmate population and the special staffing problems associated with jail management.

SHIFT RELIEF FACTOR

The shift relief factor is necessary to determine the number of jail officers required to staff assigned posts for the number of hours the posts are to be operated.  The jail operates twenty-four (24) hours per day, seven (7) days per week, and three hundred sixty five (365) days per year.  Most of the posts in the jail are maintained continuously as well.  The shift relief factor is a multiplier that is used to compensate for round the clock operation, regularly-scheduled, and unplanned days off, vacations, holidays, sick days, training, and other leave days such as funerals, injury, and discipline time.   The County establishes the number holidays, authorized sick leave days, and vacation days allowed. The Sheriff establishes training guidelines consistent with State Jail Standards, implements training programs, monitors the use of leave time, implements policy of the filling of vacant positions, and enforces employee adherence to County and Departmental policy.  The shift relief factor is determined by subtracting the number of days jail officers are not on duty from three hundred sixty five (365) days and dividing the remaining figure into three hundred sixty five (365) to determine the number of jail officers it will require to staff one post twenty-four (24) hours per day, seven (7) days per week, three hundred sixty five (365) days per year.

The Vigo County Jail will require five (5) jail officers (1.67*3), jail officers to cover a single post that is to be manned twenty-four (24) hours per day, seven (7) days per week, and three hundred sixty five (365) days per year.  For positions not requiring a relief, the factor is 1.0.

Final Report 13

Vigo County Indiana Sheriff's Office Staffing Analysis

Shift Relief Factor Table

| Description | | Days 8 Hour Shift |
|---|---|---|
| Total days in a year | | 365 |
| Less Scheduled days off | | -104 |
| Less Vacation Days | | -11 |
| Less Sick Days | | -8 |
| Less Personal Days | | -4 |
| Less Holidays | | -14 |
| Less Training Days | | -3 |
| Less Other Leave | | -3 |
| Net Days Worked | | 218 |
| Shift Relief Factor | 365/218 | 1.67 |

The following discussion is an explanation of the calculations in the relief factor table shown above:

- The facility is never closed – it is in operation twenty-four (24) hours per day, three hundred sixty five (365) days per year so there are several seven (7) day a week posts.
- Relief factor personnel work a rotating schedule of five (5) days on two (2) days off.
- The vacation, sick, and personal days have been averaged from current jail officers.
- Training days include training time as required by **210 IAC 3-1-4** Sec 5 (b): Each new jail officer, including part-time staff, shall receive the following:
  (1)   A minimum of eighty (80) hours of orientation and training at the jail prior to job assignment.
  (2)   An additional forty (40) hours certified training during the first year of employment.   This annual training must include suicide prevention, intervention and mental health issues.

Final Report 14

<u>Vigo County Indiana Sheriff's Office Staffing Analysis</u>

The forty (40) hours of certified training during the first year of employment shall be received through the Indiana law enforcement academy training board. Each jail officer shall receive sixteen (16) hours of training each subsequent year to ensure compliance with these standards. In addition, Vigo County jailers receive additional training in first aid and CPR.

- Other leave is an average of taken discipline time, bereavement time, FMLA, Military, Unpaid Leave, discipline suspension days, workers compensation leave and other approved leave from current jail staff.

## POSITION CHART AND NARRATIVE

The post chart includes the data needed to determine the number of jail officers necessary to properly staff the Vigo County Jail. The position section lists the position or post title of the jail officer/deputy assigned. The shift columns refer to the shift the post is required to be filled. The total post column provides the number of posts to be staffed in a twenty-four (24) hour period. The relief factor column contains the appropriate relief factor for the related post. The total posts or positions multiplied by the relief factor equals, in the last columns, the number of positions required to staff the assigned post for the designated period of time.

