UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| JAUSTON HUERTA, ET AL., | ) |
| Plaintiffs, | ) ) ) |
| vs. | ) No. 2:16-cv-00397-JMS-MJD ) |
| GREG EWING, ET AL., | ) ) |
| Defendants. | ) |

**ORDER**

This case is brought on behalf of past and present inmates at the Vigo County, Indiana Jail (the "Jail") who claim that the Jail is overcrowded, resulting in the violation of inmates' constitutional rights. Plaintiffs bring their lawsuit against Vigo County Sheriff Greg Ewing, the Vigo County Commissioners (the "Commissioners"), the Vigo County Council (the "Council"), and several individual Commissioners and members of the Council. The Court certified a class of Jail inmates from October 13, 2016 to the present, but did not certify a class with respect to any personal injury claims members of the class may have as a result of overcrowding at the Jail. [Filing No. 46.] Plaintiffs have moved for partial summary judgment on their declaratory and injunctive relief claims, leaving the damages claims of the named plaintiffs for trial. That motion is now fully briefed, and the Court held a hearing on the motion on September 21, 2018. The motion is now ripe for the Court's consideration.

This litigation is in a somewhat unusual posture. Plaintiffs present extensive facts in their brief in support of their Motion for Partial Summary Judgment to support their argument that conditions at the Jail result in violations of their constitutional rights. [Filing No. 119 at 2-18.] Defendants "concede the [Jail] does not meet constitutional standards because of overcrowding,

1

understaffing and inadequate space." [Filing No. 131 at 5.] The Court recognizes that Vigo County's challenges are shared by other Indiana counties already engaged in litigation over the status of their county jails. More litigation no doubt will follow, as the problem of jail overcrowding throughout Indiana is well known. Even this Court faces challenges because of county jail overcrowding and the reduction of available beds to house federal pre-trial detainees. That being said, the Court has a responsibility to ensure that conditions at the Jail are constitutional. To that end, the Court **GRANTS** Plaintiffs' Motion for Partial Summary Judgment and grants certain injunctive relief, as discussed below.

# I.
## STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

# II.
## STATEMENT OF FACTS

The following factual background is set forth pursuant to the standard discussed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005). Because, as noted above, Defendants concede that conditions at the Jail are unconstitutional, the Court's recitation of the facts need not be exhaustive and is provided more for background.

### A. The Jail's Capacity

The old part of the Jail, which is linear in structure (all cells are in a row opening into an area outside of the cells), contains 129 beds, and the new part of the Jail, which is not linear but has a control room that looks into multiple units, has 138 beds. [Filing No. 118-1 at 5-7; Filing No. 118-1 at 101.] The Jail has two individual cells for segregation, three individual isolation cells in the booking area for suicide observation, and two cells for sick inmates. [Filing No. 118-1 at 9; Filing No. 118-1 at 101.] The rest of the cells contain either two, four, six, or eight permanent beds. [Filing No. 118-1 at 9; Filing No. 118-1 at 101.]

Correctional experts recognize that a jail is overcrowded when it is above 80% capacity. [Filing No. 118-1 at 14; Filing No. 118-2 at 4.] Kenneth Whipker, Executive Liaison for Sheriff and County Jail Operations for the Indiana Department of Corrections ("IDOC"), explains:

> A jail is overcrowded long before it reaches its maximum capacity. That is because it is essential for the safety of prisoners and staff that a jail has sufficient space to classify prisoners. Obviously, there must be separate correctional space for male and female prisoners. But, there also has to be separate space to separate low-risk from high-risk prisoners as well as prisoners who need to be separated because of personal animosity or because they are co-defendants and the prosecution perceives a need to separate them. There are also certain offenses, *e.g.*, sex offenses against

children, where alleged perpetrators are subject to an increased risk of harm from other prisoners. The Jail must have the flexibility to be able to move prisoners from their initial placement if there are reasons to do so. Having sufficient room in a facility so that these sort of classification decisions can be made is absolutely necessary so that the jail can be operated without excessive risk of harm to prisoners and to the staff who supervise the prisoners.