## POSITION TABLE

The Staffing Position Table shows the number of posts and the number of jail officers required for the Vigo County Jail. The proposed staffing includes one (1) jail administrator, one (1) administrative command staff, ten (10) jail officers, one (1) transport officer, one-half (½) administrative personnel and one-half (½) medical/mental health compliance officer.

Vigo County Indiana Sheriff's Office Staffing Analysis

Staffing Position Table

| Position | Shift 1 | Shift 2 | Shift 3 | Post Total | Relief Factor | Total Staff |
|---|---|---|---|---|---|---|
| Jail Commander | 1 | 0 | 0 | 1 | 1 | 1 |
| Admin. Comm. | 1 | 0 | 0 | 1 | 1 | 1 |
| Jail Nurse | 1 | 0 | 0 | 1 | 1 | 1 |
| Mental Health | .5 | 0 | 0 | .5 | 1 | .50 |
| Court | 7 | 0 | 0 | 7 | 1 | 7 |
| Master Control | 1 | 1 | 1 | 3 | 1.66 | 5 |
| Pod Controls | 2 | 2 | 2 | 6 | 1.66 | 10 |
| Intake | 2 | 2 | 2 | 6 | 1.66 | 10 |
| Floor Rovers | 7 | 4 | 4 | 15 | 1.66 | 25 |
| Transport Staff | 2 | 1 | 0 | 3 | 1.00 | 3 |
| Recreation Staff | 1 | 1 | 0 | 2 | 1.00 | 2 |
| Required Staff | | | | | | 65.5 |
| Current Staff | | | | | | -39 |
| Additional Staff | | | | | | 26.5 |

Final Report 16

Vigo County Indiana Sheriff's Office Staffing Analysis

Summary Staffing Position Table –Proposed

| Position | Total Staff |
|---|---|
| Jail Administrator | 1 |
| Assistant Jail Administrator | 1 |
| Jail Nurse | 1 (Contract) |
| Jail Mental Health Counselor | .5 |
| Jail Sergeants (1st Sgts) | 2 |
| Shift Supervisors (Sergeant) | 3 |
| Asst. Shift Supervisors (Corporal) | 3 |
| Jail Officers - F/T | 42 |
| Court Security Personnel | 7 |
| Transport | 3 |
| Recreation Staff | 2 |
| Total | 66.5 |

Present Staffing Position Table

| Position | Total Staff |
|---|---|
| Jail Administrator | 1 |
| Assistant Jail Administrator | 1 |
| Jail Nurse | 1 (Contract) |
| Jail Mental Health Counselor | 0 |
| Jail Sergeants (1st Sergeants) | 2 |
| Shift Supervisor (Sergeants) | 3 |
| Asst. Shift Supervisor (Corporals) | 3 |
| Court Security Personnel | 7 |
| Jail Officers- F/T | 22 |
| Transport | 0 |
| Recreation Staff | 0 |
| Total | 40.00 |

Final Report 17

<u>Vigo County Indiana Sheriff's Office Staffing Analysis</u>

The tables show, as a result of calculations – an analysis of the Vigo County Jail workload, the design of the facility, and the relief factor – that there is a proposed increase of a ½ mental health counselor, twenty (20) jail officers, three (3) transport officers and two (2) recreation staff.

<u>POST DESCRIPTIONS</u>

Jail Administrator/Assistant Jail Administrator

This position is responsible for overseeing the functioning of the jail, review staff schedules, develop policy and procedure, managing the jail's budget by strategic forecasting, frequent monitoring and appropriate adjusting, review of food and medical service program, maintain contacts with outside agencies, maintaining no-contact orders, consular and ICE notifications, social service agencies and volunteers working in the jail, training, inmate classification decisions, inmate grievance appeals, inmate disciplinary decisions, personnel issues and departmental/county meetings as requested.

Jail Supervisor

There should be a supervisor available in the jail twenty-four (24) hours per day, seven (7) days per week, and three hundred sixty five (365) days per year. The supervisor is directly aware of the current status of the inmates and facility situation. Scheduling should be designed to ensure a supervisor is on duty at all times in the facility. The position provides oversight, direction and insures compliance of all jail policies by subordinates.