[Filing No. 118-2 at 3-4.]

Sheriff Ewing agrees that when the Jail rises above 80% of its capacity, the Jail is not able to properly classify inmates so that all inmates and staff are kept safe. [Filing No. 118-1 at 18-19.] The Jail rises above its capacity at times, and it is always above 80% of its capacity. [Filing No. 118-1 at 19.]

### B. The Effects of House Bill 1006

In 2015, the Indiana General Assembly passed House Bill 1006, which provides (among other things) that individuals with a sentence of less than two years cannot be housed in IDOC facilities but must remain in county jails. At the time the bill was passed, it "raised concerns among many Indiana sheriffs who said that without any money, they would see a 20 percent increase in their jail populations." Kristine Guerra, *House passes $80 million criminal justice bill*, INDIANAPOLIS STAR, February 23, 2015. Although unclear exactly how many inmates are now housed in county jails instead of in IDOC facilities due to House Bill 1006, it was estimated in 2015 that "of the 14,000 people who were sent to [IDOC] last year, about half" would now be housed in county jails pursuant to House Bill 1006. *Id.*

Today, the effects of House Bill 1006 are apparent. The Indiana Business Journal reported on the increase in county inmates just a few days ago:

> Taxpayers in dozens of Indiana counties will be paying for new jail beds years after sweeping state criminal code changes began sending more low-level offenders into local jails instead of state prisons.

5

> At least 40 jails in Indiana are over capacity…. A recent state survey found that almost half of all jail inmates are Level 6 felons, the lowest-level felons.
>
> The state pays jails $35 daily for each of those inmates to cover food and staffing, but the money doesn't pay for additional jail space. Dozens of Indiana's 92 counties are studying, actively pursuing or developing expansion plans, or are in the midst of building new facilities.
>
> Huntington County Sheriff Terry Stoffel said he's frustrated state lawmakers have passed on the expense of holding such offenders to local governments.
>
> "Indiana is so great at saying 'we are so flush with money' and just passed it on to us," he said.
>
> The Huntington County Jail was built for 98 beds but recently was holding 156 inmates. Of those, 57 were Level 6 felons.

*Many Indiana counties face jail crowding after inmate shift*, INDIANA BUSINESS JOURNAL, October 7, 2018.

### C. Increases in the Jail's Population

The Jail population has increased due to several factors, including House Bill 1006, a higher number of female inmates, and the opioid crisis. [Filing No. 118-1 at 23.] Due to the constant overcrowding, the Jail attempts to engage in rudimentary classification of inmates: keeping women separate from men, keeping extremely violent prisoners from being placed with ones who are not, and placing prisoners with disability issues together where they can hopefully be observed. [Filing No. 118-1 at 24-26.] Rudimentary classification results in prisoners being assigned to blocks where they do not have a permanent bed, and they are given a mattress and thin plastic liner within which to place their mattress on the floor. [Filing No. 118-1 at 26.] Each day, there are multiple prisoners on the floor throughout the Jail. [Filing No. 118-1 at 27.]

### D. Staffing at the Jail

In 2013, Bill Wilson of the Indiana State Sheriff's Association performed a staffing analysis of the Jail. [Filing No. 118-1 at 107-37.] He concluded that the Jail needed 66.5 staff

6

members, and it only had 40 at the time. [Filing No. 118-1 at 33.] Sheriff Ewing agrees that Mr. Wilson's conclusions in 2013 regarding staffing hold true today. [Filing No. 118-1 at 9-22.] Currently, the Jail has 45 full time staff members and 6 part-time staff members. [Filing No. 118-1 at 33-34.] Sheriff Ewing also agrees with Mr. Wilson's conclusions that a lack of staffing contributes to deficiencies in controlling inmate behavior, managing inmate visitation, documenting jail events, releasing inmates in a timely manner, administering objective classification, providing inmate protection, providing routine jail checks, staff training, inmate observation, evacuation drills, handling emergency back-up, regulating inmate movement, performing random unannounced inspections, inmate contraband control, key and tool control, providing adequate back-up for staff, completing required documentation, and providing inmate recreation. [Filing No. 118-1 at 37-38.]