Intake/Release Area

Inmates are booked into the jail at all hours of the day and night. Intake and release operations must be prepared to meet fluctuating levels of demands safely and efficiently. The admission and release functions of the jail require assigned jail officers to process inmates and accurately maintain jail records. Alleged delays in the processing of inmates who were ordered released by the courts have the potential to create frustrations with the courts and families of those inmates. This post includes completing all booking

<u>Vigo County Indiana Sheriff's Office Staffing Analysis</u>

processes and initiating inmate classification, searching inmates, properly receipting inmate property, issuing jail clothing and bedding, maintaining the inmate status board, providing bonding information, maintaining logs and monitoring detox and holding cells. Often inmates who are dangerous, mentally ill or intoxicated are held in these areas so direct visual observation must be completed on a regular basis. Because of the circumstances surrounding many inmates booked into jail, jail officers are required to provide more intimate contact with inmates during this stage of confinement. Again, electronic monitoring is not a substitute for jail officers interacting with inmates.

Control Room

The control room is the central security of the jail. These positions require jail officers to operate the security equipment and maintain surveillance twenty four (24) hours per day, seven (7) days per week, and three hundred sixty five (365) days per year. This post must never be left unattended or under-staffed. Jail officers in the control room monitor all surveillance equipment, monitor staff presence within the secure perimeter of the center, monitor inmate activity, volunteers, fire and smoke detection equipment and radio transmission within the jail. In addition the control room position monitors inmate visitation and answers questions from the public. Indiana jail standards require that personnel posting a jail control room must attend the basic jailer's course.

Pod Control Rooms

The pod control room officer is responsible for maintaining surveillance of jail personnel and inmates within their designated "pod" area. This includes keeping a close watch on inmates in the dayroom who are outside of their assigned cells, electronically controlling the movement of persons within the pod and maintaining proper records of documented activities. This post should never be left unattended or under-staffed.

Floor Security

The primary function of this post is to maintain order among inmates, provide inmate escort duties, search for security problems, assist with the delivery of food service, facilitate inmate medical service, supervise exercise areas, supervise activities, conduct

<u>Vigo County Indiana Sheriff's Office Staffing Analysis</u>

necessary health and welfare checks of all inmates, deliver required inmate supplies, be watchful for potentially dangerous and harmful situations and take appropriate action when required.

## Court Security/Transport Officers

This post manages inmate behavior during court related proceedings and provides escort for inmates to and from court and other judicial related functions. Transport duties include medical, dental and psychological transports, picking up and delivering inmates to other counties, the Indiana Department of Corrections and often times out of state. There should always be adequate staff to handle emergency transports twenty-four (24) hours per day, seven (7) days per week, and three hundred sixty five (365) days per year without impacting services to the public.

## Recreation Staff

Inmate are entitled to receive at least one  (1) hour per day, five (5) days per week of large muscle activity outside of their immediate living area.   The Vigo County Jail is equipped with both an indoor and outdoor recreation area.   The recreation staff will provide supervision of inmates during their recreation time.

## Mental Health Staff

There should be adequate, qualified personnel on duty to properly assess and coordinate services for inmates with serious mental health issues.   In addition, the mental health counselor will assist with patient management and coordinate services and referrals with other applicable county and criminal justice systems for off-site care.