As for recreation, Sheriff Ewing agrees that there is a direct correlation between recreation and prisoners not getting into fights. [Filing No. 118-1 at 43.] Mr. Whipker opined that a minimum of one hour of recreation needs to be offered daily. [Filing No. 118-2 at 7.] Because of overcrowding, understaffing, and the physical structure of the Jail, many prisoners do not get to participate in regular recreation. [Filing No. 118-1 at 42.]

**E. Physical Issues With the Jail Facility**

There are many physical issues with the Jail, which Defendants do not dispute, including: (1) the HVAC system, which is old and constantly in need of repair, [Filing No. 118-8 at 10]; (2) toilets and showers that are in need of repairs, [Filing No. 118-8 at 11]; (3) an insufficient number of toilets and showers, [Filing No. 118-2 at 7]; (4) inadequate lighting, [Filing No. 118-2 at 7]; (5) substandard air flow, [Filing No. 118-2 at 7]; (6) dirty air vents, [Filing No. 118-6 at 2]; (7) a leaky roof, which results in wet floors, [Filing No. 118-6 at 2]; (8) the existence of black mold, [Filing

7

No. 118-6 at 2]; and (9) a kitchen that is inadequate to serve the needs of the Jail population, [Filing No. 118-1 at 49-50].

### F. Negative Effects of Overcrowding on Inmates

Plaintiffs present numerous examples of the effects of overcrowding, lack of staff, lack of recreation, and the Jail's physical structure on prisoners. These examples include: (1) prisoners being injured while sleeping on the floor by other inmates who jump off the upper bunk, [Filing No. 118-4 at 18-19]; (2) increased tension between prisoners due to overcrowding, and fights going unnoticed by staff, [Filing No. 118-2 at 8 (Mr. Whipker stating "the inability to properly supervise prisoners, combined with the tensions caused by the overcrowding, means that violence between the prisoners is a constant possibility and if this occurs, it will be difficult[ ] for the Jail staff to immediately respond"); Filing No. 118-5 at 2]; (3) endangering inmates because of the difficulty in providing attention to prisoners who need medical or similar treatment due to an emergency, [Filing No. 118-6 at 2]; (4) placing prisoners with other prisoners with whom they should not be placed, [Filing No. 118-1 at 10-12]; and (5) not being able to safely evacuate all prisoners in the event of a fire or other emergency, [Filing No. 118-2 at 7-8].

### G. Previous Litigation Relating to Overcrowding at the Jail

In 2000, the Vigo County Sheriff and the Commissioners were sued for injunctive and declaratory relief in a class action related to conditions at the Jail. *Acosta v. Harris*, No. TH 00-081-C Y/H. The parties ultimately entered into a private settlement agreement that capped the population at the Jail at 268 and required that prisoners receive at least three hours of recreation a week outside of their immediate cell areas. [Filing No. 43-1.] The Jail has not been able to comply with either requirement. [Filing No. 118-1 at 40-41.]

### H. Defendants' Efforts to Address Overcrowding

*1. Reducing the Inmate Population*

Every day, Vigo County sends up to 50 prisoners to other Indiana jails for temporary housing at $35 a day per prisoner (not including the costs of transporting the prisoners), but Vigo County does not have places reserved at these other jails and must look for spaces every day. [Filing No. 118-1 at 20-21; Filing No. 118-1 at 103-06.] The annual cost to Vigo County to house inmates in other counties is approximately $1 million. [Filing No. 131-1 at 7; Filing No. 131-2 at 1.]