## Vigo County Indiana Sheriff's Office Staffing Analysis

Duties

The following are duties performed by jail officers on a customary and routine basis and not usually listed in the above post descriptions.   Many of the following duties are performed by more than one jail officer:

Duties Table

| Activity | Frequency | Time | # Staff Req. | Annual (HRS) |
|---|---|---|---|---|
| Medication Pass | 2 X Daily | 2 Hrs Daily | 1 | 728 |
| Security Inspections | 24 X Daily | 6 Hour Daily | 2 | 4380 |
| Grievance Response | Weekly | 20 Hrs X Weekly | 1 | 1040 |
| Inmate Laundry | 4 X Week | 1 Hour X Daily | 2 | 416 |
| Inmate Razor | 3 X Week | 3 Hour Weekly | 2 | 300 |
| Meals | 3 X Daily | 3.0 Hour Daily | 2 | 2190 |
| Supervisor Duty | Daily | 24 Hour Daily | 1 | 8760 |
| Court Time | Daily | 60 Hours Weekly | 1.5 | 4680 |
| Cell Inspections | Weekly | 7 Hour Weekly | 2 | 364 |
| Intake | Daily | .75 Hour/Inmate | 1 | 4100 |
| Inmate Release | Daily | 1/2 Hour/Inmate | 2 | 2641 |
| Evacuation Drills | Monthly | 2 Hour/Month* | 8 | 192 |
| Program Admin. | Weekly | 12 Hours/Week | 1 | 624 |
| Inmate Visitation | Weekly | 25 Hours/Week | 1 | 1300 |
| Inmate Recreation | Daily | 4 Hours Daily | 1 | 1460 |
| Inmate Transports | Daily | 6 Hours/Daily | 2 | 3120 |
| Staff Meetings | Qtly. | 1 Hours/Weekly | 1 | 52 |
| Staff Cleaning (Posts) | Daily | 1 Hour Daily | 2 | 730 |
| Inmate Mail | Daily | 20 Hours/Week | 2 | 2080 |
| Medical Records | Weekly | 4 Hours/Week | 2 | 416 |
| Inmate Sick Call | Weekly | 5 Hours/Week | 1 | 260 |
| Staff Training | Annual | 20 Hours/Staff | 29 | 580 |
| Pass Supplies | Weekly | 1.5 Hour/Week | 2 | 156 |
| Log Entries | Daily | .5 Hour Day | 35 | 6387.5* |

## Vigo County Indiana Sheriff's Office Staffing Analysis

| Routine Searches | Weekly | 1 Hour/Day | 2 | 730* |
|---|---|---|---|---|
| Inmate Discipline | Daily | 5 Hrs. Weekly | 2 | 520 |
| Obj. Classification | Daily | 10 Hours Weekly | 2 | 1040* |
| Inmate Hair Cuts | Random | 4 Hrs. Monthly | 2 | 96 |
| Attorney Visits | Weekly | 1 Hour Week | | 52 |
| Inmate Cleaning | 2 X Weekly | 5 Hour Weekly | | 260 |
| Staff Reports | Daily | .5 Hour Daily | 35 | 6387.5* |
| Commissary Program | Weekly | 6 Hours Weekly | 2 | 624 |
| AdminSeg. Reviews | | | | Varies |
| Dealing with Assaults | | | | Varies |
| Emergency Care | | | | Varies |
| Suicide Checks | | | | Varies |

*Not presently completed due to staffing Issues

In addition, the following more detailed responsibilities are required by jail staff:

- In house adjudications and informal hearings – Conduct inmate informal disciplinary hearings concerning violations of administrative rules.
- MATRIX – maintaining inmate classification including criminal histories of newly admitted inmates. **210 IAC 3-1-18 Sec 18 (a)** each sheriff shall develop and implement an objective classification system by November 15, 2014. This system shall include written procedures for overriding an inmate's objective classification result to accommodate local needs, for example, physical plant design, and program availability.
- Training – time spent in developing training protocol, training new staff members and volunteers, and maintaining training records.
- File Keeping – results of institutional reports including: inmate discipline, classification, grievances, intake and release records.