Law enforcement has suspended the incarceration of non-violent offenders on arrest warrants in an effort to reduce the population at the Jail. [Filing No. 118-1 at 93.] The Council also appropriated $200,000 to the public defender's office to transfer indigent pre-trial detainees to the Community Corrections program. [Filing No. 131-1 at 10.] These indigent offenders are given 30 days to obtain employment, and those who have jobs reside at the Work Release Center and avoid incarceration. [Filing No. 131-1 at 10-11.] The Council also approved funding for additional Court staff so cases can be processed more quickly and the time for pre-trial detention will be decreased. [Filing No. 131-1 at 10.] The Council also funded a Drug Court in 2017 after eliminating it from the budget a year earlier. [Filing No. 131-1 at 10.]

*2. Maintaining the Jail*

The HVAC system at the Jail was replaced in 2017 at a cost of $500,000. [Filing No. 118-8 at 9-10; Filing No. 131-1 at 9.] The Council appropriated an additional $500,000 to replace the roof on the Jail. [Filing No. 118-8 at 47; Filing No. 131-1 at 9.]

### 3. *Staffing the Jail*

The Council appropriated funds for Sheriff Ewing to hire part-time employees in response to Jail overcrowding and inadequate staffing. [Filing No. 118-1 at 33-34.] The funds allow for the hiring of six additional employees. [Filing No. 118-1 at 34.]

### 4. *Building a New Jail*

Sheriff Ewing believes that a new jail must be built to solve the issues discussed above. [Filing No. 118-1 at 60.] The Commissioners agree. [Filing No. 118-8 at 13-14.] The Council acknowledges that the Jail is in an advanced state of deterioration, there are overpopulation pressures on the Jail, staff and prisoner safety is threatened by the current conditions at the Jail, and a new jail is needed to solve these problems. [Filing No. 118-3 at 3-4.] The Commissioners hired Garmong Construction Services ("Garmong") to prepare a feasibility study and act as the construction manager for building a new jail, and DLZ Architect Engineers ("DLZ"), a firm specializing in prison architecture and design. [Filing No. 131-2 at 1.] A project team consisting of Garmong, DLZ, Sheriff Ewing, and the Commissioners have discussed design, location, and funding options for a new jail and conducted a series of workshops from October to November 2016. [Filing No. 130-2 at 4.] DLZ presented its preliminary design package to the Commissioners on December 6, 2016 and to the Council on December 13, 2016. [Filing No. 130-2 at 1.] The DLZ design included 534 inmate beds with additional space for the Sheriff's office, employee area, video visitation, intake/booking, medical, laundry, food service program area, and indoor/outdoor activity. [Filing No. 130-2 at 3.]

The Council is Vigo County's fiscal body, and funding of a new jail is the Council's responsibility. [Filing No. 131-1 at 4-5.] The Council's role is to implement a funding mechanism, and a jail could be funded through property taxes and a referendum or a local option income tax

("LOIT"). [Filing No. 131-1 at 18.] The LOIT is the most likely funding source for a new jail. [Filing No. 131-1 at 18.] In 2017, the Commissioners proposed an ordinance which included a LOIT increase, but the ordinance was withdrawn because of a drafting defect and due to public opposition. [Filing No. 118-8 at 14; Filing No. 131-1 at 17; Filing No. 131-2 at 1.] The Council requested an independent needs assessment be performed to ensure a new jail was required, and made it clear that no action on the funding of a new jail would be taken until the needs assessment was completed. [Filing No. 118-8 at 16; Filing No. 131-1 at 14.]

The Commissioners hired RJS Justice Services ("RJS") to perform the needs assessment. [Filing No. 118-8 at 15.] RJS issued the feasibility study on July 21, 2018. [Filing No. 130-4.] RJS agreed that a new jail is needed due to overcrowding, design issues, and failing structures and systems at the Jail. [Filing No. 130-4 at 18.] The RJS assessment also found that it was not economical, operationally feasible, or responsible to expand or renovate the existing Jail, and recommended constructing a new jail. [Filing No. 130-4 at 8-9.] RJS concluded that a new jail with 527 beds would be adequate to meet Vigo County's needs to 2050, would allow Vigo County to operate within the facility's operating capacity, and would eliminate the need for tax dollars to house inmates in neighboring counties. [Filing No. 130-4 at 9.] The RJS assessment also analyzed a number of Vigo County's Alternatives to Incarceration ("ATI"), including pre-trial diversion, the Psychiatric Assertive Identification and Referral ("PAIR") Program, the Adult Mental Health ("AMH") Court, the Drug/Operating a Vehicle While Intoxicated ("OVWI") Court, and the Veterans Treatment Court. [Filing No. 130-4 at 31-33.] Finally, RJS analyzed Vigo County's Community Corrections Programs, including community resource utilization, work release, home detention, community service restitution, expanded pre-trial release programming, and behavioral health diversion facilities. [Filing No. 130-4 at 33-36.] RJS acknowledged that Vigo County is