<u>Vigo County Indiana Sheriff's Office Staffing Analysis</u>

A lack of staffing was noted to contribute to deficiencies in the following activities:

Deficiencies Table

| Task | Cycle |
|------|-------|
| Controlling Inmate Behavior | Daily |
| Managing Inmate Visitation | Daily |
| Documenting Jail Events | Daily |
| Release Inmate in a Timely Manner | Daily |
| Administer Objective Classification | Daily |
| Provide Inmate Protection | Daily |
| Providing Routine Jail Checks | Continuous |
| Staff Training | Monthly |
| Inmate Observation | Daily |
| Evacuation Drills | Quarterly |
| Handling Emergency Back-up | Daily |
| Regulate Inmate Movement | Daily |
| Random Unannounced Inspections | Daily |
| Inmate Contraband Control | Daily |
| Key and Tool Control | Daily |
| Adequate Back-up for staff | Continuous |
| Complete Required Documentation | Continuous |
| Provide Inmate Recreation | Daily |

<u>Vigo County Indiana Sheriff's Office Staffing Analysis</u>

<u>RECOMMENDATIONS</u>

1.   The corrections staff should be increased from twenty-two (22) full time positions to forty-two (42) fulltime positions.  There should be a minimum of fifteen (15) jail officers on duty between the hours of 8am-4pm on the following posts:  two (2) jail officers posted at intake; one (1) jail officer posted in Master Control; two (2) jail officers – one each posted in the Pod Control Rooms; seven (7) Jail Officers posted as floor security, three (3) in the linear section and two (2) each in the pod area; two (2) transport officers and one (1) recreation officer..  This staffing summary includes the supervisors. Between the hours of 4pm-midnight there should be a minimum of eleven (11) jail officers on duty.  The minimum staffing of post should include: two (2) jail officers posted at intake; one (1) jail officer posted in Master Control; two (2) jail officers – one each posted in the Pod Control Rooms; four (4) Jail Officers posted as floor security, two in the linear section and one (1) each in the pod area; one (1) transport officer and one (1) recreation officer. Between the hours on Midnight-8am there should be a minimum of nine (9) jail officers on duty.  The minimum post staffing should be:  two (2) jail officers posted at intake; one (1) jail officer posted in Master Control; two (2) jail officers – one each posted in the Pod Control Rooms; four (4) jail officers posted as floor security, two in the linear section and one (1) each in the pod area.

Jail officers should be available to provide immediate emergency back-up, provide regular health/welfare checks, conduct random cell inspections, and maintain proper jail security. All jail officers' posts should be maintained at all times.  These jail officers may assist other jail staff during certain situations but they should not be sent to court for security of inmates or sent on transportations outside the facility.

2.   An additional three (3) transport position should be developed in order to maintain adequate security within the Vigo County Jail.  On certain days it is

Vigo County Indiana Sheriff's Office Staffing Analysis

a struggle to handle scheduled transports to the Indiana department of Correction, other counties, other states and medical transports. It should be noted that several transports require that inmates be picked up in a county for court and returned to the originating county following court. In addition there are times when unexpected last minute calls for transports are received from the court which currently results in jail officers being removed from jail duties to assist with transports.

3.    A part-time mental health staff should be added to provide the necessary staff support and services to inmates with serious mental health issues including identification of emergent mental health care needs, screening and assessment, provisions of continuous care, discharge/transfer planning, dedicated rounds and oversight mechanisms. Inadequate staffing can have the predictable effect of compromising the jail's ability to screen and evaluate inmates with mental illness. No mental health professional is currently available in the jail, and as a result, the sheriff relies on a nurse and untrained staff to screen and evaluate inmates for mental illness. Using staff in such a fashion can lead to missed and inadequate diagnoses, inadequate assessments of inmates at risk of self-harm and suicide, and improper housing assignments. In addition, staffing shortages have prevented the Vigo County Jail from providing both unstructured and structured services to inmates with mental illness.

4.    Two (2) recreation staff should be hired to provide for inmate recreation. The recreation staff will provide security in the recreation rooms during the time inmates are present for recreation activities.