11

working through numerous programs to keep individuals with mental health and/or addiction issues out of jail while maintaining employment. [Filing No. 130-4 at 37-38.]

Earlier this year, the Commissioners proposed an ordinance raising Vigo County's LOIT by .75%. [Filing No. 131-2 at 1.] The ordinance would increase the County's LOIT to 2.0% effective January 1, 2019. [Filing No. 131-2 at 2.] The ordinance was approved by the Council on August 14, 2018, and the LOIT increase includes a .25% special purpose tax to construct a new jail which will terminate in 20 years, a .20% tax for new correctional and rehabilitation services which will also terminate in 20 years, a .1% public safety tax to fund jail operations and staff, and a .1% public safety rate for 911 dispatch. [Filing No. 131-2 at 2.] DLZ estimates the cost of a new jail at over $66 million. [Filing No. 130-2 at 5-7.] The Commissioner's financial consultant advises that increasing the LOIT by .75% will allow Vigo County to build a 527-bed facility as well as satisfy the debt service for the bonds that will be issued to fund construction of a new jail. [Filing No. 131-2 at 2.]

### I. The Lawsuit

Plaintiffs initiated this action on October 13, 2016, [Filing No. 1], and filed the operative Amended Complaint on November 22, 2016, [Filing No. 14]. Plaintiffs assert claims for due process violations under the Eighth and Fourteenth Amendments to the United States Constitution. [Filing No. 14 at 15-16.] They seek an injunction prohibiting Defendants from continuing to deprive them of their constitutional rights, a mandate that the Commissioners and the Council "appropriate sufficient funds to repair the present Jail or in the alternative, to mandate the Vigo County Commissioners, and County Council members, to alleviate the present conditions in the Jail or construct a new jail in conformity with recommendations to be made by the Indiana Department of Corrections," and damages. [Filing No. 14 at 16-17.]

On May 19, 2017, the Court certified – only for the purposes of declaratory and injunctive relief, and not for any personal injury claims – a class of "[a]ll inmates in the care and custody of Vigo County, Indiana from October 13, 2016 to the present, including the current and future inmates who are or will be incarcerated in the Vigo County Jail and all current and future individuals who were transported to other county jails as a result of the overcrowding in the Vigo County Jail." [Filing No. 46 at 5.] By agreement of the parties, the Court subsequently revised the class definition to "any and all persons currently confined, or who will in the future be confined, in the Vigo County Jail." [Filing No. 145 at 3.] Plaintiffs now move for partial summary judgment on only their declaratory and injunctive relief claims. [Filing No. 118.]

## III.
### DISCUSSION

As noted above, this case is in an unusual posture. In their response brief, Defendants concede that the Jail "does not meet constitutional standards because of overcrowding, understaffing and inadequate space." [Filing No. 131 at 5.] Defendants had no choice but to so concede, as the undisputed facts establish the constitutional violations. Accordingly, the Court finds that Defendants have violated the Eighth and Fourteenth Amendments due to overcrowding, understaffing, and inadequate space at the Jail.

The only issue that remains is what type of declaratory and injunctive relief the Court may afford to Plaintiffs for Defendants' constitutional violations. The Court first sets forth the applicable law that shapes the relief it may provide, and then discusses that relief.