Conclusions

The operational guides of the organization contribute to determining the number of staff required to manage the jail and respond to inmate concerns. It is incumbent upon the Sheriff and Jail staff to insure that all inmates and staff are protected while at the same time hold inmates responsible for their actions. Inmates are to be returned to the

## Vigo County Indiana Sheriff's Office Staffing Analysis

community in no worse condition than they were in when they were committed to custody.

It is the legal obligations of the Sheriff and staff of the Vigo County Jail to provide a safe, sanitary, and secure facility that is consistent with Indiana Jail Standards (**210 IAC 3-1-1**), federal law, applicable guidelines, and relevant court rulings.

Jail officers need to be available on a continuous basis to observe and respond to inmate behavior, to resolve conflicts and to interact with all inmates especially those inmates who are quiet or isolated. In addition, jail officers need to be available to observe and assist with in-house activities, facilitate recreation and manage programs. Inmates should only be moved through the facility based on classification and with staff present. Jail officers need to be able to enter housing areas at any given time without delay. Under no circumstances should these jailers be assigned to transport or court details that will place them outside of the jail.

Observations of the present operations indicate there are not enough jail officers to adequately supervise inmates, initiate activities, or complete other required and legal duties.

In compliance with **210 IAC 3-1-14** Inmate Supervision:
Sec. 14 Supervision of Inmates (a) There shall be sufficient jail personnel present in the jail to provide adequate twenty-four hour supervision of inmates.
(1) A jail officer shall provide personal observation not including observation by a monitoring device, of each inmate at least once every sixty (60) minutes between the hours of 8:00 p.m. and 7:00 a.m. Such observation may be conducted on an irregular schedule but shall be documented.
(2) High risk, suicidal inmates shall be provided appropriate supervision consistent with that behavior.

Final Report 26

Vigo County Indiana Sheriff's Office Staffing Analysis

(b)  The sheriff shall establish written procedure for the supervision of female inmates by male staff and the supervision of male inmates by female staff. These procedures shall take into consideration the privacy rights and needs of inmates.

In addition, current Vigo County Jail staffing levels prevent the sheriff from:

- Adequately supervise inmates.  Not having a sufficient complement of staff assigned to important areas of the jail at all times.
- Ensuring that frequent, irregular timed, and documented security rounds by jail officers occur.
- Ensuring that staff adequately and promptly report incidents.
- Conducting regular inspections of cells and common areas to identify and prevent rule violation by inmates.
- Properly patrolling the jail
- Providing for the proper documentation of events occurring within the jail.
- Ensuring that frequent suicide and health watch checks of inmates under observation for risk are timely performed and appropriately documented.
- Affording inmates timely and adequate access to appropriately skilled mental health professionals.
- Ensuring that emergency drills are conducted on a regular basis.

Adequate staffing for the operation of the Vigo County Jail is dependent on having the correct number of posts appropriately staffed.  It is essential that enough personnel be available to insure that inmate supervision and control is maintained constantly and both the jail officers and inmates are afforded safe and secure conditions.

---

[i] http://quickfacts.census.gov/qfd/states/18/18167.html
[ii] http://quickfacts.census.gov/qdf/states.html

Final Report 27

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

JAUSTON HUERTA, *et al.*,                )
                                         )
        Plaintiffs,                      )
                                         )
            v.                           )     No. 2:16-cv-397-JMS-DKL
                                         )
GREG EWING, *et al.*,                    )
                                         )
        Defendants.                      )

### Notice of Deposition

To:     The Vigo County Commissioners

        Plaintiffs notify the defendants that the deposition of the Vigo County Commissioners will be taken pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, beginning at 11:30 a.m. on April 27, 2018, at the offices of Wilkinson, Goeller, Modesitt, Wilkinson & Drummy, LLP, 333 Ohio Street, Terre Haute, IN 47807.