**A. Applicable Law**

The Prison Litigation Reform Act ("PLRA") sets forth the parameters within which a court may grant injunctive relief in the corrections context. *Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012). The PLRA reflects the principle that "prison officials have broad administrative and

discretionary authority over the institutions they manage." *Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *see also Westefer*, 682 F.3d at 683 (the PLRA "enforces a point repeatedly made by the Supreme Court in cases challenging prison conditions: prison officials have broad administrative and discretionary authority over the institutions they manage") (internal quotation marks and citation omitted).

Specifically, the PLRA provides that:

(A) Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

\* \* \*

(C) Nothing in this section shall be construed to authorize the courts, in exercising their remedial powers, to order the construction of prisons or the raising of taxes, or to repeal or detract from otherwise applicable limitations on the remedial powers of the courts.

18 U.S.C. § 3626.

To the extent any prospective relief includes a requirement that the prison capacity be kept at a certain number, courts have construed this as a population reduction order equivalent to a prisoner release order, which is subject to the PLRA's limitations. *See, e.g.*, *Coleman v. Brown*, 952 F.Supp.2d 901, 906 (E.D. Cal. 2013) (reiterating earlier order explaining that "a population reduction order is a 'prisoner release order,' as defined by the PLRA"). Specifically, the PLRA provides that:

(3)(A) In any civil action with respect to prison conditions, no court shall enter a prisoner release order unless –

14

(i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and

(ii) the defendant has had a reasonable amount of time to comply with the previous court orders.

(B) In any civil action in Federal court with respect to prison conditions, a prisoner release order shall be entered only by a three-judge court in accordance with section 2284 of title 28, if the requirements of subparagraph (E) have been met.

18 U.S.C. § 3626(a)(3)(A)-(B). So, to the extent a plaintiff seeks prospective relief capping a prison's capacity, that relief can only be provided by a three-judge panel, which can only be convened if a court has previously entered an order for less intrusive relief, and the defendant has had a reasonable time to comply with the previous court order and has not done so. *See Brown v. Plata*, 563 U.S. 493, 512 (2011).

### B. The Parties' Positions

Plaintiffs seek a declaration that Defendants are violating their Eighth and Fourteenth Amendment rights due to the conditions at the Jail. [Filing No. 119 at 29.] Plaintiffs acknowledge that the PLRA prevents the Court from ordering Defendants to build a new jail, or to cap the capacity of the Jail at 80% of the maximum capacity – at least at this stage of the litigation. [Filing No. 119 at 30.] Because of the constraints the PLRA places on the Court, Plaintiffs request that:

- The Court "order the Sheriff, the President of the Vigo County Commissioners and the President of the Vigo County Council to appear personally before the Court on dates set by the Court, approximately 30 days apart, to report on the progress in finalizing plans for a new Vigo County Jail or any alternate plans to achieve a permanent resolution of the Jail's constitutional deficiencies";

- In the event plans are finalized, the Court "order the parties to file a schedule with the Court establishing relevant benchmark dates leading to the opening of the new Jail"; and

- "[O]rder the County, within thirty days from the grant of partial summary judgment, to file its plan to minimize unconstitutional conditions in the Jail until a new facility is constructed, assuming that the County determines to construct a new facility," and "[t]he prisoners should be given thirty days to respond to

15

> this proposal with the Court thereafter issuing, if necessary, further injunctive relief."

[Filing No. 119 at 31.] Plaintiffs request that the Court retain jurisdiction over this matter, even after the damages actions are resolved, which would "end once a new facility is opened and there is agreement that constitutional requirements are satisfied." [Filing No. 119 at 31.]

Defendants do not respond specifically to Plaintiffs' requested relief, other than to state that "[a]s proposed by plaintiffs' counsel, the Commissioners and members of the County Council will appear before the Court at regular intervals to provide updates on the location, design and construction of a new Vigo County Jail." [Filing No. 131 at 14-15.]