        Pursuant to Rule 30(b)(6), the defendant Vigo County Commissioners are to designate one or more employees, agents, officers, or other persons to testify on its behalf at the deposition as to the following matters.

        1.      Whether the Vigo County Commissioners are of the opinion that a new, or expanded, Vigo County Jail needs to be constructed and, if so, why.

        2.      All steps that have been taken, or that will or may be taken, by the Vigo County Commissioners to address any:

                a.      Population pressures on the Vigo County Jail and, what are those pressures, if any.

                b.      Issues concerning staffing at the Vigo County Jail, and, what are those issues, if any.

                c.      Concerns about physical plant deficiencies of the Vigo County Jail, and, what are those concerns, if any.

        3.      How the current Vigo County Jail came to be constructed.



PLAINTIFF'S DEPOSITION
EXHIBIT
9
PENGAD 800-631-6989

[1]

4.      Whether the Vigo County Commissioners are of the opinion that the population of the Jail, its physical layout, staffing patterns and/or any other reason(s), have contributed to incidents of prisoner to prisoner or prisoner to staff violence. If so, why.

5.      Whether any current conditions at the Vigo County Jail contribute to any difficulty in prisoners obtaining medical care and, if so, what conditions and what problems are engendered.

6      All ways that the current population of the Jail, its physical layout, its structure, staffing patterns and/or any other conditions at the Jail negatively affect the Jail's ability to care for its prisoners and, if so, how.

7.      All efforts being made to build a new Vigo County Jail or to expand the existing facility.

8.      The recommendations of any consultants hired to evaluate the need for a new or expanded Vigo County Jail.

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, please produce at the deposition the following documents to the extent that they have not already been produced in this litigation or in *Hos v. Vigo Co. Sheriff*, No. 84D01-1308-PL-07173 (Vigo Sup. Ct.).

1.      Any and all documents that contain information about there not being room for prisoners to sleep on permanent beds in the Vigo County Jail since January 1, 2017.

2..      Any and all documents specifying recreation offered to prisoners in the Vigo County Jail since January 1, 2017.

3.      Any and all documents, created since January 1, 2016, that concern efforts that have been taken by the defendants, or that are planned or that may take place, to address the population of the Vigo County Jail.

4.      Any and all documents created by the Vigo County Sheriff, Commissioners, or Council, or created by others but in the possession of the Vigo County Commissioners that discuss the need, desire, plans, or hopes for a new or expanded Vigo County Jail facility or problems with the existing Vigo County Jail.

5.      Any and all documents that concern the need for increased staff at the Vigo County Jail.

[2]

6.      Any and all reports or other documents produced by consultants hired to evaluate the need for a new or expanded Vigo County Jail.

s/ Michael K. Sutherlin

Michael K. Sutherlin
No. 508-49
Michael K. Sutherlin and Associates
403 E. Wabash Ave.
Crawfordsville, IN 47933
317/634-6313
fax: 317/631-8818
msutherlin@gmail.com

Attorney for Plaintiffs and the Certified Class

s/ Kenneth J. Falk

Kenneth J. Falk
No. 6777-49
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059 ext. 104
fax: 317/635-4105
kfalk@aclu-in.org

Attorney for the Certified Class

**Certificate of Service**

I hereby certify that on this 23rd day of April 2018, a copy of the foregoing served on the below named persons both electronically and via first class U.S. postage, pre-paid.

Michael Wright
605 Ohio Street – Suite 312
Terre Haute, IN 47807
wrightlawfirm812@gmail.com

Craig M. McKee

[3]

David P. Friedrich
WILKINSON, GOELLER, MODESITT, WILKINSON
   & DRUMMY
333 Ohio St.
PO Box 800
Terre Haute, IN 47808
cmmckee@wilkinsonlaw.com
dpfriedrich@wilkinsonlaw.com

s/ Kenneth J. Falk
Kenneth J. Falk
Attorney at Law

[4]