### C. Appropriate Relief

The Court notes at the outset that, as Plaintiffs concede, it is not able to order that Defendants keep the Jail at 80% of its capacity, nor can it order Defendants to comply with the portion of the *Acosta* Settlement Agreement that requires Defendants to maintain capacity at the Jail that does not exceed 268 inmates. As discussed above, this would be considered a prisoner release order under the PLRA, which the Court may not issue at this stage of the litigation – *i.e.*, absent the requirements for the appointment of a three-judge panel being met, and absent an order from a three-judge panel. *Plata*, 563 U.S. at 512; *Coleman*, 952 F.Supp.2d at 906; 18 U.S.C. § 3626(a)(3)(A)-(B).

All parties – and the Court – agree that building a new jail is the only way to alleviate the violation of Plaintiffs' constitutional rights in the long term. The Court recognizes that the size, location, and scope of remodeled or newly constructed county jails inevitably stirs up local controversy and resistance. Significantly, the issues at the Jail are not new, and the failure to solve these issues spawns a number of collateral expenses that the public may not consider, including increased costs of supervision and health care for inmates, costs of transportation to other counties,

16

the demand for attorneys' fees from the class, and the prospect of serial litigation. Vigo County's tax dollars would be best spent on a long-term solution to unconstitutional conditions at the Jail, rather than on these collateral expenses.

The Court also notes that a significant percentage of the Jail's population is pre-trial detainees – individuals charged with a crime but not subject to punishment unless and until their pending cases result in a conviction. The Court is mindful that the conditions at the Jail are particularly harsh on these individuals, who have not yet been convicted of a crime.

While the Court is not a party to public controversy in Vigo County, it does have a clear role in adjudicating the management and future of a county jail that it has found to be unconstitutional. To that end, and having found that the conditions at the Jail violate both the Eighth and Fourteenth Amendments to the United States Constitution, the Court finds that it is appropriate and necessary to enter permanent injunctive relief consistent with the requirements imposed by § 3626(a)(1) of the PLRA. In doing so, the Court is cognizant of the fact that Defendants have stated that it is their intent to construct a new jail. The below enumerated injunctive relief is predicated on Defendants abiding by their expressed statements that they will be building a new jail. In the event that Defendants do not follow through on their assurances that a new jail will be built, the Court, on motion from Plaintiffs or on its own motion, reserves the right to provide additional or alternative relief. The Court also notes that although, as set out below, reporting requirements are being imposed on Defendants, Plaintiffs' counsel, as counsel for the certified class in this case, are expected to continue to monitor conditions at the Jail and shall have the right, as they deem fit, to petition the Court for further relief.

The Court therefore sets out the following injunctive relief, which addresses both the long-term solution of constructing a new jail and the short-term solution of attempting to ameliorate

unconstitutional conditions at the current Jail during the pendency of the construction. The Court finds that the injunctive relief enumerated below is narrowly drawn and extends no further than necessary to correct the violation of the federal rights here and is the least intrusive means necessary to correct the violation of the federal rights. The Court **ORDERS** as follows:[1]

1. In order to ensure that Defendants remedy the ongoing constitutional violations at the Jail as quickly as possible, the parties are **ORDERED** to periodically appear before this Court to report as to steps being taken to address these violations. Unless otherwise ordered by this Court, the parties who must report on the dates ordered are the Vigo County Sheriff, the President of the Vigo County Council, the President of the Vigo County Commissioners, and any other individuals who possess information necessary to provide a complete report to the Court as discussed below. The first such report will take place at a hearing on **November 13, 2018 at 1:00 p.m.** in Room 131 of the United States Courthouse, 921 Ohio Street, Terre Haute, Indiana. Future hearings will be set by order of this Court.

2. Pending the opening of the new jail, Defendants are **ORDERED** to commit sufficient staff and take all other steps necessary to insure that all prisoners are offered, at a minimum, at least three hours a week of recreation outside of their cell areas and are further **ORDERED** to commit sufficient staff to make sure that the health and safety of prisoners is safeguarded.

3. At least **seven days prior to the November 13, 2018 hearing**, Defendants are **ORDERED** to file a report with the Court specifying: (a) the number of staff necessary to comply with the injunctive relief set out in the immediately preceding paragraph; (b) how the number noted was determined; (c) how the additional staff will be added; and (d) when the new staff will be added. The Court views this additional staff as a priority and a necessity to try to minimize the most egregious of the unconstitutional conditions existing in the Jail and therefore the Court anticipates that the new staff will be added in the immediate future, without delay.

4. At least **seven days prior to the November 13, 2018 hearing**, Defendants are **ORDERED** to submit a plan to this Court, in writing, detailing the anticipated dates that relevant construction benchmarks will be met, concluding with the opening of the new jail. Additionally, Defendants are **ORDERED** to submit to this Court relevant information including, among other things, the population capacity of the new jail and the staffing numbers that will be necessary in the

---

[1] In a September 24, 2018 Order, the Court set forth a deadline of October 15, 2018 for the parties to file various reports with the Court. [Filing No. 145.] The Court **VACATES** the October 15, 2018 deadline and sets forth new deadlines below.

new jail. These reports shall include any and all documents submitted by architects, contractors, or other relevant persons that detail these dates, population capacity, and staffing numbers. Defendants are **ORDERED** to file supplements to these reports at least **seven days** prior to all future hearings scheduled by this Court until such time as this Court orders otherwise.

The Court has determined that the above injunctive relief represents the least intrusive relief available to attempt to remedy the ongoing constitutional violations that have existed and continue to exist at the Jail, and in the event that they are not successful in remedying the violations Plaintiffs have the right to seek further relief, including a prisoner release order pursuant to 18 U.S.C. § 3626(a)(3).

Additionally, the Court finds that Plaintiffs are the prevailing parties on their Motion for Partial Summary Judgment. Even though final judgment in this matter will not enter at this time, as the individual damages claims of the named Plaintiffs remain to be resolved, Plaintiffs are entitled to attorneys' fees pursuant to 42 U.S.C. § 1988. *See, e.g.*, *Hanrahan v. Hampton*, 446 U.S. 754, 758 (1980) ("Congress intended to permit the interim award of counsel fees only when a party has prevailed on the merits of at least some of his claims"); *Richardson v. Penfold*, 900 F.2d 116, 119 (7th Cir. 1990) ("Once a plaintiff obtains substantive relief that is not defeasible by further proceedings, he can seek interim fees and the district court has the power to award them"); *see also Dupuy v. Samuels*, 423 F.3d 714, 719 (7th Cir. 2005) (citing *Hanrahan* and *Penfold*). Plaintiffs shall have **thirty days** from the date of this Order to file their petition for attorneys' fees and costs.

## IV.
### CONCLUSION

This litigation has been pending just a few days short of two years, and the issue of overcrowding has been in litigation for nearly a decade. The Court is mindful that the Indiana General Assembly compounded an already existing problem with the passage of House Bill 1006.

19

Nevertheless, until the recent passage of the LOIT ordinance, there had been minimal progress toward alleviating the unconstitutional conditions at the Jail. Defendants – and those who may succeed them on January 1 – should understand that the Court's forbearance in the injunctive relief it has crafted is in express reliance on the passage of the ordinance and the stated intention to fund a new constitutionally adequate jail. The Court will continue in its restraint as long as the responsible elected officials, Defendants, perform their constitutional duty. But the time for a solution is now, not when financial circumstances have improved or until all of Vigo County's citizens agree on the size and location of a new jail. Public officials are accountable to the citizens, but they also are accountable to an oath sworn to uphold the Constitution regardless of dissent or dispute from the public. The objective now is to make demonstrable progress toward a solution, without further delay. Delay risks the establishment of a three-judge panel and even more draconian outcomes such as mandated reduction in jail population or, at the extreme, closure of the Jail. Surely no public official desires such an outcome. The Court remains confident that Vigo County can solve this problem. But, if it fails to do so, the Court will do what the law permits to solve the problem for Vigo County.

The Court **GRANTS** Plaintiffs' Motion for Partial Summary Judgment, [118], as set forth above.

Date: 10/10/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**